**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, SAVE RGV, THE CARRIZO/COMECRUDO NATION OF TEXAS, INC., and SOUTH TEXAS ENVIRONMENTAL JUSTICE NETWORK,<br>Plaintiffs,<br><br>v.<br><br>BRIAN NESVIK, in his official capacity, and UNITED STATES FISH AND WILDLIFE SERVICE,<br>Defendants,<br><br>and<br><br>SPACE EXPLORATION TECHNOLOGIES CORP.,<br>Defendant-Intervenor. | Civil Action No. 1:26-cv-0831<br>(Transferred from D.D.C. No. 1:26-cv-02053-JDB) |

**SPACE EXPLORATION TECHNOLOGIES CORP.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**


**I. INTRODUCTION .......... 1**

**II. FACTUAL BACKGROUND .......... 3**

A. SpaceX and its Starbase operations .......... 3

B. The proposed land exchange .......... 4

C. The Service's environmental, historic-preservation, and final review .......... 6

D. SpaceX's plans .......... 8

E. Procedural history .......... 9

**III. STANDARD OF REVIEW .......... 9**

**IV. ARGUMENT .......... 10**

A. Plaintiffs fail to show a likelihood of success on the merits. .......... 10

1. Because Plaintiffs fail to show Article III standing, they cannot succeed on the merits of their claims. .......... 10

2. The Service complied with the NHPA. .......... 15

a. Plaintiffs' NHPA Section 111 claim fails. .......... 15

b. Plaintiffs waived Sections 106 and 110(f) as grounds for preliminary relief, and both theories fail. .......... 21

3. The exchange complies with the Refuge Act. .......... 26

a. The decision whether to enter into this land exchange is committed to the Service's discretion. .......... 26

b. The Service reasonably found that the exchange furthers the LRGV Refuge's purposes and yields a net conservation benefit. .......... 28

c. The exchange is consistent with the 1997 Plan. .......... 31

4. Plaintiffs' Section 706(1) claim fails as a matter of law and cannot support a request to enjoin the exchange. .......... 32

5. The Service complied with NEPA. .......... 35

B. Plaintiffs have not shown imminent, irreparable harm absent an injunction. .......... 37

C. The balance of equities and the public interest strongly disfavor an injunction. .......... 39

D. If an injunction issues, Plaintiffs should be required to post adequate security .......... 42

**V. CONCLUSION .......... 42**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AbbVie, Inc. v. Fitch*,
152 F.4th 635 (5th Cir. 2025) ....................39

*Allied Home Mortg. Corp. v. Donovan*,
830 F. Supp. 2d 223 (S.D. Tex. 2011) ....................9

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987)....................37

*Audubon Soc'y of Portland v. Haaland*,
40 F.4th 967 (9th Cir. 2022) ....................31

*Ayala Chapa v. Bondi*,
132 F.4th 796 (5th Cir. 2025) ....................17

*Barber v. Bryant*,
860 F.3d 345 (5th Cir. 2017) ....................11

*Bell v. Redflex Traffic Sys., Inc.*,
374 F. App'x 518 (5th Cir. 2010) ....................13

*Biden v. Texas*,
597 U.S. 785 (2022)....................16, 17, 19

*Butts v. Aultman*,
953 F.3d 353 (5th Cir. 2020) ....................10

*Christian Legal Soc'y Chapter of Univ. of Cal. v. Wu*,
626 F.3d 483 (9th Cir. 2010) ....................22

*Citizens for Clean Air & Clean Water in Brazoria Cnty. v. U.S. Dep't of Transp.*,
98 F.4th 178 (5th Cir. 2024) ....................35

*City of Dallas v. Hall*,
562 F.3d 712 (5th Cir. 2009) ....................35

*Clarke v. Commodity Futures Trading Comm'n*,
74 F.4th 627 (5th Cir. 2023) ....................10

*Coliseum Square Ass'n, Inc. v. Jackson*,
465 F.3d 215 (5th Cir. 2006) ....................23, 25

*Ctr. for Biological Diversity v. Burgum*,
826 F. Supp. 3d 18 (D.D.C. 2026)....................33

*Ctr. for Biological Diversity v. U.S. Dep't of Transp.*,
180 F.4th 796 (5th Cir. 2026)....................12, 15

*Ctr. for Biological Diversity v. U.S. EPA*,
937 F.3d 533 (5th Cir. 2019)....................15

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
900 F. Supp. 2d 1151 (D. Nev. 2012), *aff'd*, 807 F.3d 1031 (9th Cir. 2015)....................37

*Ctr. for Food Safety v. Jewell*,
83 F. Supp. 3d 126 (D.D.C. 2015)....................33, 35

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
710 F.3d 579 (5th Cir. 2013)....................37, 38

*Dep't of Commerce v. New York*,
588 U.S. 752 (2019)....................31

*Env't Def. Fund v. FERC*,
2 F.4th 953 (5th Cir. 2021)....................14, 38

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021)....................26

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)....................10, 11, 13, 14

*Fort Bend Cnty. v. U.S. Army Corps of Eng'rs*,
59 F.4th 180 (5th Cir. 2023)....................33, 34

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000)....................11

*Gas Transmission Nw., L.L.C. v. FERC*,
157 F.4th 674 (5th Cir. 2025)....................36

*Greenbaum v. Islamic Rep. of Iran*,
67 F.4th 428 (D.C. Cir. 2023)....................19

*Heckler v. Chaney*,
470 U.S. 821 (1985)....................26, 28

*Jama v. Immigr. & Customs Enf't*,
543 U.S. 335 (2005)....................16

*Kaepa, Inc. v. Achilles Corp.*,
76 F.3d 624 (5th Cir. 1996) ....................42

*La. Crawfish Producers Ass'n–W. v. Rowan*,
463 F.3d 352 (5th Cir. 2006) ....................37

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)....................20

*Mazher v. Rubio*,
No. 25-CV-017-P, 2025 WL 2471789 (N.D. Tex. Aug. 11, 2025) ....................34

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) (per curiam)....................22

*Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*,
602 F.3d 687 (5th Cir. 2010) ....................10, 29, 31

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....................10

*N. Cal. River Watch v. Wilcox*,
633 F.3d 766 (9th Cir. 2011) ....................28

*Nat'l Post Off. Collaborate v. Donahoe*,
No. 13CV1406, 2014 WL 6686691 (D. Conn. Nov. 26, 2014)....................17

*Nat'l Tr. for Historic Pres. v. Blanck*,
938 F. Supp. 908 (D.D.C. 1996), *aff'd*, 203 F.3d 53 (D.C. Cir. 1999)....................23

*Nat'l Wildlife Refuge Ass'n v. Rural Utils. Serv.*,
No. 24-139, 2025 WL 2719976 (W.D. Wis. Sept. 24, 2025) ....................28, 29, 32

*Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*,
463 F.3d 50 (1st Cir. 2006)....................23

*Norton v. S. Utah Wilderness All.* (*SUWA*),
542 U.S. 55 (2004)....................34

*Presidio Hist. Ass'n v. Presidio Tr.*,
811 F.3d 1154 (9th Cir. 2016) ....................23

*Qorane v. Barr*,
919 F.3d 904 (5th Cir. 2019) ....................26

*Russello v. United States*,
464 U.S. 16 (1983)....................18

*Save RGV v. SpaceX*,
No. 24-CV-00148, 2024 WL 5357188 (S.D. Tex. Nov. 21, 2024) ........................................42

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025)..................................................................................10, 36, 37

*Sierra Club v. Hickel*,
467 F.2d 1048 (6th Cir. 1972) ..........................................................................27

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)..............................................................................................13

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009)........................................................................................11, 13

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of the Interior*,
608 F.3d 592 (9th Cir. 2010) ..............................................................................36

*Texas v. U.S. EPA*,
137 F.4th 353 (5th Cir. 2025) ..............................................................................20

*Town of Superior v. U.S. Fish & Wildlife Serv.*,
913 F. Supp. 2d 1087 (D. Colo. 2012)...................................................................28

*United States v. Abbott*,
110 F.4th 700 (5th Cir. 2024) (en banc) ..........................................................9, 10

*United States v. Holy Land Found. for Relief & Dev.*,
722 F.3d 677 (5th Cir. 2013) ..............................................................................19

*United States v. Scroggins*,
599 F.3d 433 (5th Cir. 2010) ..............................................................................21

*Vapor Tech. Ass'n v. Graham*,
167 F.4th 302 (5th Cir. 2026) ..............................................................................10

*Vieux Carré Prop. Owners, Residents & Assocs., Inc. v. Pierce*,
719 F.2d 1272 (5th Cir. 1983) ......................................................................23, 25

*WaterLegacy v. USDA Forest Serv.*,
2019 WL 4757663 (D. Minn. Sep. 30, 2019) .......................................................11

*Webster v. Doe*,
486 U.S. 592 (1988)..............................................................................................27

*WildEarth Guardians v. U.S. Fish & Wildlife Serv.*,
784 F.3d 677 (10th Cir. 2015) ..............................................................................28

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ..... 37

**Federal Statutes**

5 U.S.C.
§ 701 ..... 26
§ 706 ..... *passim*

16 U.S.C.
§ 668dd ..... *passim*
§ 668ee ..... 27

28 U.S.C.
§ 2401 ..... 33

42 U.S.C.
§ 4332 ..... 35

43 U.S.C.
§ 1716 ..... 27

54 U.S.C.
§ 304101 ..... 20
§ 304102 ..... 20
§ 306107 ..... 21
§ 306108 ..... 21, 22, 23
§ 306121 ..... *passim*

**Other Authorities**

36 C.F.R. § 800.6 ..... 21, 22, 23

36 C.F.R. § 800.10 ..... 23

36 C.F.R. § 800.14 ..... 25

50 C.F.R. § 25.21 ..... 4, 12

Fed. R. Civ. P. 65(c) ..... 42

H.R. Rep. No. 96-1457 (1980) ..... 18

## I. INTRODUCTION

SpaceX's mission is to build the systems and technologies necessary to make life multiplanetary. To that end, more than a decade ago, SpaceX began developing land near Boca Chica, Texas. That site became Starbase—SpaceX's global headquarters and the home of Starship, a fully and rapidly reusable, super-heavy-lift launch system designed to carry crew and cargo to Earth orbit, the Moon, Mars, and beyond.

Like Kennedy Space Center and Cape Canaveral Space Force Station, the Starbase launch site operates close to a national wildlife refuge. In 2023, as SpaceX continued to develop its Starbase operations, the U.S. Fish and Wildlife Service approached the company about a land exchange designed to consolidate that development and reduce fragmented ownership around the Boca Chica tract of the Lower Rio Grande Valley National Wildlife Refuge (LRGV Refuge). SpaceX will convey parcels with more contiguous, higher-conservation-value habitat to the Service and receive parcels adjoining its existing holdings that are already affected by development, including parcels by its Massey's rocket-testing site. After a review spanning two presidential administrations, the Service concluded that the exchange would reduce fragmentation and management conflicts, benefit the LRGV Refuge and broader National Wildlife Refuge System, and minimize harm to historic resources through binding mitigation.

