# Exhibit D

**Federal Register** / Vol. 89, No. 32 / Thursday, February 15, 2024 / Notices 11847

**ACTION:** Notice.

**SUMMARY:** The Secretary of Health and Human Services announces a meeting of the Interdepartmental Serious Mental Illness Coordinating Committee (ISMICC).

The meeting will provide information on federal efforts related to serious mental illness (SMI) and serious emotional disturbance (SED); the Olmstead Decision: 25 Years of History in the Making; SMI Advisor: A Modern Approach to Technical Assistance that Makes an Impact; and Report Outs from Focus Area 1—Data and Evaluation; Focus Area 2—Access and Engagement; Focus Area 3—Treatment and Recovery; Focus Area 4—Criminal Justice and Focus Area 5—Finance.

**DATES:** March 27, 2024, 9:00 a.m. to 4:00 p.m. (EST)/Open.

**ADDRESSES:** The meeting is open to the public and can be accessed virtually only by accessing: *https://www.zoomgov.com/j/1611468532?pwd=b0xnU2dTbFJqQXlONkJkUzdjdzhtZz09* or by dialing 646–828–7666, webinar ID: 161 146 8532, passcode: 127885. Agenda with call-in information will be posted on the SAMHSA website prior to the meeting at *https://www.samhsa.gov/about-us/advisory-councils/meetings.*

**FOR FURTHER INFORMATION CONTACT:** Pamela Foote, ISMICC Designated Federal Officer, SAMHSA, 5600 Fishers Lane, Rockville, MD 20857; telephone: 240–276–1279; email: *pamela.foote@samhsa.hhs.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. Background and Authority

The ISMICC was established on March 15, 2017, in accordance with section 6031 of the 21st Century Cures Act, and the Federal Advisory Committee Act, 5 U.S.C. App., as amended, to report to the Secretary, Congress, and any other relevant federal department or agency on advances in SMI and SED, research related to the prevention of, diagnosis of, intervention in, and treatment and recovery of SMIs, SEDs, and advances in access to services and supports for adults with SMI or children with SED. In addition, the ISMICC will evaluate the effect federal programs related to SMI and SED have on public health, including public health outcomes such as: (A) rates of suicide, suicide attempts, incidence and prevalence of SMIs, SEDs, and substance use disorders, overdose, overdose deaths, emergency hospitalizations, emergency room boarding, preventable emergency room visits, interaction with the criminal justice system, homelessness, and unemployment; (B) increased rates of employment and enrollment in educational and vocational programs; (C) quality of mental and substance use disorders treatment services; or (D) any other criteria determined by the Secretary. Finally, the ISMICC will make specific recommendations for actions that agencies can take to better coordinate the administration of mental health services for adults with SMI or children with SED. Not later than one (1) year after the date of enactment of the 21st Century Cures Act, and five (5) years after such date of enactment, the ISMICC shall submit a report to Congress and any other relevant federal department or agency.

## II. Membership

This ISMICC consists of federal members listed below or their designees, and non-federal public members.

*Federal Membership:* Members include, The Secretary of Health and Human Services; The Assistant Secretary for Mental Health and Substance Use; The Attorney General; The Secretary of the Department of Veterans Affairs; The Secretary of the Department of Defense; The Secretary of the Department of Housing and Urban Development; The Secretary of the Department of Education; The Secretary of the Department of Labor; The Administrator of the Centers for Medicare and Medicaid Services; the Administrator of the Administration for Community Living, and The Commissioner of the Social Security Administration.

*Non-Federal Membership:* Members include, not less than 14 non-federal public members appointed by the Secretary, representing psychologists, psychiatrists, social workers, peer support specialists, and other providers, patients, family of patients, law enforcement, the judiciary, and leading research, advocacy, or service organizations.

The ISMICC is required to meet at least twice per year.

To attend virtually, submit written or brief oral comments, or request special accommodation for persons with disabilities, contact Pamela Foote. Individuals can also register at *https://snacregister.samhsa.gov/.*

The public comment section will be scheduled at the conclusion of the meeting. Individuals interested in submitting a comment, must notify Pamela Foote on or before March 18, 2024, via email to: *Pamela.Foote@samhsa.hhs.gov.*

Up to three minutes will be allotted for each approved public comment as time permits. Written comments received in advance of the meeting will be considered for inclusion in the official record of the meeting.

Substantive meeting information and a roster of Committee members is available at the Committee's website: *https://www.samhsa.gov/about-us/advisory-councils/ismicc.*

Dated: February 12, 2024.

**Carlos Castillo,**

*Committee Management Officer, SAMHSA.*

[FR Doc. 2024–03165 Filed 2–14–24; 8:45 am]

**BILLING CODE 4162–20–P**

---

# ADVISORY COUNCIL ON HISTORIC PRESERVATION

## Notice of Adoption of Policy Statement on Housing and Historic Preservation

**AGENCY:** Advisory Council on Historic Preservation.

**ACTION:** Notice of adoption of policy statement on housing and historic preservation.

**SUMMARY:** The Advisory Council on Historic Preservation has adopted its Policy Statement on Housing and Historic Preservation.

**DATES:** The policy statement was adopted and went into effect on December 22, 2023.

**FOR FURTHER INFORMATION CONTACT:** Druscilla Null, (202) 517–1487, *dnull@achp.gov.*

**SUPPLEMENTARY INFORMATION:** The Advisory Council on Historic Preservation (ACHP), an independent Federal agency created by the National Historic Preservation Act (NHPA), works to promote the preservation, enhancement, and sustainable use of our nation's diverse historic resources, and advises the President and the Congress on national historic preservation policy.