Plaintiffs ask this Court to override that expert judgment and halt the exchange based on flawed legal theories and a false premise that the Refuge would be better off without it. But they cannot make the clear showing required for such extraordinary relief.

At the threshold, Plaintiffs have not established Article III standing. Their declarations describe recent trips to the Boca Chica area, but not lawful, preexisting use of the lands to be conveyed. Massey Way and adjoining Refuge lands are closed to the public, and no declarant

claims authorized access. Plaintiffs' other asserted injuries are tied to other land and existing launch operations, traffic, or road closures that are not caused by the exchange.

Even apart from this threshold defect, Plaintiffs' statutory theories fail on the law and the record. Section 111 of the National Historic Preservation Act (NHPA) authorizes agencies to lease historic property or exchange any property for comparable historic property; it does not make that authority exclusive or impose its conditions on exchanges under other statutes. The Service used the Refuge Act's exchange authority here. The Service satisfied the NHPA sections that do apply by identifying adverse effects, consulting preservation authorities, considering alternatives and mitigation, and executing a binding Programmatic Agreement that minimizes harm to the Palmito Ranch Battlefield National Historic Landmark and other historic resources.

Plaintiffs' Refuge Act claim is not subject to judicial review under the Administrative Procedure Act (APA) and, in any case, fails under the APA's deferential arbitrary-and-capricious standard of review. The Service reasonably found that the slightly smaller acreage it will acquire provides greater habitat value, connectivity, and manageability, and Plaintiffs identify no basis to reject its Biological Importance Scores or finding of a net conservation benefit. Their Section 706(1) claim to compel the Service to revise the LRGV Refuge's comprehensive conservation plan misreads the statute as creating a non-discretionary duty and, regardless, cannot justify relief against the separate land exchange challenged here. Plaintiffs' NEPA argument also fails. Their preferred alternative—retaining the parcels while enforcing the Refuge Act on them—materially duplicates the no-action alternative evaluated and would not achieve the exchange's conservation and management objectives.

Plaintiffs also fail to establish irreparable harm. SpaceX's only current plans for lands it will acquire are in the Massey's area: expanding existing testing infrastructure onto adjoining land

and building a service road to State Highway 4. Because Plaintiffs lack authorized access to those lands, they cannot show irreparable harm from SpaceX's use of them. By contrast, a preliminary injunction would prevent SpaceX from addressing a testing bottleneck that constrains Starship's launch cadence until at least a merits decision. That delay would harm SpaceX, could jeopardize Artemis's planned return to the Moon, impede other national-security and commercial-space programs, and damage regional employment and economic activity. And if, in the end, the exchange were permanently enjoined, SpaceX would have to redirect development to less suitable, higher-habitat-value parcels it otherwise will convey to the Service. That would harm everybody and benefit nobody—it would foreclose the Refuge's acquisition of higher-value habitat and the management benefits of consolidation while further delaying urgently needed testing and the national and regional interests served by Starship.

The motion should be denied.

## II. FACTUAL BACKGROUND

### A. SpaceX and its Starbase operations

In 2014, after a multiyear environmental review, the Federal Aviation Administration (FAA) approved SpaceX's construction and operation of a private launch site near Boca Chica now known as Starbase. *See generally* Dkt. 26-16 (FAA Final Environmental Impact Statement). Today, Starbase manufactures, tests, and launches Starship, a fully and rapidly reusable, super-heavy-lift launch system designed to carry crew and cargo to Earth orbit, the Moon, Mars, and beyond. *Id.* at 16, 23–28;[1] Decl. of Justin Styer (Styer Decl.) ¶¶ 4–15, 23–28.

Starship is central to multiple national space programs. NASA selected Starship as the Human Landing System that will transport astronauts between lunar orbit and the Moon's surface

[1] Citations to electronically filed documents and docket entries refer to PDF pages.

for the Artemis program. Styer Decl. ¶¶ 28, 48–52. Starship is also being developed to carry national-security payloads and support rapid military cargo transport. *Id.* ¶¶ 54–55. And it will carry the next generation of Starlink and Starshield satellites, expanding broadband capacity and supporting government, disaster-response, and national-security services. *Id.* ¶¶ 56–64.

SpaceX tests Starship at Massey's, a former gun range about three miles west of Starbase that SpaceX acquired in 2021 and converted into a fully equipped test site. *Id.* ¶¶ 15–18. Massey's includes six test pads, ground support infrastructure, storage tanks, communications equipment, offices, and inventory space. *Id.* ¶ 17. Moving testing there from the Starbase launch site has reduced the frequency of public safety-based access restrictions to Boca Chica Beach and other publicly accessible land. *Id.* ¶ 16. Massey's is reached from State Highway 4 by Massey Way, a Service-owned access road that is closed to the public and that SpaceX maintains and uses under a right-of-way permit. *Id.* ¶ 19. Consistent with federal regulations, the adjoining Refuge lands are also closed to the public. *Id.* ¶¶ 16, 19; *see* 50 C.F.R. § 25.21(a).

**B. The proposed land exchange**

The LRGV Refuge comprises more than 100,000 acres in over 100 fragmented tracts spread over 275 river miles and interspersed with federal, state, and private land across the Lower Rio Grande Valley. *Lower Rio Grande Valley National Wildlife Refuge*, U.S. Fish & Wildlife Serv. (Welti Decl. Ex. A), *available at* https://www.fws.gov/refuge/lower-rio-grande-valley (last visited Aug. 8, 2026) (map showing LRGV Refuge lands as shaded parcels); *see* Dkt. 26-4 at 5; Dkt. 26-21 at 2–3.

SpaceX owns parcels adjoining LRGV Refuge lands, including Massey's. The Service began considering the exchange in 2023 to reduce fragmented ownership within the LRGV Refuge and consolidate Service and SpaceX operations in the Boca Chica area. Dkt. 26-21 at 2–3. Under

the exchange, the Service will convey approximately 727.3 acres of the LRGV Refuge to SpaceX. *Id.* In return, the Service will acquire approximately 683 acres of SpaceX land within the LRGV Refuge's approved acquisition boundary, which will be added to the National Wildlife Refuge System. *Id.*




*See* Dkt. 26-4 at 8. Of the land SpaceX will receive, approximately 703 acres lie within the 9,391-acre Palmito Ranch Battlefield National Historic Landmark. Dkt. 26-21 at 2–3.

The parcels the Service will convey are interspersed with SpaceX holdings and affected by rights-of-way, access, noise, light, and nearby development. *Id.* at 3. The parcels the Service will acquire are largely undeveloped, contiguous with existing Refuge lands, and contain high-quality coastal marsh, tidal flats, saline prairie, and thornscrub habitat. *Id.* The Laguna Heights parcels also adjoin the Bahia Grande Unit of the Laguna Atascosa National Wildlife Refuge, which the

1997 Plan identifies as a partner with the LRGV Refuge and with which the Service coordinates habitat restoration and other management activities. Dkt. 26-3 at 13–14; Dkt. 26-4 at 6.[2] Each side of the exchange is valued at more than $13 million. Dkt. 26-21 at 4. Because the SpaceX parcels are appraised at $824,750 more than the federal parcels, SpaceX agreed to donate the difference to equalize the values. *Id.*

**C. The Service's environmental, historic-preservation, and final review**

The Service evaluated the exchange under the NHPA, NEPA, and Section 7 of the Endangered Species Act (ESA).

Consistent with NHPA Sections 106 and 110(f), the Service identified effects on historic properties, considered alternatives and mitigation, and consulted the Texas State Historic Preservation Officer, the National Park Service, the Advisory Council on Historic Preservation (ACHP), Tribes, and other interested parties. Dkt. 26-4 at 200–02, 222. That process culminated in a Programmatic Agreement among the Service, the Texas State Historic Preservation Officer, the National Park Service, and SpaceX that imposes enforceable measures to resolve adverse effects and minimize harm to the Palmito Ranch Battlefield. Dkt. 26-7. ACHP concluded that further participation was unnecessary "since the PA was fully executed with the support of [State Historic Preservation Officer]." Dkt. 26-4 at 222. SpaceX and the Service removed approximately eight historically sensitive acres from the exchange. Dkt. 26-7 at 7. The Agreement also prohibits industrial, commercial, and residential development within the approximately 10-acre White's Ranch Preservation Area; requires a public viewing platform and interpretive exhibit in that area;

---

[2] *See also Lower Rio Grande Valley National Wildlife Refuge: About Us*, U.S. Fish & Wildlife Service, https://stage.fws.gov/refuge/lower-rio-grande-valley/about-us (last visited Aug. 3, 2026) (explaining that the South Texas Refuge Complex is made up of Lower Rio Grande Valley, Santa Ana, and Laguna Atascosa National Wildlife Refuges).

and mandates archaeological monitoring, discovery procedures, artifact collection, and curation. *Id.* at 7–8; Dkt. 26-4 at 222.

The Service also prepared an Environmental Assessment (EA) under NEPA that evaluated the exchange's potential environmental effects. Dkt. 26-4 at 12–49. As part of that analysis, Service specialists assigned each parcel a Biological Importance Score based on habitat quality, Refuge connectivity, and critical-habitat presence, "where 0 is the lowest biological importance, and 1 is the highest." *Id.* at 16–17, 207. The parcels the Service proposed to divest scored between 0.33 and 0.60, while the parcels it would acquire scored between 0.73 and 1.00. *Id.* at 17. After considering public and agency comments, the Service issued a Finding of No Significant Impact (FONSI), concluding that the exchange would not significantly affect the environment. Dkt. 26-1 at 5. The FONSI explained that the exchange will improve landscape-scale habitat connectivity, reduce "edge effects, light and noise encroachment, and land use conflicts that currently diminish the conservation function of several [LRGV Refuge] parcels," and implement enforceable historic-preservation measures. *Id.* at 2–4.

Finally, the Service's Biological Assessment evaluated potential effects on ESA-listed species and designated critical habitat. Dkt. 26-12. It concluded that the exchange would have no effect on some listed species; may affect, but is not likely to adversely affect, other listed species and critical habitat; and is not likely to jeopardize any species evaluated. *Id.* at 54–55 & tbl. 2.