Under the NHPA, the ACHP's duties include advising the President and Congress on matters relating to historic preservation; recommending measures to coordinate activities of Federal, state, and local agencies and private institutions and individuals related to historic preservation; and advising on the dissemination of information pertaining to those activities. In keeping with these mandates, in June 2023 the ACHP initiated discussions regarding the role that rehabilitation of historic buildings can play in alleviating America's housing shortage and how the ACHP might advise and assist Federal agencies and other stakeholders on the topic.

ACHP staff developed a draft discussion outline that was provided to the full ACHP membership for review in July 2023. The general consensus of the members was to move forward with drafting of the policy statement using the proposed outline. Staff then developed a draft policy statement, with input from ACHP members and feedback from the Chair's Expert Advisory Committee. (For more information on this committee, see *https://www.achp.gov/expertsadvisory committee.*)

Subsequently, the members approved providing the draft to stakeholders and the public for comment. Two consultation events were held, one for Tribal and Native Hawaiian organization leaders and the other for State Historic Preservation Officers and their staffs. General public comments also were solicited. Based on the feedback received, the draft was revised. The final version of the policy statement was adopted by vote of the ACHP members on December 22, 2023.

The ACHP issues the regulations (36 CFR part 800) that implement section 106 of the NHPA, which requires Federal agencies to take into account the effects of projects they carry out, approve, or fund on historic properties. The policy statement applies to the consideration of housing issues during section 106 reviews.

While the policy statement pertains to Federal agency challenges and opportunities, it also speaks broadly to nonfederal parties, including but not limited to state, Tribal, and local governments; community groups; nonprofit organizations; developers, and others in the private sector. The document defines the scope of the challenge and discusses why rehabilitating and reusing historic buildings can be so impactful in addressing the housing shortfall being experienced by many communities. The policy statement promotes streamlining and improved permitting to support reuse of historic buildings for housing. It also explicitly acknowledges and aims to address burdens historically imposed on disadvantaged and underserved communities, and communities with environmental justice concerns.

The bulk of the document consists of a series of policy principles that are grouped under five general topics: reuse historic buildings; accelerate project permitting and environmental review; gather information; educate; and collaborate.

## Text of the Policy Statement on Housing and Historic Preservation

The full text of the adopted policy statement is reproduced below:

## ACHP Housing and Historic Preservation Policy Statement

Many communities across America are experiencing housing shortages, especially shortages of affordable housing. Cumulatively, this problem has grown to crisis proportions. Tackling this challenge requires a multi-pronged effort, of which rehabilitation of historic buildings is a critically important component. Recognizing that facilitating rehabilitations can help boost housing supply, meet sustainability goals, and utilize community assets more effectively, the Advisory Council on Historic Preservation (ACHP) has developed this policy statement to encourage both rehabilitation of historic housing (including historic public housing) and adaptation of historic buildings not originally built for housing.

## Scope of the Issue

Estimates vary among studies quantifying the scope of the current housing shortage, but the overall conclusion is the same–America is facing a significant deficit in housing supply versus demand in many communities. This deficit is a major cause of rising costs. A 2023 report by the Joint Center for Housing Studies of Harvard University, *The State of the Nation's Housing 2023,* succinctly summarizes what many other studies have found:

*Millions of households are now priced out of homeownership, grappling with housing cost burdens, or lacking shelter altogether, including a disproportionate share of people of color, increasing the need for policies to address the national housing shortfall at the root of the affordability crisis.*

While discussing the need to construct new units, the report also concludes that:

*In addition to expanding the supply of new homes, improving the existing housing supply is critical. Substantial investment will be needed to preserve the aging stock and respond to climate change. At 43 years of age, the median home in 2021 was the oldest it has ever been . . .*

Rehabilitating and reusing existing buildings must be integral to addressing the housing shortage, which is not a problem America can build its way out of solely through new construction.

Because approximately 40 percent of America's current building stock (residential and commercial) is at least 50 years old, rehabilitation of historic and older buildings must play an important role in addressing the housing supply shortfall. In towns, counties, and cities, and on Tribal lands throughout the country, historic buildings either are or can be rehabilitated as housing. Given that the cost of rehabilitation on a per-square-foot basis tends to be less than new construction, historic buildings are an important source of so-called ''naturally occurring'' affordable housing. The opportunities for housing creation and retention are immense. Further, every person should have safe, clean, and affordable options for housing and a healthy environment, and these needs are closely linked with other social determinants of health and environmental justice goals.

This policy statement pertains primarily to historic properties—buildings, sites, districts, structures, and objects—which are included in or eligible for inclusion in the National Register of Historic Places (National Register), and principally to individual historic buildings and buildings within historic districts. However, it is important to recognize that many older buildings that could qualify for historic designation have not yet been designated. Others are not yet 50 years old—the usual age threshold that must be reached to be considered eligible for National Register designation. The ACHP acknowledges that many of the strategies and suggestions offered in this policy statement can apply to older buildings generally, not just those formally determined to be historic.