On July 13, 2026, Service Director Brian Nesvik signed a decision memorandum and approved proceeding with the exchange. Dkt. 26-21 at 2, 9. He found that "[t]he proposed exchange will benefit the Refuge and the Service." *Id.* at 4. The memorandum explained that acquiring intact habitat will improve connectivity, support migratory birds and listed species, strengthen the restored Bahia Grande landscape, and "lessen[] the effects of industrial activities

near existing Refuge tracts in the Boca Chica area by consolidating that activity onto parcels already affected by industrial use." *Id.* at 4–5. The no-action alternative, by contrast, would perpetuate fragmentation, access conflicts, and management challenges. *Id.* at 5, 8. Consistent with the Service's exchange guidance, the Director found that the "lands to be divested are suitable for disposition"; the exchanged properties are approximately equal in value; and "the exchange benefits the United States, furthers the purposes of the Refuge, fulfills the mission of the National Wildlife Refuge System, and provides a net conservation benefit to the individual refuge." *Id.* at 9. He also confirmed the Service had fulfilled its NHPA obligations by executing the Programmatic Agreement and clarified that, because the Service was using its exchange authority under the Refuge Act, Section 111's exchange criteria did not apply. *Id.* at 7 & n.1, 9.

The Director's approval did not itself transfer title. Because each side of the exchange is valued at more than $13 million, the Department of the Interior notified the House and Senate Committees on Appropriations and allowed a 30-day examination period. *Id.* at 2, 4. Only after that period may the Service's Region 2 Office execute the land-exchange agreement, open escrow, complete title-curative and other closing work, and transfer title. *Id.*

**D. SpaceX's plans**

SpaceX's current plans for the land it will receive are to expand existing testing infrastructure immediately east of Massey's and to construct a service road from Massey's to State Highway 4. Styer Decl. ¶¶ 5, 38–40. The expanded testing infrastructure will proceed away from the Refuge, and thus will not border Refuge land. *Id.* ¶ 39. The service road will reduce the need to transport Starship hardware along part of State Highway 4, thereby decreasing interference with traffic and beach access. *Id.* ¶ 40. SpaceX expects to begin both projects after receiving title and obtaining applicable governmental approvals. *Id.* ¶ 41.

### E. Procedural history

Plaintiffs filed this action in the U.S. District Court for the District of Columbia on June 10, 2026. Dkt. 1. On July 20, Plaintiffs moved to preliminarily enjoin the exchange. Dkt. 24.

On July 28, the D.C. Court transferred the case to this Court. Dkt. 34; Dkt. 35. It concluded that Plaintiffs are "challenging a proposed South Texas land exchange based primarily on work carried out in South Texas" and that Plaintiffs' asserted injuries, SpaceX's affected operations, and the Service's Refuge-management interests are centered there. Dkt. 35 at 11–13. It further found that the exchange's direct effects on communities and the environment will be felt primarily in South Texas. *Id.* at 16–18.

On August 3, Plaintiffs filed an amended complaint that now challenges Director Nesvik's July 13 decision approving the exchange. Dkt. 48.

## III. STANDARD OF REVIEW

A preliminary injunction is an extraordinary remedy. The Court should deny relief unless Plaintiffs clearly carry their burden of persuasion by showing that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *United States v. Abbott*, 110 F.4th 700, 706 (5th Cir. 2024) (en banc) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Failure on any one requirement is sufficient to deny the motion. *See Allied Home Mortg. Corp. v. Donovan*, 830 F. Supp. 2d 223, 227 (S.D. Tex. 2011).

Whether Plaintiffs are likely to prevail depends in large part on the standard under which those claims will be reviewed. Here, because Plaintiffs challenge the Service's approval of the exchange under the APA, the Court may set aside final agency action only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

Review under that standard is narrow and deferential. The Court asks whether the agency examined the relevant evidence and articulated a rational connection between the facts found and the decision made; it may not substitute its judgment for the agency's. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Deference is especially substantial for technical judgments within an agency's expertise. *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010). That substantial deference extends to an agency's fact-dependent and policy-laden choices that fall within a "broad zone of reasonableness." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 182–83 (2025).

## IV. ARGUMENT

### A. Plaintiffs fail to show a likelihood of success on the merits.

Plaintiffs bear the burden of showing that their claims are likely to succeed, which is the most important preliminary injunction factor. *Abbott*, 110 F.4th at 706. For APA claims, Plaintiffs must be "substantially likely to show" that the Service's decision was not "reasonable and reasonably explained." *Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 641 (5th Cir. 2023). Plaintiffs do not meet that burden and thus "the injunction should be denied and there is no need for the court to address the other requirements for a preliminary injunction." *Butts v. Aultman*, 953 F.3d 353, 361 (5th Cir. 2020).

#### 1. Because Plaintiffs fail to show Article III standing, they cannot succeed on the merits of their claims.

Because showing jurisdiction "is a prerequisite to success on the merits, Plaintiffs' failure to establish it forecloses injunctive relief." *Vapor Tech. Ass'n v. Graham*, 167 F.4th 302, 305 (5th Cir. 2026). "To establish standing … a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. All. for*

*Hippocratic Med.*, 602 U.S. 367, 380 (2024). At the preliminary-injunction stage, Plaintiffs "must make a 'clear showing' that they have standing." *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017). Here, that means Plaintiffs must clearly show that the land exchange between the Service and SpaceX will cause them or their members an injury that is "actual or imminent, not speculative." *All. for Hippocratic Med.*, 602 U.S. at 380–81. Beyond that, the land exchange must injure Plaintiffs or their members "in a personal and individual way." *Id.* at 381 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 n.2 (1992)). Plaintiffs have not made those showings.

1. A property transfer like this one presents few opportunities for personalized harm to third parties. After all, the only change to the status quo from the Service's decision is the ownership of the properties being exchanged. True, "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (cleaned up). But since the "challenged activity" in a land exchange case is a title transfer, the key issue for standing is whether Plaintiffs "*use* the affected area." *Id.* (emphasis added). If Plaintiffs cannot show that they "use" the land that is passing into private hands—and that they have "concrete plans" to use it again absent the exchange, *see Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)—they can hardly claim to be personally injured when they lose access, *see WaterLegacy v. USDA Forest Serv.*, 2019 WL 4757663, at *7–*20 (D. Minn. Sep. 30, 2019) (dismissing land exchange challenges for lack of standing where the plaintiffs failed to show sufficient use of the relevant land).

Plaintiffs cannot show harm from the land exchange between the Service and SpaceX because they are not allowed to access the parcels that SpaceX is acquiring. Indeed, under Service

rules, "all areas included in the National Wildlife Refuge System are closed to public access until and unless [the Service] open[s] the area for a use or uses." 50 C.F.R. § 25.21(a). None of the parcels SpaceX is acquiring (see the red-highlighted areas in the map above) is open to the public. As the Refuge's website explains, public access is limited to designated roads and trails, and no such roads or trails have been designated in these areas.[3]

2. Perhaps anticipating a challenge to their standing, Plaintiffs have filed several declarations that describe specific members' visits to the Boca Chica area. But to show standing, "a petitioner must show that he uses the area affected by the challenged activity and not an area roughly in the vicinity of a project site." *Ctr. for Biological Diversity v. U.S. Dep't of Transp.*, 180 F.4th 796, 803 (5th Cir. 2026) (cleaned up). So it is not enough that one member "will be visiting the Boca Chica area this summer," Dkt. 24-3 ¶ 7, or that another has "visited the area at least 6 times" in the last year, Dkt. 24-5 ¶ 10. Especially in the context of a land exchange like this one, standing must turn on access to the specific land that the Service is divesting. And since that land is already off-limits to the public, Plaintiffs cannot prove harm from a loss of access.

Despite lacking legal access, some of Plaintiffs' declarants claim that they have visited the land SpaceX is acquiring. For example, one says that she "visited the area around the Massey Test Site, which would be given over to SpaceX under the proposed exchange" and that she "intend[s] to view wildlife in Refuge areas along Highway 4 (including areas proposed to be exchanged)." Dkt. 24-3 ¶¶ 22, 31. Another says that he has been to "areas accessible from Route 4, Massey Way, and Quicksilver Avenue to visit and perform sacred ceremonies." Dkt. 24-5 ¶ 14. A third says that he put a boat into the Rio Grande "off of Richardson Drive and traveled upstream along the

[3] *Lower Rio Grande Valley National Wildlife Refuge: Facility Rules and Policies*, U.S. Fish & Wildlife Serv., https://www.fws.gov/refuge/lower-rio-grande-valley/visit-us/rules-policies (last visited Aug. 10, 2026) ("Walk only on designated roads and trails.").

divestment area" to enjoy the view, Dkt. 24-6 ¶ 9, and that he has driven and walked "along Massey Way" to view "undisturbed Refuge land," *id.* ¶ 13.

All these alleged visits suffer from the same standing problem: Because the land being visited is not open to the public, the declarants lack a "legally protected interest" in going there, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016), and thus cannot claim the requisite "concrete plans" to visit again, *Summers*, 555 U.S. at 496. The same goes for Massey Way and Quicksilver Avenue. Massey Way is a Service-owned road that is not open to the public and is posted with signs saying "unauthorized entry prohibited."[4] Styer Decl. ¶ 19. Quicksilver Avenue is a gated road for use by private landowners, not the public. *Id.* ¶ 20. So even if unauthorized visits to the land SpaceX is acquiring could show legitimate "use" of that land—and it is hard to see how they could—the visitors' inability to legally return precludes those visits from creating standing. *See Bell v. Redflex Traffic Sys., Inc.*, 374 F. App'x 518, 520 (5th Cir. 2010) (holding that an "interest in evading the law cannot create standing").

3. Unable to show injury from loss of access to the land SpaceX is acquiring, Plaintiffs must claim that SpaceX's future activities on that land will create standing. Here, Plaintiffs cannot establish causation because their theory of harm is too speculative and too removed from the challenged action. As the Supreme Court has explained, "plaintiffs attempting to show causation" for standing purposes "generally cannot 'rely on speculation about the unfettered choices made by independent actors not before the courts.'" *All. for Hippocratic Med.*, 602 U.S. at 383 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415 n.5 (2013)). And that is just what Plaintiffs are doing here—trying to stop the Service's action based on decisions SpaceX might later make. That

[4] Richardson Avenue (inaccurately called "Richardson Drive" by Plaintiffs' declarant, Dkt. 24-6 ¶ 9) is not private, but the land between the end of the road and the river that the declarant would have had to use to "put in" his boat is Refuge land that is not open to the public. Styer Decl. ¶ 21.

SpaceX is "before the court[]" does not change its status as an "independent actor" relative to the Service's land exchange decision, such that Plaintiffs can rely on speculation about SpaceX's future plans.