It also is important to acknowledge that while efforts to honor and preserve the stories of all Americans are expanding, historic properties in disadvantaged and underserved communities, as well as communities with environmental justice concerns, are often underrepresented on the National Register, creating imbalances in access to preservation incentives. Disproportionately affected by the housing shortage, these communities also often lack management and decision-making authority that would help them determine where and how investments in the reuse of historic buildings for housing are made, or address any negative impacts of such determinations.

Projects to rehabilitate historic buildings for housing or build new housing may be subject to historic preservation review at the Federal, state, and/or local levels. The existence of these processes sometimes gives rise to an assumption that historic preservation

reviews will complicate or be a barrier to housing development, particularly of affordable housing. This need not be the case, and when fully integrated into regular project planning and scheduling, such reviews can benefit project development without causing delay or increasing project costs. However, such reviews do need to be grounded in a flexible yet consistent approach to ensure that housing can be developed expeditiously while still preserving the historic qualities of affected historic properties. One intent of this policy statement is to encourage such flexibility.

**Role of the Federal Government**

The National Historic Preservation Act (NHPA) states that it is the policy of the Federal government ''to foster conditions under which our modern society and our historic property can exist in productive harmony and fulfill the social, economic, and other requirements of present and future generations.'' [1] Consistent with this, the Federal government plays a role in establishing and implementing both historic preservation and housing policy. It also directly funds both historic preservation projects and housing projects, undertaken by public and private actors alike. And finally, it sets forth standards for the treatment of historic properties that are, in turn, interpreted and applied by state, Tribal, and local governments and private parties. Thus, the Federal government has a significant role to play in the way that buildings are updated or repurposed for housing.

A key player regarding historic preservation is the ACHP, an independent Federal agency created by the NHPA. It works to promote the preservation, enhancement, and sustainable use of our nation's diverse historic resources. It is the ACHP's responsibility to ''advise the President and Congress on matters relating to historic preservation, recommend measures to coordinate activities of Federal, state, and local agencies and private institutions and individuals related to historic preservation, and advise on the dissemination of information pertaining to those activities.'' [2] The ACHP has developed this policy statement in keeping with this mandate.

Across the Federal government, agencies are responsible for directly managing and caring for historic properties under their control, and for fostering both nonfederal, governmental, and private preservation activities. Section 110 of the NHPA sets out these broad historic preservation responsibilities of Federal agencies and is intended to ensure that historic preservation is fully integrated into their ongoing programs.[3] Federal agencies with responsibilities regarding housing must consider historic properties as part of their program planning, addressing the role historic buildings can play in providing housing and the potential impacts of housing projects and programs on historic properties of all types.

Federal agencies also must consider the effects of projects—including housing projects—they carry out, approve, or fund on historic properties. This requirement has been enshrined in section 106 of the NHPA and in corresponding regulations issued by the ACHP.[4] Section 106 applies both to housing built directly by Federal agencies and to housing funded by Federal agencies. Many Federal agencies, including the Departments of Defense, Interior, and Agriculture build housing for their staff and for other purposes. In addition, some Federal agencies, notably the Departments of Housing and Urban Development (HUD), Agriculture, and Veterans Affairs, provide funding to and/or partner with public housing authorities, state and local governments, and private entities for the creation of housing. These Federal agencies (and funding recipients that have assumed HUD's environmental review requirements by statute) must comply with section 106.[5]

Influencing the physical nature and form of both public and private projects, whether subject to the section 106 review process or not, are standards for the treatment of historic properties set forth by the Department of the Interior, including the Secretary of the Interior's Standards for Rehabilitation (Secretary's Standards). These standards have been adopted by state and local governments and also influence private action.

It is within this context of the Federal government's role at the intersection of housing and historic preservation that this policy statement has been developed.

**Intended Audience**

Given the leadership role of the Federal government in addressing both housing and historic preservation, the following policy principles seek to promote informed policy making, decision making, and responsible stewardship of historic properties by the Federal government. The ACHP also has designed this policy statement to assist Tribal, state, and local governments; community groups; and nonprofit organizations (collectively, along with Federal agencies, ''public-serving institutions''); developers, and others in the private sector as they seek to reuse historic buildings for housing as a strategy to address the housing crisis.

It is important to note that a wide variety of nonprofit organizations can play a role in rehabilitation of historic buildings for housing. Among these are nonprofit housing corporations, community development corporations, land banks, and heritage conservancies. Similarly, for-profit developers are central to maximizing housing creation through historic building rehabilitation, frequently creating affordable housing through the use of local, state, or Federal tax credits or subsidies. The ACHP encourages both the nonprofit and the for-profit private sectors to explore the opportunities inherent in reusing historic buildings for housing.

**Policy Principles**

It is the policy of the ACHP to encourage and accelerate rehabilitation of historic buildings for housing and to assist in harmonizing historic preservation and housing goals. The ACHP has developed the following principles to guide its own actions and to advise public-serving institutions and other public and private entities on these issues. The ACHP will integrate these principles into its oversight of the Federal section 106 review process and into the advice it provides to Federal agencies, Tribal, state, and local governments, and the general public.

*Reuse Historic Buildings*

1. *The Federal government and state governments should develop additional historic tax incentives and easier ways to pair those incentives with housing and energy tax incentives.* The existing Federal historic tax credit provides a 20 percent income tax credit for the rehabilitation of historic, income-producing buildings. As of June 2023, 39 states also have adopted state historic tax credits. Retaining and enhancing these credits and developing new

---

[1] 54 U.S.C. 300101.

[2] 54 U.S.C. 304102.