The EA is clear: "The land exchange itself would be an administrative action that would not result in immediate changes to land use." Dkt. 26-4 at 23. Still, Plaintiffs' declarants worry that SpaceX will immediately develop the land it is acquiring. *See, e.g.*, Dkt. 24-6 ¶ 17. But sheer speculation about land clearing cannot create standing. To the contrary, Plaintiffs must "thread the causation needle" by showing that the independent actors "will likely react in predictable ways" that "will likely injure the plaintiffs." *All. for Hippocratic Med.*, 602 U.S. at 383 (citation omitted). Here, where the "links in the chain of causation" are either "too speculative or too attenuated," no standing exists. *Id.*

It is true that SpaceX has some near-term development plans near the existing Massey Test Site.[5] Styer Decl. ¶¶ 38–40. But the harm to Plaintiffs from this development is not apparent given Plaintiffs' lack of legal access to the lands. They must show that SpaceX's plans include changes that can be viewed from places they both can legally go and plan to legally go. Especially given the scale of the area at issue here, more general concerns about development do not establish Article III standing. Beyond that, the visible changes must be more than a mere "eyesore" that they occasionally drive past. *Env't Def. Fund v. FERC*, 2 F.4th 953, 969 (5th Cir. 2021). Plaintiffs have not made any such showings.

4. Finally, even if Plaintiffs could visit the property that SpaceX is acquiring, or could claim aesthetic harm from SpaceX's imminent and predictable activity in areas that they can see,

---

[5] SpaceX's near-term plans are to expand east of Massey's and to build a service road, both located away from Refuge lands. Styer Decl. ¶¶ 38–40.

they cannot show that their declarants ever used the land SpaceX is acquiring before they knew that SpaceX was acquiring it. The Fifth Circuit has made clear that "standing cannot be conferred by a self-inflicted injury." *Ctr. for Biological Diversity v. U.S. EPA*, 937 F.3d 533, 541 (5th Cir. 2019) (citation omitted). Thus, "someone who goes looking for pollution cannot claim an aesthetic injury in fact from seeing it." *Id.* at 540. By the same token, someone who goes looking for areas that might be "bulldozed," Mot. 22, if a land exchange happens does not suffer an injury in fact. *See Ctr. for Biological Diversity*, 937 F.3d at 541.

Plaintiffs' declarants are clear that their visits to the land SpaceX is acquiring were "recent." Dkt. 24-6 ¶ 9. Where they mention more specific dates, they say April, May, and June of this year, *see* Dkt. 24-3 ¶ 22, Dkt. 24-5 ¶ 14, Dkt. 24-6 ¶ 13—well after the draft EA for the land exchange was published in March and presumably during Plaintiffs' planning for the complaint they filed on June 10. The Refuge includes more than 100,000 acres stretched over 275 miles of the Texas-Mexico border. *See* Dkt. 26-4 at 5; Dkt. 26-21 at 2–3. That Plaintiffs' declarants made last-minute visits to the 700 acres that were part of an announced land exchange with SpaceX is just the kind of self-inflicted harm that does not justify standing.

**2. The Service complied with the NHPA.**

Even setting aside standing, Plaintiffs cannot show that their APA challenges to the Service's land exchange decision are likely to succeed.

**a. Plaintiffs' NHPA Section 111 claim fails.**

Plaintiffs contend that because the exchange includes historic property, the Service must satisfy NHPA Section 111(a)(2)'s "comparable historic property" and preservation conditions. Mot. 25–30. As they see it, the Service "may *only*" exchange historic property if those conditions are met. *Id.* at 9, 25 (emphasis added). But Section 111(a)(2) does not say "may only." It says "may." And it does not govern a conveyance undertaken under independent exchange authority—

here, the Refuge Act.

This is what NHPA Section 111(a) says:

> (a) Authority to Lease or Exchange. Notwithstanding any other provision of law, each Federal agency, after consultation with the Council—
> (1) *shall*, to the extent practicable, establish and implement alternatives (including adaptive use) for historic property that is not needed for current or projected agency purposes; and
> (2) *may* lease historic property owned by the agency to any person or organization, or *exchange* any property owned by the agency with comparable historic property, if the agency head determines that the lease or exchange will adequately ensure the preservation of the historic property.

54 U.S.C. § 306121(a) (emphasis added). The key language for present purposes is that "each Federal agency … may … exchange any property" it owns under certain conditions. *Id.* By its plain terms, this language grants discretionary authority to exchange historic properties so long as specific conditions are met; it does not limit other exchange authority that agencies may possess.

When Congress uses "may" to grant authority, it gives the agency a "tool" without imposing a "duty." *Biden v. Texas*, 597 U.S. 785, 802 (2022) (citation omitted). As the Supreme Court has emphasized, "the word 'may' *clearly* connotes discretion." *Id.* (emphasis in original) (citation omitted). And "[t]hat connotation is particularly apt where … 'may' is used in contraposition to the word 'shall.'" *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 346 (2005). Thus, in *Biden*, the Supreme Court explained that a statute providing that the government "may" return applicants abroad pending their immigration proceedings did not preclude the government from using other authorities Congress said it "may" use, such as parole. *Biden*, 597 U.S. at 806. Similarly, the Fifth Circuit recently held that a regulation detailing the appointment powers of the Director of the Executive Office of Immigration Review—which the appellant contended had not been complied with—"does not limit" a separate grant of appointment authority to the Attorney General. *Ayala Chapa v. Bondi*, 132 F.4th 796, 800 (5th Cir. 2025) (collecting cases).

The statute here functions the same way: Under Section 111(a), an agency "shall, to the extent practicable," establish alternatives for unneeded historic property, and "may" lease or exchange property. 54 U.S.C. § 306121(a)(1)–(2). The contrast between "shall" and "may" only underscores what "may" itself conveys: Section 111 bestows a permissive authority to exchange lands. *See Nat'l Post Off. Collaborate v. Donahoe*, No. 13CV1406, 2014 WL 6686691, at *13 (D. Conn. Nov. 26, 2014) (interpreting Section 111 as a grant of permissive authority). Congress could have said "shall exchange" or "may only" exchange. But as in *Biden v. Texas*, "[t]he problem is that the statute does not say anything like that." *Biden*, 597 U.S. at 802. If Congress had meant something else, it would not have used the "unambiguous, express term 'may.'" *Id.* at 803.

Plaintiffs' contention is that the statute *prohibits* agencies from exchanging historic property *unless* the specified conditions are met. But "[t]he statutory grant of discretion here contains no such caveat, and [courts] will not rewrite it to include one." *Id.*; *accord Ayala Chapa*, 132 F.4th at 800. Section 111's grant of authority never suggests that an agency's other authorities are displaced or limited by Section 111. Rather, Section 111's requirements apply only to exchanges under Section 111.

Implicitly recognizing this textual problem, Plaintiffs argue that "may" merely gives an agency discretion whether to exchange property, after which Section 111's conditions become mandatory. Mot. 29. But that argument assumes the disputed premise—that every exchange involving historic property necessarily exercises Section 111 authority. Again, the statute does not say that. Congress could have said that historic property may be exchanged only on Section 111's terms. It did not. Section 111 is phrased as an affirmative grant of authority to acquire historic property through exchange, not as a universally applicable condition on conveying historic property under independent authority.

Other features of Section 111 prove that it provides additional, permissive authority to exchange properties. First, in the same sentence, Congress authorized an agency to "lease *historic property* owned by the agency," but to "exchange *any property* owned by the agency with comparable historic property." 54 U.S.C. § 306121(a)(2) (emphases added). That deliberate variation must be given effect. *See Russello v. United States*, 464 U.S. 16, 23 (1983). "Any property" includes non-historic federal property, while "with comparable historic property" describes what the agency receives. In other words, Section 111 permits an agency to convey non-historic property in exchange for privately owned historic property, with the preservation condition protecting the incoming historic property. The House Report gave that precise example, and ACHP's guidance does the same. H.R. Rep. No. 96-1457, at 39 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 6378, 6402; ACHP, *Section 111 Leasing and Exchange Questions and Answers* (Welti Decl. Ex. B). Under Plaintiffs' theory, agencies could not exchange any property except to acquire historic property of comparable value. But the historic character of the outgoing property therefore does not trigger Section 111, as Plaintiffs argue. Rather, Section 111 supplies a particular exchange authority, available for "any" federal property, whose conditions govern when—and only when—that same authority is invoked.

Second, Section 111 does not address sales of historic property at all. That omission is difficult to reconcile with Plaintiffs' theory that Congress silently created an exclusive regime governing every conveyance of historic property by a federal agency.

Section 111's opening "notwithstanding" clause confirms rather than defeats SpaceX's reading. Such a clause does "not have the sweeping effect" of overriding all other laws; it operates to resolve an actual conflict, and its reach depends on the substantive provision it introduces. *United States v. Holy Land Found. for Relief & Dev.*, 722 F.3d 677, 687 (5th Cir. 2013); *see*

*Greenbaum v. Islamic Rep. of Iran*, 67 F.4th 428, 433 (D.C. Cir. 2023). Here, the clause introduces a permissive grant: "Notwithstanding any other provision of law," agencies "may" exchange "any property" under specified conditions. 54 U.S.C. § 306121(a). The "notwithstanding" language thus clears conflicting statutory restrictions that might otherwise prevent an agency from using Section 111 on Section 111's terms. It does not change "may" exchange into "may only" exchange or otherwise channel every independently authorized transaction involving historic property through Section 111. That would invert both the clause's function and Section 111's purpose of enabling productive alternatives for unneeded historic property. *See id.* § 306121(a)(1). It simply means that agencies "may" make an exchange on Section 111's terms even if some other provision of law bars an exchange on those terms.

Subsection (b) similarly uses a "notwithstanding" clause to permit an agency to retain and use proceeds from "a lease under subsection (a)" for specified purposes for up to two years. *Id.* § 306121(b). By specifying a "lease under subsection (a)," Congress treated a Section 111 lease as a distinct category, indicating that subsection (a) is not the exclusive means of leasing historic property. And if Congress intended Section 111(b) to displace other laws governing proceeds from leases entered under different authority, it presumably would have said so clearly, particularly given the significant fiscal consequences. It did not. As the Supreme Court held in interpreting a similar statutory scheme, "[t]he statute says 'may'" and Congress would not impose a mandate through "an unspoken inference" contrary to that express term, particularly where other statutes separately authorize action. *Biden*, 597 U.S. at 802–03, 806–07.

ACHP reads Section 111 the same way SpaceX does, consistently treating Section 111 as one authority among others. Its 2020 guidance asks whether agencies use "Section 111 … or other authorities to lease or exchange historic properties." Dkt. 26-22 at 7. And while Plaintiffs suggest

that guidance has been "superseded," Mot. 29, later ACHP interpretations reinforce it. A 2021 report explained that agencies use "agency- or program-specific" authorities "to make productive use of their historic buildings," and that "agency-specific … authorities [may be] more attractive" than Section 111 "because there may be fewer fund use and timeframe restrictions, and no need for development and management of a separate NHPA Section 111 program." ACHP, *Leveraging Federal Historic Buildings: Working Group Final Report*, 6 (2021) (Welti Decl. Ex. C). ACHP stated again in 2024 that "Section 111 of the NHPA *and other agency-specific authorities* allow Federal property-managing agencies to outlease historic buildings." ACHP, Notice of Adoption of Policy Statement on Housing and Historic Preservation, 89 Fed. Reg. 11,847, 11,851 (Feb. 15, 2024) (Welti Decl. Ex. D) (emphasis added). Although the 2021 and 2024 materials focus on leasing, Section 111 grants lease and exchange authority in the same sentence and subjects both to the same "may" and "notwithstanding" language. Nothing supports treating Section 111 as optional for leases but exclusive for exchanges.