[3] 54 U.S.C. 306101–306107; 306109–306114.

[4] 54 U.S.C 306108; 36 CFR part 800.

[5] This statement incorporates provisions of a 2006 ACHP Policy Statement on Affordable Housing and Historic Preservation (a replacement for a previous 1995 policy statement), which was designed to serve as a guide for Federal agencies and other stakeholders when making decisions about affordable housing projects during section 106 review. In recognition that the Federal government engages in undertakings triggering section 106 review for both affordable housing and other types of housing, this policy statement removes the word ''affordable'' from text that previously appeared in the 2006 policy statement.

historic tax incentives is vitally important to scaling up rehabilitation of historic buildings for housing. Policymakers should consider increasing historic tax credit percentages for rehabilitation projects that create housing, particularly affordable housing, as well as setting aside a portion of tax credit benefits for housing creation in states where the state historic tax credit has a monetary program cap.

Tax credits for rehabilitation of older buildings that are not formally designated as historic also would contribute to housing creation while complementing and supporting efforts to rehabilitate nearby historic buildings in historic neighborhoods. Also, expanding homeowner historic tax credits should be considered. Rehabilitation of owner-occupied historic housing does not qualify for all state credits or the Federal historic tax credit. Homeowner rehabilitation tax credits would encourage preservation of existing historic housing by helping to support maintenance, rehabilitation, weatherization, and energy retrofits of historic homes.

The effectiveness of Federal and state historic tax credits could be further leveraged if it were easier to couple them with housing and energy tax incentives, notably the Low-Income Housing Tax Credit (LIHTC). Legislative and/or administrative fixes should be explored to reconcile conflicts. It is particularly important to address disconnects that are making pairing of the Federal historic tax credit and LIHTC increasingly difficult, including both tax policy and application-based challenges. More states should consider giving preference points for historic preservation projects in their allocation of LIHTCs, as some already do.

2. *Public-serving institutions should support existing programs and develop new programs that assist homeowners (particularly lower- and middle-income homeowners) and small-scale landlords in maintaining, repairing, and weatherizing their historic homes, and reducing their energy costs through renewable energy installation.* While historic tax credits for homeowners and small-scale landlords are one vehicle to help preserve historic homes, other forms of assistance are needed. Support is particularly critical in the case of low- and middle-income housing and can help assist in discouraging displacement of long-term residents in established neighborhoods. Financial constraints of owners can lead to a spiral of deferred maintenance and an inability to lower utility costs through weatherization and energy retrofitting, potentially leading to eventual vacancy and demolition of buildings. Types of assistance—with an emphasis on retention and repair of historic materials—that should be considered include the following: grants and low-cost loans for repairs and hazard mitigation (remediation of lead-based paint, asbestos, mold, etc.); do-it-yourself support through materials warehouses, tool sharing programs, and training workshops; free or low-cost energy audits; and job training programs focused on historic home repair.

3. *Public-serving institutions should support zoning code changes that encourage greater density and availability of housing in tandem with preserving historic buildings, that allow for mixed uses, and that allow housing in historic buildings in areas where it is now prohibited.* Increasing density and expanding housing options in existing neighborhoods—including historic neighborhoods and historic districts—are potential solutions to help address the shortfall in housing supply. This and other changes to zoning to better balance competing factors—such as through the use of form-based codes—should be seriously explored.

Taking into account the unique conditions of each community, consideration should be given to allowing and incentivizing ‘‘density without demolition’’ through: conversion of historic single-family dwellings to multi-family dwellings; creation of accessory dwelling units, either in rehabilitated historic structures or through compatible new construction; removal or reduction of minimum parking requirements in historic neighborhoods; enabling transfer of development rights to incentivize rehabilitation of historic buildings while allowing new development in alternative locations; adoption of procedures and permitting incentives to facilitate the reuse of existing buildings for housing; and compatible infill construction of multi-family housing on vacant parcels in historic districts. More guidelines, pattern books, best practices, and other resources are needed to help assist local governments and developers in implementing additional density in a manner most compatible with a community's historic buildings. Proactive efforts should be made, however, to ensure ‘‘density without demolition’’ also means ‘‘density without displacement,’’ so that long-term residents are not priced out of living in their historic homes and neighborhoods.

Many zoning codes prohibit historic buildings in certain areas from being converted into housing. There is a significant need to rezone neighborhoods filled with office and commercial buildings for residential use. In addition, large-scale historic industrial buildings, like New England mill buildings, are often zoned for industrial purposes, even in locations where manufacturing seems unlikely to return. And finally, public-serving institutions should consider zoning for historic Main Streets, which organically developed with housing mixed with (and usually above) shops but which are too often now subject to prohibitions on residential uses enacted through ever-stricter zoning codes. Upper stories can be returned to residential use and, in some instances, first-floor commercial space could be converted to housing. This mix of uses that proved to enrich small towns and larger cities alike should be allowed again through zoning.

Local historic preservation commissions can play a pivotal role in advising on zoning changes to address the issues raised above. They, as well as the planners responsible for zoning code development and revision, should have the training and resources they need to understand the options and opportunities for enabling and promoting rehabilitation of historic buildings for housing and development of compatible new infill construction.