ACHP's repeated, reasoned interpretation of Section 111 as permissive, additional authority that does not supplant agency-specific authority should be given substantial persuasive weight, particularly because ACHP is the independent federal agency Congress established under the NHPA to serve as the expert advisor on historic preservation policy. *See* 54 U.S.C. §§ 304101–02. An agency's interpretation of the statutory provisions it administers—while not binding on this court—is still entitled to substantial weight. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394, 402–03 (2024) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *see also Texas v. U.S. EPA*, 137 F.4th 353, 365 (5th Cir. 2025).

The Service's decision is consistent with ACHP's reading of Section 111. The Director explained that Section 111 "provides additional authority to exchange or lease land" and that "the

Service did not use or invoke Section 111 … for this land exchange," but instead acted "under its own statutory authority." Dkt. 26-21 at 7 n.1, 9. The EA and Programmatic Agreement are also consistent. The PA begins by explaining that the Service planned the transaction "under the management and exchange authorities" of the Refuge Act and refers to Section 111 only "if applicable." Dkt. 26-7 at 2–3. The EA uses the same "if applicable" qualification. Dkt. 26-4 at 24–25. Plaintiffs' assertion that those documents "acknowledged" Section 111's application, Mot. 29, omits both that qualification and the documents' express reliance on the Refuge Act.

Because the Service exercised Refuge Act authority rather than Section 111 authority, Section 111(a)(2)'s conditions do not govern this exchange. Plaintiffs therefore cannot establish a likelihood of success on this claim.

**b. Plaintiffs waived Sections 106 and 110(f) as grounds for preliminary relief, and both theories fail.**

While NHPA Section 111's exchange conditions do not govern this Refuge Act exchange, Sections 106 and 110(f) do apply, and the Service complied with both. It identified historic properties and adverse effects; consulted the Texas State Historic Preservation Officer, the National Park Service, ACHP, Tribes, and other interested parties; considered alternatives and measures to avoid, minimize, or mitigate harm; and executed a binding Programmatic Agreement that memorializes the consultation and establishes enforceable measures for the Palmito Ranch Battlefield National Historic Landmark and other historic resources. *See* 54 U.S.C. §§ 306107–306108; 36 C.F.R. §§ 800.6, 800.10, 800.14(b).

To start, Plaintiffs cannot rely on Sections 106 or 110(f) as grounds for preliminary relief because their motion does not distinctly develop either theory. *See United States v. Scroggins*, 599 F.3d 433, 446–47 (5th Cir. 2010) (finding an issue mentioned but not "discuss[ed] … in any depth" was waived); *Christian Legal Soc'y Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 487–88 (9th

Cir. 2010) (holding that issues "argue[d] in passing" and "not specifically and distinctly argued in [an] opening brief" are waived). That waiver rule should apply with heightened force to a request for the "extraordinary and drastic remedy" of a preliminary injunction, for which Plaintiffs bear a "much higher" burden of persuasion. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam). Here, Plaintiffs' motion never argues that the Service violated Section 106. And while their motion quotes Section 110(f)—misidentified as Section 107—it does not apply that provision's "maximum extent possible" or "minimize harm" language to the record. *See* Mot. 26–29. The ensuing discussion instead applies Section 111's "adequately ensure the preservation" standard and concludes that the Service violated it. Mot. 26 (quoting 54 U.S.C. § 306121(a)(2)). And as just explained, that section does not apply to an exchange that does not invoke Section 111. Such a passing reference to another NHPA theory cannot carry Plaintiffs' burden to make a clear showing of likely success on it.

In any event, the Service complied with Sections 106 and 110(f). Section 106 requires an agency to "take into account the effect of the undertaking on any historic property" and afford ACHP a reasonable opportunity to comment. 54 U.S.C. § 306108. When adverse effects are found, ACHP regulations require consultation with the State Historic Preservation Officer and other parties to evaluate ways to avoid, minimize, or mitigate them. 36 C.F.R. § 800.6(a). For a complex undertaking, a programmatic agreement may govern resolution of adverse effects, and compliance with the agreement satisfies the agency's Section 106 responsibilities for the undertaking it covers. *Id.* § 800.14(b)(1), (3); *see also id.* § 800.6(b)–(c) (a memorandum of agreement between agency, state historic preservation officer, and ACHP (if participating in the consultation) on "how the adverse effects will be resolved" "evidences the agency official's compliance with section 106" and the regulations).

Section 110(f) adds safeguards for National Historic Landmarks. Before approving an undertaking that may "directly and adversely affect" a landmark, the agency must, "to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm to the landmark" and afford ACHP a reasonable opportunity to comment. 54 U.S.C. § 306107; *see also* 36 C.F.R. § 800.10. The duty "to minimize the harm done" to landmarks applies when the agency "finds that a project will adversely affect" them. *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 242–43 (5th Cir. 2006). This duty does not "impose[] a heightened substantive standard." *Presidio Hist. Ass'n v. Presidio Tr.*, 811 F.3d 1154, 1169 (9th Cir. 2016); *see also, e.g.*, *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 463 F.3d 50, 64 (1st Cir. 2006). Rather, it adds a procedural safeguard that "builds on the general consultation process set out in Section 106, which … is a procedural 'stop, look, and listen' requirement." *Presidio Hist. Ass'n*, 811 F.3d at 1169; *see also Nat'l Tr. for Historic Pres. v. Blanck*, 938 F. Supp. 908, 925 (D.D.C. 1996), *aff'd*, 203 F.3d 53 (D.C. Cir. 1999). As part of the Section 106 process, the agency must consider alternatives and give preservation authorities' views reasoned consideration. *See Coliseum Square*, 465 F.3d at 242–44 (explaining that, under NHPA regulations, "the results of the § 110f review process are to be incorporated into the NHPA § 106 process" and that "a signed [memorandum of agreement] evidences the agency's official compliance with NHPA § 106"); *Vieux Carré Prop. Owners, Residents & Assocs., Inc. v. Pierce*, 719 F.2d 1272, 1281 (5th Cir. 1983); *see also* 36 C.F.R. §§ 800.6(c), 800.10. In the end, "an agency's actions under the NHPA are procedural, and [the Court's] review of its decisions is conducted under the [APA]'s 'arbitrary and capricious' standard." *Coliseum Square*, 465 F.3d at 241.

The record belies any claim that the Service acted arbitrarily and capriciously in

discharging its obligations under Sections 106 and 110(f). The Service identified as adverse effects the transfer of the Palmito Ranch Battlefield landmark and other historic resources; the possibility that future structures or infrastructure could diminish the landmark's integrity of setting and feeling and its ability to convey its significance; and potential disturbance of deeply buried archaeological deposits and recorded artifacts that contribute to the landmark's significance. Dkt. 26-4 at 29–31, 221–22 (EA); Dkt. 26-7 at 2–3, 7–10 (Programmatic Agreement). The Service also solicited input from 22 interested parties, Tribes, and agencies; convened a meeting with the Texas Historical Commission, multiple National Park Service offices, the American Battlefield Trust, and other preservation experts; consulted the State Historic Preservation Officer, the National Park Service, and ACHP on eligibility, effects, and mitigation; and provided ACHP the information it requested. Dkt. 26-4 at 221–22; Dkt. 26-7 at 2–3, 28–30. ACHP opted not to further participate "since the [Programmatic Agreement] was fully executed with the support of [the State Historic Preservation Officer]." Dkt. 26-4 at 222.

That consultation materially changed the exchange and produced enforceable preservation measures memorialized in the Programmatic Agreement signed by the Texas State Historic Preservation Officer, the National Park Service, the Service, and SpaceX. SpaceX and the Service removed about eight historically sensitive acres from the exchange. Dkt. 26-7 at 7. The Agreement also: prohibits industrial, commercial, and residential development within the approximately 10-acre White's Ranch Preservation Area through deed restrictions and Starbase zoning protections, preserving the viewshed near the location believed to be associated with the last shot of the Civil War; requires SpaceX to build a public viewing platform and exhibit at that site to enhance its interpretive value, including "storyboards or panels discussing the history of the Palmito Ranch Battlefield NHL, the significance of the White's Ranch area, and the story of the last shot of the

Civil War"; requires a qualified archaeologist to monitor initial ground-disturbing activities in soils designated as Point Isabel clay loam and establishes procedures for archaeological discoveries; and requires collection and curation at the Texas Archaeological Research Laboratory of specified recorded artifacts that contribute to the landmark's historic significance. *Id.* at 7–10; *see also* Dkt. 26-4 at 29–31, 221–22.

These steps satisfy Sections 106 and 110(f). Compliance with the Programmatic Agreement satisfies the Service's Section 106 responsibilities for this undertaking. 36 C.F.R. § 800.14(b)(3). The record likewise shows the heightened planning to minimize harm that Section 110(f) requires. The Service identified adverse effects, consulted preservation authorities and interested parties, considered the no-action alternative and mitigation options, revised the exchange, and adopted binding measures tailored to preserving the Palmito Ranch Battlefield's historic significance. The State Historic Preservation Officer and the National Park Service signed the Agreement, and ACHP received the required opportunity to participate. Given the Programmatic Agreement's measures to "preserve, interpret, and manage historic properties in perpetuity," the Service's NEPA analysis also found no significant effects on the landmark, which spans 9,391 acres and already includes some private, developed areas like Massey's. Dkt. 26-1 at 3-5; *see* Dkt. 35 at 6, 9, 24–30.

Plaintiffs may prefer different mitigation or no exchange at all, but that disagreement does not show that the Service's determination was arbitrary or capricious. *See Coliseum Square*, 465 F.3d at 243–44 (upholding a Section 110(f) determination supported by the National Park Service under the APA standard); *Vieux Carré Prop. Owners*, 719 F.2d at 1281 (rejecting a challenge where the record showed reasoned historic preservation review included "significant efforts to mitigate any adverse effects on historic sites"). Under the applicable arbitrary and capricious

standard, Plaintiffs and the Court must defer to the agency's reasoning so long as it is "within a zone of reasonableness." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Plaintiffs therefore cannot establish a likelihood of success on any claims under Section 106 or Section 110(f).

**3. The exchange complies with the Refuge Act.**

Plaintiffs argue that the exchange violates the Refuge Act because it allegedly provides no net conservation benefit to the LRGV Refuge, conflicts with the 1997 comprehensive conservation plan (Plan), and proceeds even though the Service has not recently revised that plan. Mot. 30–35. None of those theories supports preliminary relief.