4. *Public-serving institutions should advocate for changes in building codes and interpretations of the Americans with Disabilities Act to create more flexible standards (especially for small-scale housing of four units or fewer) to facilitate conversion of nonresidential historic buildings to residential use and to prioritize design solutions for historic housing that ensure access and inclusion of disabled residents and visitors.* Traditional building codes tend to focus on new construction to the detriment of rehabilitation of historic buildings, particularly for affordable housing. Property owners wishing to undertake renovations, regardless of their scope, are often confronted with requirements to bring a historic building into full compliance with the building code requirements for new construction. Cities and states should consider adoption of performance-based rehabilitation building codes (such as the International Existing Building Code) or other building code changes to provide needed flexibility and better relate building code requirements to the scale of projects. This also would facilitate new approaches to housing development, such as conversion of underused office and retail buildings–including those that are historic–for use as housing.

The American with Disabilities Act prohibits public-serving institutions from discriminating on the basis of disability in providing or making available housing. Public-serving institutions should give full consideration of all that is needed to ensure accessibility for users of housing, including historic properties used for housing. Interpretations of the Americans with Disabilities Act by public officials should prioritize the need to provide accessible environments to all users of housing in historic buildings. Collecting successful examples of projects that promote both preservation ideals and accessibility could be useful to many different actors. It also is imperative that planners, local historic preservation commission members and staff, and building inspectors have the training and resources they need to understand the code enforcement options available for the rehabilitation of historic buildings for housing and development of compatible new infill construction.

5. *Public-serving institutions should seek to promote thoughtful energy retrofitting during rehabilitation of historic buildings for housing.* Most states have adopted energy conservation codes to enhance creation and operation of energy efficient buildings. Widely used codes and standards often include options for exempting historic buildings in situations where full compliance would damage their historic design and materials. However, as the climate crisis becomes more acute, use of such waivers may increasingly be seen as problematic, discourage reuse of historic buildings for housing, and cause disproportionate and adverse health or environmental impacts on already overburdened communities with environmental justice concerns. More guidelines, best practices, and other resources are needed to help promote energy retrofitting of historic buildings used for housing in a manner most compatible with their historic character.

6. *Federal, state, Tribal, and local governments should lead by example through disposition or outleasing of excess or underutilized historic government buildings for housing development.* Government building inventories often include structures that are no longer needed to facilitate agency missions and that are vacant or underutilized. Enhanced use of telework and remote work, sparked by the COVID–19 pandemic, has further increased the amount of government office space that is underused. Governments at all levels should examine the opportunities inherent in excess and underutilized government buildings–including those that are historic–to create housing through office-to-housing conversions and other adaptive use. Strategic disposal (with protective covenants) and leasing to nongovernmental partners should be considered. Section 111 of the NHPA and other agency-specific authorities allow Federal property-managing agencies to outlease historic buildings (or portions thereof) to nonfederal parties. Federal agencies should identify and remove impediments to outleasing their historic buildings, with consideration given to the recommendations of the ACHP's 2021 report, *Leveraging Federal Historic Buildings.*

7. *The Federal government should expand upon its guidance regarding reuse and rehabilitation of historic properties for housing and should encourage flexible yet consistent application of such guidance.* Federal standards and guidelines significantly influence the rehabilitation of historic properties, public and private alike, because they are often adopted or adapted by state and local governments, as has been the case with the Secretary's Standards. The Federal government should add to and flexibly apply its guidance on the treatment of historic properties in ways that will incentivize housing development, particularly of affordable housing, and facilitate adapting nonresidential buildings to housing. Likewise, additional guidance is needed on remediating environmental, health, and safety hazards when rehabilitating historic buildings and providing access for persons with disabilities. The Federal government, particularly agencies that fund housing development, also should accelerate the development of guidance on the benefits of rehabilitating historic housing (including historic public housing) and of adapting historic commercial buildings for use as housing. Enhanced recommendations and training are needed to encourage reuse of historic buildings and promote project planning and review that are adaptable yet consistent.

*Accelerate Project Permitting and Environmental Review*

8. *Federal, state, Tribal, and local governments should expedite development of housing projects through efficient and effective permitting processes and environmental reviews while still ensuring full consideration of potential impacts to historic properties.* Addressing the problem of insufficient housing supply will require widespread large-scale and small-scale projects, both for new construction and for rehabilitation of historic and other existing buildings. Environmental reviews and permitting processes for such projects, especially small-scale projects with limited impacts, should be managed in such a way as to proceed expeditiously. However, potential adverse effects to historic properties must be carefully addressed, whether they be physical or visual impacts to historic properties from new housing construction or effects to the historic qualities of historic buildings that are being rehabilitated. It also is important that actions not be taken that result in the damage or destruction of historic properties prior to applicants seeking tax credits and government funding, and prior to agencies completing environmental review.

Efficient permitting and environmental review depends in large part upon the funding and staffing capacity of the government agencies at all levels participating in the reviews. It is vitally important to build capacity for historic preservation review within Federal agencies, State and Tribal Historic Preservation Offices, and local historic preservation commissions, and to provide robust training for staff. Public-serving institutions also should seek to educate communities and project sponsors on environmental review requirements; their roles in those review processes; the need to initiate environmental review early in planning; and the importance of flexible consideration of project alternatives.

Current housing needs pose complex challenges that need to be addressed on an increasingly accelerated timeline, and it is important that environmental reviews be rooted in flexibility and creativity. The section 106 regulations provide for development of program alternatives to tailor and expedite the review process while at the same time ensuring the consultation process is accessible, meaningful, and transparent to the wide variety of consulting parties and stakeholders.[6] Program alternatives already are in use for a variety of housing-related projects and programs. The ACHP will explore further opportunities to use program alternatives to expedite housing development, as should other Federal agencies. Federal agencies also should explore how best to integrate section 106 review with review under the National Environmental Policy Act, based on options available in the section 106 regulations and advice in *NEPA and NHPA: A Handbook for Integrating*

[6] 36 CFR 800.14.