**a. The decision whether to enter into this land exchange is committed to the Service's discretion.**

As an initial matter, Plaintiffs' Refuge Act challenge to the Service's discretionary decision to enter this exchange is not subject to APA review because the Act commits the relevant judgment to the Secretary of the Interior's discretion.

Actions "committed to agency discretion by law" are not subject to APA review. 5 U.S.C. § 701(a)(2). That exception applies when a statute provides "no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985); *Qorane v. Barr*, 919 F.3d 904, 906 (5th Cir. 2019).

The Refuge Act broadly authorizes the Secretary to "[a]cquire lands … by exchange." 16 U.S.C. § 668dd(b)(3). The Act imposes just two conditions: the outgoing land must be found "suitable for disposition," and the exchanged properties must be approximately equal in value or cash-equalized. *Id.* Plaintiffs do not appear to dispute the Director's suitability finding or the value equalization. Dkt. 26-21 at 2–3, 9. Even if they disputed suitability, Congress supplied no manageable criteria for assessing it. Rather, as the phrase "which *he* finds" shows, it entrusted the

suitability judgment to the Secretary. 16 U.S.C. § 668dd(b)(3) (emphasis added); *see Webster v. Doe*, 486 U.S. 592, 600 (1988) ("shall deem" standard "fairly exudes deference to the Director, and appears to us to foreclose the application of any meaningful judicial standard of review"). The statute's structure confirms that commitment: Subsection (a)(5) restricts other dispositions of acquired refuge lands but expressly excepts an "exchange pursuant to subsection (b)(3)." 16 U.S.C. § 668dd(a)(5). And, unlike the Refuge Act's exchange authority, other land-exchange statutes like the Federal Land Policy and Management Act enumerate detailed decisional criteria. *See, e.g.*, 43 U.S.C. § 1716(a). Congress thus knows how to constrain exchange authority but chose not to do so here beyond the requirements stated in subsection (b)(3). Moreover, Congress defined "compatible use" in the Refuge Act and made compatibility findings subject to specific requirements, but it did not define "suitable" or impose specific criteria governing whether to proceed with an exchange. *See* 16 U.S.C. § 668ee(1).

Interpreting this same provision, the Sixth Circuit held that because "the Secretary had discretion to determine whether he should enter into the agreement for the exchange of the lands, his action in so doing is not reviewable by the courts." *Sierra Club v. Hickel*, 467 F.2d 1048, 1051 (6th Cir. 1972). And while Congress later amended the Refuge Act via the National Wildlife Refuge System Improvement Act of 1997, Pub. L. No. 105-57, it did not amend subsection (b)(3), which has remained substantively unchanged since 1966. Because Congress left subsection (b)(3) unchanged, the Sixth Circuit's holding that exchange decisions are unreviewable remains persuasive.[6]

---

[6] *Accord Town of Superior v. U.S. Fish & Wildlife Serv.*, 913 F. Supp. 2d 1087, 1111–12 (D. Colo. 2012), *aff'd sub nom. WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677 (10th Cir. 2015) ("[T]he decision to enter into a land exchange is committed to the FWS' discretion."). *But see Nat'l Wildlife Refuge Ass'n v. Rural Utils. Serv.*, No. 24-139, 2025 WL 2719976, at *15–17 (W.D. Wis. Sept. 24, 2025) (holding that suitability and net-benefit analyses

Plaintiffs point to the Act's general mission provisions and the Service Manual's non-purchase-acquisition chapter, 342 FW 5.7(B)(2)(c), as supplying governing standards. Mot. 30–31. But the Manual is internal guidance, not a regulation with the force of law, and does not create judicially enforceable duties. *See N. Cal. River Watch v. Wilcox*, 633 F.3d 766, 779 (9th Cir. 2011) (holding that Service manuals "lack the force of law" and are intended only to provide guidance); *see also Heckler*, 470 U.S. at 836 (declining to treat a policy statement as limiting agency discretion). Nor do the Act's broad directions to carry out the Refuge System's mission and each refuge's purposes supply criteria for second-guessing the Secretary's exchange judgment. 16 U.S.C. §§ 668dd(a)(3)(A), (a)(4)(D). Those general provisions do not displace subsection (b)(3)'s specific exchange authority or subsection (a)(5)'s express exemption of such exchanges from the Act's ordinary disposal restrictions.

**b. The Service reasonably found that the exchange furthers the LRGV Refuge's purposes and yields a net conservation benefit.**

Even if APA review were available, Plaintiffs cannot show that the Director's findings were arbitrary or capricious. Supported by the EA, Biological Assessment, parcel-level Biological Importance Scores, and the no-action comparison, the Director expressly found that the exchange furthers the LRGV Refuge's purposes, fulfills the Refuge System's mission, and provides a net conservation benefit to the LRGV Refuge. Dkt. 26-21 at 4–9. Plaintiffs identify no material factor the Service ignored; they instead dispute how the Service weighed acreage, foreseeable development, fragmentation, and the allocation of benefits between refuges. None of their arguments overcome the substantial deference owed the Service's expert conservation judgment. *See Medina Cnty. Env't Action Ass'n*, 602 F.3d at 699 ("Where an agency's particular technical

---

were reviewable but upholding the exchange under deferential APA review). Plaintiffs do not challenge the Director's suitability finding here.

expertise is involved, we are at our most deferential in reviewing the agency's findings.").

First, the modest net acreage reduction does not establish a conservation loss. *See* Mot. 31. Neither the Refuge Act nor the Service Manual makes acreage dispositive or calls for acre-for-acre ecological equivalence. *See* 16 U.S.C. § 668dd(b)(3). Rather, the Manual calls for the Refuge Manager's "expert judgment" in comparing conservation value, planned uses, and effects on the refuge. 342 FW 5.7(B)(2); *see Nat'l Wildlife Refuge Ass'n v. Rural Utils. Serv.*, No. 24-139, 2025 WL 2719976, at *15–17 (W.D. Wis. Sep. 24, 2025) (upholding a net-benefit determination that considered habitat quality, connectivity, and fragmentation rather than acreage alone).

The record supports the Director's comparative judgment here. The parcels the Service will acquire contain high-quality coastal marsh, tidal flats, saline prairie, and thornscrub habitat; adjoin refuge lands; and strengthen the Bahia Grande landscape. Dkt. 26-21 at 3–5. They received materially higher Biological Importance Scores, and listed species had a greater potential to occur there. Dkt. 26-4 at 16–17, 38–39 tbl. 2-7, 207–12. The parcels being transferred to SpaceX, by contrast, are already interspersed with SpaceX holdings and affected by rights-of-way, access, noise, light, fragmentation, and nearby industrial activity. Dkt. 26-21 at 3–5. The Service reasonably concluded that marginally less acreage of more contiguous, higher-value habitat yields a net conservation gain.

Second, the Service did not ignore SpaceX's potential development of the parcels it will acquire. *See* Mot. 31–32. To the contrary, the Director acknowledged that development could have "foreseeable and unavoidable consequences" and weighed those effects against the benefits of consolidating activity near already affected lands and permanently protecting the acquisition parcels. Dkt. 26-21 at 4–6. The Director's no-action analysis likewise considered continuing effects on Refuge lands from interspersed private holdings and anticipated development of the

acquisition parcels if SpaceX retained them. *Id.* at 8. Plaintiffs' disagreement with that balance does not show that the Service ignored an important factor.

Third, current access conditions at the Las Palomas and Boca Chica Beach parcels the Service is acquiring do not undermine the Service's fragmentation rationale. Plaintiffs contend those parcels are already practically protected because access requires crossing Refuge land. Mot. 32–33. But current access conditions are not permanent conservation restrictions. The no-action analysis reasonably treated the private parcels as subject to future private development if SpaceX retained them. Dkt. 26-21 at 8. As the Director explained, SpaceX has a "right to access its lands and the utilities necessary for their development" and the existing ownership patchwork already requires multiple rights-of-way across Refuge land for access and utilities. *Id.* at 2–3. Rejecting this land exchange, in other words, would not and could not prevent SpaceX from accessing the parcels it already owns. This uncertainty about future development—and SpaceX would surely pursue such development—supports the Director's reasoning.

Nor is the Service's fragmentation concern or finding of a net conservation benefit contradicted because the exchange will convert a "smattering of fragmented inholdings" into a larger contiguous SpaceX holding. *See* Mot. 33–34. Consolidating interspersed ownership necessarily creates larger contiguous holdings; that is how the exchange reduces repeated access and utility crossings, boundary conflicts, and management burdens. Dkt. 26-21 at 3–5, 8–9. The Service acknowledged that SpaceX may develop the land it acquires but reasonably concluded that concentrating activity in an already affected area while acquiring contiguous, high-value habitat will improve the Refuge's overall conservation value. *Id.* at 4–5, 7–9.

Fourth, the benefits run to the LRGV Refuge itself. *See* Mot. 30–31. The Director expressly found a net conservation benefit to the individual refuge. Dkt. 26-21 at 9. Every acquisition parcel

lies within the LRGV Refuge's approved acquisition boundary, even though the Laguna Heights parcels also adjoin Laguna Atascosa's Bahia Grande Unit. *Id.* at 3–5. The overlap between two refuges does not negate their benefit to the LRGV Refuge. The 1997 Plan identifies Laguna Atascosa as a "partner with the LRGV [Refuge]" and calls for coordinated habitat restoration, research, water management, fire control, and law enforcement. Dkt. 26-3 at 13–14. The Director found that acquiring these parcels would strengthen connectivity, protect higher-quality habitat, and reduce ownership and management conflicts *within the LRGV Refuge*. Dkt. 26-21 at 4–5, 9.

The Service thus considered habitat quality, species use, connectivity, fragmentation, management conflicts, foreseeable development, and the no-action alternative, and rationally explained why the exchange furthers Refuge purposes and provides a net conservation benefit. Those conservation judgments fall squarely within the Service's technical expertise and receive highly deferential review. *See Medina Cnty. Env't Action Ass'n*, 602 F.3d at 699. Plaintiffs' request that the Court reweigh them must be rejected; even if the factors might have been weighed differently, it would not establish arbitrary or capricious action. *See Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 973 (9th Cir. 2022) (under APA, court could not "second-guess [the Service's] scientific judgment and institute our own program for Refuge management"); *Dep't of Commerce v. New York*, 588 U.S. 752, 777 (2019) ("It is not for us to ask whether his decision was 'the best one possible' or even whether it was 'better than the alternatives.'").