*NEPA and Section 106,* issued by the ACHP and the Council on Environmental Quality in 2013. Policy Principle #9 offers further recommendations on flexibly proceeding through section 106 review specifically for housing projects.

9. *All participants in section 106 review of housing projects should approach the review flexibly in keeping with the following principles and any applicable implementing guidance from the ACHP.* In keeping with section 110(f) of the NHPA,[7] which requires Federal agencies to minimize harm to National Historic Landmarks to the maximum extent possible, the following provisions should not apply to National Historic Landmarks. The ACHP plans to issue implementing guidance on effect determinations under section 106, including addressing the potential adverse effects of housing projects to the interiors of historic buildings.

a. *Review of effects on historic districts made up of buildings should focus on effects to exterior features.* Section 106 review of effects focuses on potential alterations to the characteristics that qualify a property for listing in the National Register. The significance of a historic district comprised of buildings is typically associated in large part with the exterior features of the buildings, which cumulatively convey the significance of the overall district and qualify it for inclusion in the National Register. Accordingly, unless a building in a district is listed or considered eligible for listing in the National Register as an individual property or specific interior elements contribute to maintaining a historic district's character, review under section 106 should focus on proposed changes to the exteriors of the district's buildings.

b. *Consultation should consider the overall preservation and housing goals of the community.* When assessing, and negotiating the resolution of, the effects of housing projects on historic properties, consultation should focus not simply on individual buildings but on the historic preservation goals of the broader neighborhood or community. If the affected historic property is a historic district, the agency official should assess effects on the historic district as a whole.

c. *When possible, plans and specifications should adhere to the Secretary's Standards, taking into account the economic and technical feasibility of the project.* The Secretary's Standards outline a consistent national approach to the treatment of historic properties that can be applied flexibly in a way that relates to local character and needs and project requirements. Plans and specifications for rehabilitation, new construction, and abatement of hazardous conditions in housing projects associated with historic properties should strive to adhere to the recommended approaches in the Secretary's Standards when possible. However, the ACHP recognizes that there are mission-related, economic, or other circumstances when the Secretary's Standards cannot be followed and that section 106 allows for the negotiation of other outcomes.

When assessing effects during section 106 review and seeking to avoid adverse effects for housing projects, priority should be given to consistency with the Secretary's Standards for the exterior of buildings. Adverse effects to historic interior spaces and features may more frequently need to be accepted and resolved to facilitate reuse of the buildings for housing. This especially is the case for conversions of commercial or institutional buildings to housing and to address issues such as energy retrofitting, providing access for persons with disabilities, and hazard remediation. Projects taking advantage of the Federal historic tax credit must be reviewed by the National Park Service for adherence to the Secretary's Standards in a separate and distinct process that benefits from early coordination.

d. *Section 106 consultation should emphasize consensus building.* Section 106 review strives to build consensus with affected communities in all phases of the process. Consultation with affected communities should be on a scale appropriate to that of the undertaking. Various stakeholders, including community members and neighborhood residents, should be included in the section 106 review process as consulting parties so that the full range of issues can be addressed in developing a balance between historic preservation and housing goals. See Policy Principle #10 regarding the importance on consultation with Indian Tribes and Native Hawaiian organizations, and engagement with disadvantaged and underserved communities, and communities with environmental justice concerns, including people with disabilities.

e. *The ACHP encourages streamlining the Section 106 process to respond to local conditions.* The ACHP encourages participants to seek innovative and practical ways to streamline the section 106 process that respond to unique local conditions related to the delivery of housing. Programmatic Agreements are one approach to enhance efficiency in section 106 reviews. Some such agreements delegate the section 106 review role of the State Historic Preservation Officer to local governments, particularly where local preservation ordinances exist and/or where qualified preservation professionals are employed to improve the efficiency of historic preservation reviews. Such agreements may also target the section 106 review process to local circumstances that warrant the creation of exempt categories for routine activities, the adoption of ''treatment and design protocols'' for rehabilitation and new infill construction, and the development of design guidelines tailored to a specific historic district and/or neighborhood.

f. *Archaeological investigations should be avoided or minimized for rehabilitation projects with minimal ground disturbance.* No archaeological investigations should be carried out for housing projects limited to rehabilitation or energy retrofitting that require no ground disturbance. In those circumstances where minimal ground disturbance may be necessary to carry out rehabilitations, archaeological investigations should be minimized and proportional to the potential effects of such disturbance. Guidance on archaeological investigations in this context can be found in the ACHP's *section 106 Archaeology Guidance.* For all other projects, archaeological investigation may be needed, to be determined and carried out in consultation with State and/or Tribal Historic Preservation Officers. Inadvertent discoveries related to any housing project once construction has begun should be addressed in accordance with the section 106 regulations, the ACHP's Policy Statement on Burial Sites, Human Remains, and Funerary Objects, applicable state burial laws, and the Native American Graves Protection and Repatriation Act (if applicable).