**c. The exchange is consistent with the 1997 Plan.**

Plaintiffs next argue that any net reduction in the LRGV Refuge's acreage violates 16 U.S.C. § 668dd(e)(1)(E), which directs the Secretary to manage a refuge consistently with its comprehensive conservation plan. Mot. 34–35. That argument treats the 1997 Plan's 132,500-acre acquisition goal as a one-way ratchet forbidding any exchange that yields fewer acres, regardless of relative habitat value, connectivity, or management benefit. Nothing in the plan says that.

The acreage target is a means of advancing the plan's broader conservation goals, not an end divorced from those goals. The plan seeks to protect biological diversity, land, waters, and cultural resources; conserve endangered species; connect native habitat; protect isolated desirable habitat; and manage lands for the "continuum of ecological processes" rather than as "individual geographic entities." Dkt. 26-3 at 8–12, 45–52.

The Director reasonably found that the exchange advances those objectives, and the EA, Biological Importance Scores, and no-action comparison supported that finding. Dkt. 26-21 at 4–9; *see Nat'l Wildlife Refuge Ass'n*, 2025 WL 2719976, at *17 (upholding an exchange where the applicable plan did not prohibit exchanges and left the Service discretion to determine whether the transaction advanced refuge goals). The exchange places higher-scoring habitat with greater listed-species potential and connectivity under federal protection, reduces ownership and management conflicts, and strengthens habitat adjoining Bahia Grande. Dkt. 26-4 at 16–17, 38–39 tbl. 2-7, 207–12; Dkt. 26-21 at 4–5. As noted, the Plan identifies Laguna Atascosa as a partner refuge whose lands form part of planned habitat corridors and calls for coordinated conservation management. Dkt. 26-3 at 13–14. Plaintiffs thus do not show that the Director's consistency finding was arbitrary or capricious. Indeed, Plaintiffs' reading would subvert the Plan's goals by preventing the Service from exchanging a somewhat larger area of lower-value, fragmented land for a smaller area of higher-value, more contiguous habitat.

**4. Plaintiffs' Section 706(1) claim fails as a matter of law and cannot support a request to enjoin the exchange.**

Plaintiffs separately contend that the Service violated the Refuge Act by failing to issue a comprehensive conservation plan for the LRGV Refuge and to revise the existing plan. Mot. 35–37; Dkt. 48 ¶¶ 129–35 (amended complaint). They invoke APA § 706(1), which permits a court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). But

that remedy reaches only a "discrete agency action" the agency is legally required to take. *Fort Bend Cnty. v. U.S. Army Corps of Eng'rs*, 59 F.4th 180, 197 (5th Cir. 2023) (quoting *Norton v. S. Utah Wilderness All.* (*SUWA*), 542 U.S. 55, 63–64 (2004)). "In other words, a § 706(1) action bears fruit only where it seeks 'enforcement of a specific, unequivocal command' or 'the ordering of a precise, definite act about which an official ha[s] no discretion whatever.'" *Ctr. for Biological Diversity v. Burgum*, 826 F. Supp. 3d 18, 31 (D.D.C. 2026) (quoting *SUWA*, 542 U.S. at 63). Plaintiffs identify no nondiscretionary duty to issue the revised plan they demand. Regardless, any viable planning-delay claim would not justify enjoining the separately approved exchange.

Plaintiffs first assert that the Service never issued a qualifying comprehensive conservation plan for the LRGV Refuge because the governing 1997 Plan is titled an "Interim Comprehensive Management Plan." Mot. 35–36; *see* Dkt. 26-3. But the plan's title is not dispositive. That document serves as the Refuge's governing comprehensive conservation plan, and Plaintiffs themselves invoke it as the plan with which the exchange must be consistent. Mot. 34–35; *see Ctr. for Food Safety v. Jewell*, 83 F. Supp. 3d 126, 143 & n.16 (D.D.C. 2015) (recognizing a pre-1997 "Comprehensive Management Plan" served as a comprehensive conservation plan). Plaintiffs identify no statutory element that the Plan omits. *See* 16 U.S.C. § 668dd(e)(2). To the extent they attack the sufficiency of the 1997 Plan, that challenge is untimely under 28 U.S.C. § 2401(a). And the Act expressly directs the Service to manage under plans in effect on October 9, 1997, to the extent consistent with the Act, until revised or superseded. 16 U.S.C. § 668dd(e)(1)(C).

Plaintiffs' plan-revision argument also fails because they do not identify a nondiscretionary act the Court may compel. Subsection (A)(iv) directs the Service to "revise the conservation plan *as may be necessary*," while subsection (E) requires revision "*if* the Secretary determines" that conditions affecting a refuge have changed significantly. 16 U.S.C. § 668dd(e)(1)(A)(iv), (E)

(emphases added). The duty to update the plan thus applies only upon a finding by the Secretary that conditions have "significantly changed" or an update is otherwise "necessary." Plaintiffs identify no such determination. The Fifth Circuit has already rejected a similar § 706(1) theory. In *Fort Bend County*, the Court of Appeals held that language directing that a plan "shall be revised as necessary" did not impose a "discrete, mandatory duty to revise" because the agency "must exercise discretion in deciding when updating a [plan] is necessary." 59 F.4th at 198. Nor does the 1997 Plan's statement that the Service anticipated revisiting it within five to ten years create a binding legal duty. This type of "statement by [an agency] about what it plans to do, at some point, provided it has the funds and there are not more pressing priorities, cannot be plucked out of context and made a basis for suit under § 706(1)." *See SUWA*, 542 U.S. at 69–72.[7]

Even if Plaintiffs could show that some planning action is required by law and overdue, neither § 706(1) nor the Refuge Act authorizes the relief they seek—an injunction against a *different* agency action. Section 706(1) permits a court to compel unlawfully withheld or unreasonably delayed action; it does not authorize setting aside an independent action as a remedy for such delay. The Refuge Act likewise provides that existing plans remain operative to the extent consistent with the Act and that "[u]ses or activities consistent with this Act may occur … before existing plans are revised or new comprehensive conservation plans are issued." 16 U.S.C. § 668dd(e)(1)(C)–(D). Thus, even assuming revision is overdue, the Service may undertake an action consistent with the Act and existing plan—as the Director found this exchange is.

*Center for Food Safety v. Jewell* confirms that even if Plaintiffs' plan update claim were

---

[7] The amended complaint labels the alleged inaction both "unlawfully withheld" and "unreasonably delayed," Dkt. 48 ¶ 135, but the preliminary injunction motion does not develop the multi-factor standard for unreasonable-delay claims. Mot. 35–37; *see Mazher v. Rubio*, No. 25-CV-017-P, 2025 WL 2471789, at *7 (N.D. Tex. Aug. 11, 2025). Any such theory would also fail due to the lack of a mandatory legal duty to update the plan.

viable, it would not support the injunction they seek. 83 F. Supp. 3d at 143–45. The court in that case held that any unreasonable delay in revising a plan could not justify setting aside independent refuge-management decisions because a revised plan would guarantee additional analysis, not a particular outcome, and § 706(1) relief must target the delayed action. *Id.* Here, the Service separately reviewed the exchange through the EA, Biological Assessment, Programmatic Agreement, FONSI, and Director's decision. Plaintiffs offer no basis to presume that a future plan revision would prohibit it.

### 5. The Service complied with NEPA.

Plaintiffs advance one NEPA theory: the EA should have separately analyzed a no-exchange alternative under which the Service would pursue enforcement against SpaceX and consider denying future rights-of-way across Refuge land. Mot. 37–40. But the EA analyzed a no-action alternative, under which the Service would retain and manage the divestiture parcels and evaluate future right-of-way applications under the Refuge Act. Plaintiffs' proposal is not materially distinct from that alternative, and it would not satisfy the exchange's purpose and need to consolidate ownership, reduce land-use conflicts, improve habitat protection, and simplify refuge management.

For an environmental assessment, NEPA requires discussion of "appropriate alternatives," 42 U.S.C. § 4332(2)(H), not every alternative proposed in comments. *City of Dallas v. Hall*, 562 F.3d 712, 718–19 (5th Cir. 2009) (upholding an EA prepared by the Service). Nor must an agency study an alternative at odds with the project's purpose or one not significantly distinguishable from alternatives actually considered. *Citizens for Clean Air & Clean Water in Brazoria Cnty. v. U.S. Dep't of Transp.*, 98 F.4th 178, 195 (5th Cir. 2024); *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of the Interior*, 608 F.3d 592, 602 (9th Cir. 2010). And in the end, courts must afford substantial deference to an agency's fact-dependent choices about the breadth and depth of its

alternatives analysis. *Seven Cnty.*, 605 U.S. at 183, 186. Applying that rule, the Fifth Circuit upheld a no-action discussion even though it "did not provide much detail" because the agency identified the status quo and compared the proposed project's effects. *Gas Transmission Nw., L.L.C. v. FERC*, 157 F.4th 674, 709–10 (5th Cir. 2025).

The Service satisfied these standards. The EA analyzed the proposed exchange and the no-action alternative and also considered smaller and larger exchange configurations. Dkt. 26-4 at 11–12. Smaller configurations—including one limited to the immediate Massey's area—offered limited conservation benefit and presented operational constraints. *Id.* at 12. Larger configurations in Cameron and Willacy Counties were financially infeasible and lacked willing sellers. *Id.* So they were not carried forward for detailed analysis.

Plaintiffs' proposal adds nothing NEPA required the Service to analyze separately. Under the no-action alternative, the Service would retain and manage the divestiture parcels, process applications for access and utilities, and confront continuing conflicts between conservation land and private development; the SpaceX parcels proposed for acquisition would remain outside the Refuge System. *Id.* at 11. Plaintiffs' proposed alternative is not significantly distinguishable—it calls for the Service to continue to apply the Refuge Act to the lands. Plaintiffs would predetermine future enforcement and right-of-way outcomes, but that concerns how the Service would administer the no-action alternative, not a distinct alternative. Insofar as Plaintiffs assume the Refuge Act authorizes regulation of activity on adjoining private land to reduce proximity effects, they are mistaken. *See* 16 U.S.C. § 668dd(d)(1)(A), (B) (limiting Service's authority to permit uses to "areas within the System"); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 900 F. Supp. 2d 1151, 1160 (D. Nev. 2012), *aff'd*, 807 F.3d 1031 (9th Cir. 2015) (holding Refuge Act inapplicable because challenged pumping occurred "on lands outside the boundaries of the

refuge"). As the Service explained, it "does not control how private landowners use their private property." Dkt. 26-4 at 220. And "SpaceX has a legal right to develop its inholdings in the Boca Chica Tract," a fact Plaintiffs' proposed alternative does not eliminate. Dkt. 26-21 at 5.

In any case, Plaintiffs' no-action-plus-enforcement alternative would not consolidate ownership or bring SpaceX's high-habitat-value parcels proposed for acquisition into the Refuge and would not accomplish the exchange's goals. NEPA thus did not require the Service to analyze Plaintiffs' preferred alternative. *See La. Crawfish Producers Ass'n–W. v. Rowan*, 463 F.3d 352, 356–57 (5th Cir. 2006) (upholding an EA that did not separately analyze proposal to reopen waterways and enforce pipeline permits because the agency reasonably rejected it as impracticable and inconsistent with project objectives).