10. *During planning, permitting, and environmental reviews (including section 106 reviews) for housing projects, Federal, state, and local governments should consult and engage—beginning early in the process—with Indian Tribes, Native Hawaiian organizations (NHOs), disadvantaged and underserved communities, and communities with environmental justice concerns, including people with disabilities, and should explore capacity building options for supporting their participation in consultation.* The section 106 process under the NHPA already requires Federal agency

[7] 54 U.S.C 306107.

consultation with Indian Tribes, NHOs, and other consulting parties regarding the impact of projects on historic properties. Here, the ACHP would like to emphasize the importance of consultation and engagement—whether or not section 106 applies—with Indian Tribes, NHOs, disadvantaged and underserved communities, and communities with environmental justice concerns, including people with disabilities, all of whom are disproportionately impacted by the housing supply shortfall. Soliciting and considering their views on reuse of historic buildings for housing and the impacts of housing projects on historic properties should be done proactively, early in planning, and throughout environmental reviews and permitting processes.

In some cases, limited resources may constrain the active participation of disadvantaged and underserved communities and communities with environmental justice concerns in consultation. Federal, state, and local government entities should consider options for strategic financial investments or other assistance to help with needed capacity development. The ACHP previously has recommended capacity-building support for consulting parties pursuant to the agency's ''Guidance on Assistance to Consulting Parties in the section 106 Review Process.'' Since many Indian Tribes have been incorporating consideration of housing issues into their environmental reviews and permitting processes for decades, housing-related project planning should seek to adopt or align with existing practices and standards, where feasible. On trust land, Tribes should control how housing is developed and its location, whether as new construction or rehabilitation.

*Gather Information*

11. *Public-serving institutions should work collaboratively to research and share information with each other, policymakers, the private sector, and the public about the costs, benefits, incentives, and disincentives associated with rehabilitating historic buildings for housing.* To maximize reuse of historic buildings, ongoing research and study are needed in order to identify opportunities, document benefits, shape guidance development, and disseminate best practices. Public-serving institutions should undertake such research; recommended areas for study and dissemination of information include those below. Consistent with their missions and authorities, Federal agencies should provide funding and technical assistance to support state, Tribal, local, and nongovernmental research efforts.

*Existing Government Programs*

—Survey laws and financial incentives at the Federal, state, Tribal, and local levels that address rehabilitation of historic buildings for housing and assess the impact of such laws and incentives on housing supply, housing affordability, mixed-use development (including housing above ground-floor commercial), and equitably distributed development; and determine if such policies should be updated, modified, or expanded to ensure they are applied and interpreted in a flexible manner allowing for housing production.
—Study how well Federal programs are helping to meet the housing needs of Indian Tribes and disadvantaged and underserved communities, as well as communities with environmental justice concerns, while encouraging the reuse and protection of historic properties, and what changes may be needed to make the application process for Federal assistance more inclusive and easier to navigate.

*Historic Properties and Neighborhoods*

—Assemble information about the location, size, condition, quality of features, and occupancy of historic buildings in localities and assess those against local housing needs.
—Evaluate any links between historic designation and housing affordability, and between historic designation and displacement of residents in disadvantaged and underserved communities, and in communities with environmental justice concerns.
—Explore impacts of institutional real estate investment in owner-occupied housing for rental use and (in some communities) an increase in short-term rentals, seasonally occupied homes, and second homes in historic neighborhoods.

*Rehabilitation of Existing Properties for Housing*

—Study the costs of rehabilitating historic buildings for housing relative to new construction, considering intangible and environmental costs and benefits in addition to monetary cost.[8]
—Study the climate impacts of rehabilitating historic buildings for housing, including decarbonization; improved operational energy efficiency; climate resilience; decreased emissions through reduced urban sprawl; and responding to housing needs following disasters.

*Preservation Workforce*

—Survey the current and anticipated future state of the public sector preservation workforce and its expertise and capacity to handle environmental reviews, including section 106 reviews, of housing projects in a timely manner.
—Survey the current and anticipated future state of the private sector preservation workforce, including its ability to rehabilitate existing buildings for housing and conduct energy efficiency retrofits.

*Educate*

12. *Public-serving institutions should educate policymakers, housing advocates, developers, the media, and the public about the benefits of reusing historic buildings in housing development and debunk misperceptions regarding historic preservation as a barrier to addressing the housing supply shortfall.* With increasing attention being paid to reusing existing buildings to help address the housing shortage, consciousness raising efforts are needed regarding the role historic buildings can play. Outreach is needed to explain: why historic building rehabilitation for housing is a sound financial investment and what incentives are available; how modern housing needs (including accessibility for people with disabilities) can be accommodated in historic buildings without sacrificing their historic qualities; and how rehabilitation of historic buildings for housing also has intangible and environmental benefits for communities.

Countering misperceptions of historic preservation review as a barrier to addressing the housing shortage also is critical. Preservation regulations that require review of housing projects affecting historic properties help to preserve what makes the properties historically significant and give local citizens a voice in project planning. However, such review can be—and should be—approached flexibly, consistently, and expeditiously, taking into consideration the economic and technical feasibility of each project. Public-serving institutions overseeing preservation reviews should embrace this imperative and actively work to educate all stakeholders, the media, and the public on how the historic preservation review process balances

[8] Studies should not conflate rehabilitation and adaptive use with restoration (defined as accurately restoring a building to its appearance at a particular point in time). The latter generally is more expensive and is not necessary for effective reuse of historic buildings for housing.

consideration of housing needs and preservation of the community's historic places.