Accordingly, the Service's alternatives analysis falls comfortably within NEPA's "broad zone of reasonableness" and should be upheld. *Seven Cnty.*, 605 U.S. at 183.

**B. Plaintiffs have not shown imminent, irreparable harm absent an injunction.**

The Supreme Court has made clear that "a preliminary injunction will not be issued simply to prevent the possibility of some remote future injury." *Winter*, 555 U.S. at 22 (citation omitted). Plaintiffs must instead prove that irreparable harm is likely, imminent, and not speculative. *See Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013). Alleged statutory error does not dispense with that requirement. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544–45 (1987). Plaintiffs do not meet this burden for the same reasons they do not show injury-in-fact supporting standing. Indeed, their showing is even weaker because the only development SpaceX currently plans on the acquired lands is to expand its existing Massey's testing facility and build a service road.

Plaintiffs' access-based theory of irreparable harm fails because they show no lawful use of the areas implicated by those plans. Massey Way and the adjoining Refuge lands are closed and posted against unauthorized entry. Quicksilver Avenue is a private road. Styer Decl. ¶¶ 19–20. The planned eastward expansion of the Massey's testing facility will not border Refuge land. *Id.* ¶ 39. The service road will reduce, not increase, interference with traffic and beach access. *Id.* ¶ 40. And even if some development were visible, a passing "eyesore" viewed while driving along State Highway 4 is not enough to show Article III standing, *Env't Def. Fund*, 2 F.4th at 969, much less irreparable harm supporting the extraordinary relief of a preliminary injunction. Plaintiffs therefore identify no imminent impairment of a lawful recreational, aesthetic, or cultural use.

Plaintiffs' other asserted harms are either attributable to existing operations or dependent on conjecture. Their declarations focus on launches, testing, lighting, traffic, debris, and beach closures that predate and are not authorized by the exchange. And predictions that SpaceX will immediately industrialize all acquired land conflict with the company's actual plans. Potential development elsewhere at some undefined time, subject to applicable law and approvals, does not establish a reasonably certain and imminent injury required for preliminary relief. *See Daniels Health Scis.*, 710 F.3d at 585.

Nor do Plaintiffs show imminent ecological or historic harm. The Service's Biological Assessment found the exchange not likely to adversely affect listed species or designated critical habitat,[8] Dkt. 26-12 at 54–55 & tbl. 2, and the Programmatic Agreement imposes binding preservation measures, including the White's Ranch deed and zoning restrictions and archaeological protections, Dkt. 26-7 at 7–10. On this record, Plaintiffs have not established that any irreparable injury to them is likely before the Court can resolve the merits.

[8] Plaintiffs have not sought relief under the Endangered Species Act.

## C. The balance of equities and the public interest strongly disfavor an injunction.

The balance-of-equities and public-interest inquiries merge when the government is a party. *AbbVie, Inc. v. Fitch*, 152 F.4th 635, 642 (5th Cir. 2025). Both strongly disfavor an injunction here. Plaintiffs portray the requested relief as a short pause that would cause little more than administrative inconvenience. Mot. 46–49. The opposite is true. An injunction would postpone or foreclose the conservation benefits the Service found and delay infrastructure needed to relieve an existing Starship testing bottleneck. Those concrete harms substantially outweigh Plaintiffs' speculative allegations.

SpaceX has refrained from developing the higher-habitat-value parcels it will convey to the Service and instead plans to expand testing immediately east of existing Massey's and build a service road to State Highway 4. Dkt. 26-4 at 16–17, 207–12; Styer Decl. ¶¶ 5, 7, 38–40. That approach concentrates new testing capacity that is urgently needed at an existing site and reduces interference with traffic and beach access. Styer Decl. ¶¶ 38–42.

If a lengthy or permanent injunction prevents the exchange, SpaceX would redirect engineering, permitting, and construction to less suitable land it already owns, including parcels intended for the Service. *Id.* ¶¶ 7, 43–45. A separate test site would delay expanded capacity by at least two years, require additional roadwork, complicate movement of Starship hardware, and introduce effects near another part of the Refuge. *Id.* Thus, an injunction would not prevent development; it would steer development toward the higher-value land the Service seeks to protect while increasing cost, delay, and fragmentation.

Even if SpaceX ultimately prevails and the exchange proceeds, the delay itself would harm SpaceX and public programs that depend on Starship. SpaceX has invested billions of dollars in Starbase and Starship and has billions of dollars in government and commercial contracts tied to

continued Starship development and increasing launch cadence. *Id.* ¶¶ 46–47. Delaying the testing capacity needed to support that cadence could jeopardize contract milestones, revenue, and the following federal programs and public services. *Id.* ¶¶ 47–66.

**Artemis:** NASA selected Starship as the Human Landing System for returning astronauts to the Moon for the first time in more than 50 years. Styer Decl. ¶ 48. Before the planned crewed lunar landing in 2028, SpaceX must complete a sequence of demanding milestones, including integrated launches, orbital docking and propellant-transfer demonstrations, a long-duration orbital flight, and an uncrewed lunar landing. *Id.* ¶ 50. Each lunar mission will require tens of Starship launches, making increased launch cadence—and the ground testing that supports it—critical to NASA's schedule. *Id.* ¶¶ 48–50. A delay of two years or longer could risk SpaceX's ability to meet the planned 2027 crewed Earth-orbit demonstration and later Artemis milestones, including the planned 2028 return to the Moon. *Id.* ¶¶ 50–53. This delay would not only harm SpaceX's ability to realize returns but also could harm the U.S. space program's objective to return astronauts to the Moon before geopolitical rivals. *Id.* ¶¶ 52–53.

**National-security programs:** The Air Force Research Laboratory awarded SpaceX a $102 million contract under the Rocket Cargo Vanguard program to investigate rapid point-to-point military cargo transportation using Starship. *Id.* ¶ 54. The program seeks the ability to use rockets to transport large quantities of military cargo anywhere on the planet within tactical timelines, and its performance milestones are tied to Starship development and flight tests. *Id.* SpaceX also plans to use Starship for national-security launches, which require demonstrated maturity, reliability, and flight heritage through repeated successful missions. *Id.* ¶ 55. Delaying testing and increased launch cadence would risk postponing capabilities sought by U.S. defense and intelligence agencies.

**Starlink, Starshield, and orbital data centers:** Starlink provides satellite broadband to more than 10 million customers in over 170 markets, including users in remote and underserved areas, government entities, and communities recovering from disasters. *Id.* ¶¶ 56, 60–61. SpaceX's next-generation V3 satellites have substantially greater capacity and can be launched only on Starship because of their size and mass. *Id.* ¶¶ 57–58. Delaying increased Starship launch cadence would constrain V3 deployment, limit service expansion, and affect government and national-defense users. *Id.* ¶¶ 57–63. It would likewise risk postponing upcoming Starshield systems used by defense and intelligence agencies. *Id.* ¶ 64. And it would impair SpaceX's ability to deploy artificial-intelligence data centers into orbit to sustainably address accelerating demand for computing power. *Id.* ¶¶ 65–66.

An injunction would also harm the Brownsville community and Lower Rio Grande Valley. SpaceX is Brownsville's largest private employer, directly employing about 4,000 people at Starbase, approximately 85% of whom are Lower Rio Grande Valley residents. *Id.* ¶ 67. Its operations support more than 80 local suppliers and over 20,000 regional jobs. *Id.* SpaceX expects the expanded testing facility and increased launch cadence to support additional employees, contractors, suppliers, and economic activity. *Id.* ¶ 68. A preliminary injunction would postpone those benefits while SpaceX waits to expand Massey's or pursues a less efficient alternative site.

Plaintiffs therefore miss the point in asserting that SpaceX will suffer no injury from being temporarily prevented from developing land it does not yet own. Mot. 47. SpaceX planned in reliance on the exchange, refrained from developing the higher-value parcels it will convey, and now faces a near-term testing bottleneck. Styer Decl. ¶¶ 6–8, 38, 42–45. Enjoining the exchange would delay SpaceX's response to that bottleneck and postpone increased launch cadence. The resultant harms are concrete and immediate. This Court previously denied emergency relief that

would have delayed Starship launches, reasoning that "[b]eing unable to launch would create various consequences for not only [SpaceX], but also the public at large." *Save RGV v. SpaceX*, No. 24-CV-00148, 2024 WL 5357188, at *4 (S.D. Tex. Nov. 21, 2024). The same is true here: an injunction would risk delaying Artemis, affect national-security launch programs, hinder Starlink deployment, and force SpaceX onto a slower, costlier, and more environmentally disruptive development path.

The balance of equities and the public interest thus strongly favor allowing the exchange to proceed.

### D. If an injunction issues, Plaintiffs should be required to post adequate security.

Rule 65(c) provides that a court may issue a preliminary injunction "only if the movant gives security in an amount the court considers proper to pay the costs and damages sustained by a party wrongfully enjoined." Despite this plain language, the Fifth Circuit has held that district courts have discretion to set the amount and, in appropriate circumstances, to require only nominal security or even to waive it. *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996). SpaceX disagrees with this reading of the rule, but in any case, the discretion it gives should account for the substantial losses SpaceX would face here.

An injunction would force additional site-development costs, delay testing and contractual milestones, jeopardize revenue, and risk market opportunities that cannot readily be recaptured. Styer Decl. ¶¶ 42–45, 70–71. If the Court grants relief, it should require security commensurate with those potential losses after permitting SpaceX to make an appropriate evidentiary showing.

## V. CONCLUSION

The Court should deny the motion for a preliminary injunction.

Dated: August 14, 2026

Respectfully Submitted,

*/s/ Tyler Welti*
Tyler G. Welti (D.C. Bar No. 1015691)
VENABLE LLP
101 California Street, Suite 3800
San Francisco, CA 94111
tgwelti@venable.com
Phone: 415-653-3714
Fax: 415-653-3755

Jay C. Johnson (D.C. Bar No. 487768)
VENABLE LLP
600 Massachusetts Ave., N.W.
Washington, DC 20001
jcjohnson@venable.com
Phone: 202-344-4000
Fax: 202-344-8300

Counsel for Defendant-Intervenor Space Exploration Technologies Corp.

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 14, 2026, a copy of the foregoing was served on counsel for Plaintiffs and Federal Defendants through the Court's electronic filing system.

*/s/ Tyler Welti*

Tyler G. Welti (D.C. Bar No. 1015691)

VENABLE LLP
101 California Street, Suite 3800
San Francisco, CA 94111
tgwelti@venable.com
Phone: 415-653-3714
Fax: 415-653-3755