*Collaborate*

13. *Public-serving institutions and the private sector should cooperate and form partnerships across agencies, between levels of government, and within communities to enhance the implementation of each of the principles discussed above.* The impacts of America's housing supply shortfall are so wide-ranging that collaboration among public-serving institutions, developers, financial institutions, philanthropic organizations, and others in the private sector is essential. Cooperation and forging of partnerships will enhance implementation of each of the principles discussed above. Federal agencies can take a leadership role in this regard through their own collaborative work and by encouraging such work through funding and technical assistance.

Adopted December 22, 2023.

(END OF DOCUMENT)

*Authority:* 54 U.S.C. 304102(a).

Dated: February 12, 2024.

**Javier E. Marques,**

*General Counsel.*

[FR Doc. 2024–03164 Filed 2–14–24; 8:45 am]

**BILLING CODE 4310–K6–P**

## DEPARTMENT OF HOMELAND SECURITY

### Federal Emergency Management Agency

**[Docket ID FEMA–2024–0002]**

### Changes in Flood Hazard Determinations

**AGENCY:** Federal Emergency Management Agency, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** New or modified Base (1-percent annual chance) Flood Elevations (BFEs), base flood depths, Special Flood Hazard Area (SFHA) boundaries or zone designations, and/or regulatory floodways (hereinafter referred to as flood hazard determinations) as shown on the indicated Letter of Map Revision (LOMR) for each of the communities listed in the table below are finalized. Each LOMR revises the Flood Insurance Rate Maps (FIRMs), and in some cases the Flood Insurance Study (FIS) reports, currently in effect for the listed communities.

**DATES:** Each LOMR was finalized as in the table below.

**ADDRESSES:** Each LOMR is available for inspection at both the respective Community Map Repository address listed in the table below and online through the FEMA Map Service Center at *https://msc.fema.gov.*

**FOR FURTHER INFORMATION CONTACT:** Rick Sacbibit, Chief, Engineering Services Branch, Federal Insurance and Mitigation Administration, FEMA, 400 C Street SW, Washington, DC 20472, (202) 646–7659, or (email) *patrick.sacbibit@fema.dhs.gov;* or visit the FEMA Mapping and Insurance eXchange (FMIX) online at *https://www.floodmaps.fema.gov/fhm/fmx_main.html.*

**SUPPLEMENTARY INFORMATION:** The Federal Emergency Management Agency (FEMA) makes the final flood hazard determinations as shown in the LOMRs for each community listed in the table below. Notice of these modified flood hazard determinations has been published in newspapers of local circulation and 90 days have elapsed since that publication. The Deputy Associate Administrator for Insurance and Mitigation has resolved any appeals resulting from this notification.

The modified flood hazard determinations are made pursuant to section 206 of the Flood Disaster Protection Act of 1973, 42 U.S.C. 4105, and are in accordance with the National Flood Insurance Act of 1968, 42 U.S.C. 4001 *et seq.,* and with 44 CFR part 65.

The currently effective community number is shown and must be used for all new policies and renewals.

The new or modified flood hazard information is the basis for the floodplain management measures that the community is required either to adopt or to show evidence of being already in effect in order to remain qualified for participation in the National Flood Insurance Program (NFIP).

This new or modified flood hazard information, together with the floodplain management criteria required by 44 CFR 60.3, are the minimum that are required. They should not be construed to mean that the community must change any existing ordinances that are more stringent in their floodplain management requirements. The community may at any time enact stricter requirements of its own or pursuant to policies established by other Federal, State, or regional entities.

This new or modified flood hazard determinations are used to meet the floodplain management requirements of the NFIP. The changes in flood hazard determinations are in accordance with 44 CFR 65.4.

Interested lessees and owners of real property are encouraged to review the final flood hazard information available at the address cited below for each community or online through the FEMA Map Service Center at *https://msc.fema.gov.*

(Catalog of Federal Domestic Assistance No. 97.022, ''Flood Insurance.'')

**Nicholas A. Shufro,**

*Deputy Assistant Administrator for Risk Management, Federal Emergency Management Agency, Department of Homeland Security.*

| State and county | Location and case No. | Chief executive officer of community | Community map repository | Date of modification | Community No. |
|---|---|---|---|---|---|
| Colorado: | | | | | |
| Adams (FEMA Docket No.: B–2391). | City of Federal Heights (23–08–0183P). | The Honorable Linda S. Montoya, Mayor, City of Federal Heights, 2380 West 90th Avenue, Federal Heights, CO 80260. | City Hall, 2380 West 90th Avenue, Federal Heights, CO 80260. | Jan. 12, 2024 | 080240 |
| Denver (FEMA Docket No.: B–2386). | City and County of Denver (23–08–0074P). | The Honorable Mike Johnston, Mayor, City and County of Denver, 1437 North Bannock Street, Room 350, Denver, CO 80202. | Department of Public Works, 201 West Colfax Avenue, Denver, CO 80202. | Jan. 19, 2024 | 080046 |
| El Paso (FEMA Docket No.: B–2386). | City of Colorado Springs (23–08–0612X). | The Honorable Yemi Mobolade, Mayor, City of Colorado Springs, 30 South Nevada Avenue, Colorado Springs, CO 80903. | El Paso County Pikes Peak Regional Building Department, Floodplain Management Office, 2880 International Circle, Colorado Springs, CO 80910. | Jan. 22, 2024 | 080060 |