**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

CENTER FOR BIOLOGICAL DIVERSITY; SAVE RGV; THE CARRIZO/COMECRUDO NATION OF TEXAS, INC.; and SOUTH TEXAS ENVIRONMENTAL JUSTICE NETWORK,

*Plaintiffs,*

v.

BRIAN NESVIK, in his official capacity as Director of the United States Fish and Wildlife Service, and UNITED STATES FISH AND WILDLIFE SERVICE, an agency within the United States Department of the Interior,

*Defendant*,

and

SPACE EXPLORATION TECHNOLOGIES CORP.

*Defendant-Intervenor.*

Case No. 1:26-cv-00831

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS


Table of authorities ........ iii

Introduction ........ 1

Argument ........ 2

I. Plaintiffs have standing to challenge the Exchange. ........ 2

A. Plaintiffs' members have visited and enjoyed the areas of the Refuge open to the public, intend to return, but cannot do so once the Exchange is executed. ........ 2

B. Plaintiffs' members will be further harmed through their use and enjoyment of nearby areas, due to the Exchange and SpaceX's plans for development. ........ 7

II. Plaintiffs properly challenge final agency action and the Service's failure to act. ... 10

III. Plaintiffs are likely to succeed on the merits. ........ 16

A. Plaintiffs are likely to succeed under the NHPA because the Exchange does not yield "comparable historic property" or adequately protect the landmark. ........ 16

B. The Service violated the Refuge Act because the Exchange will not provide a net benefit to the Refuge, and is not consistent with the 1997 Plan. ........ 20

1. The Exchange will not provide a net conservation benefit to the Refuge. ... 20

2. The Exchange is inconsistent with the Refuge's 1997 Interim Plan. ........ 24

C. The Service is in violation of the Refuge Act by failing to have in place an up-to-date Comprehensive Conservation Plan ("CCP") for the Refuge. ........ 25

D. Plaintiffs are likely to succeed on their NEPA claim because the Service failed to consider reasonable alternatives to exchanging the Refuge lands. ........ 26

IV. Plaintiffs will be irreparably harmed without a preliminary injunction. ........ 27

V. The balance of harms and public interest weigh in favor of an injunction. ........ 28

VI. The Court should exercise its discretion to order no bond for the minor administrative burden caused by a temporary pause of the Exchange. ........ 30

Conclusion ........ 30

## TABLE OF AUTHORITIES

**Cases**

*A.T.N. Indus., Inc. v. Gross*,
632 Fed. Appx. 185 (5th Cir. 2015) ........ 30

*Abbott Lab'ys v. Gardner*,
387 U.S. 136 (1967) ........ 11

*Abdallah v. Mesa Air Grp., Inc.*,
83 F.4th 1006 (5th Cir. 2023) ........ 17

*Biden v. Texas*,
597 U.S. 785 (2022) ........ 18

*Big Time Vapes, Inc. v. FDA*, 963 F.3d 436
(5th Cir. 2020) ........ 21

*Bouarfa v. Mayorkas*,
604 U.S. 6 (2024) ........ 17

*Canal Authority of Florida v. Callaway*,
489 F.2d 567 (5th Cir. 1974) ........ 15

*Cantrell v. City of Long Beach*,
241 F.3d 674 (9th Cir. 2001) ........ 8

*Citizens for Clean Air v. United States DOT*,
98 F.4th 178 (5th Cir. 2024) ........ 9

*Clarke v. CFTC*,
74 F.4th 627 (5th Cir. 2023) ........ 11, 12, 13

*Desert Citizens Against Pollution v. Bisson*,
231 F.3d 1172 (9th Cir. 2000) ........ 15

*Driftless Area Land Conservancy v. Rural Utilities Serv.*,
74 F.4th 489 (7th Cir. 2023) ........ 14

*Earle v. District of Columbia*,
707 F.3d 299 (D.C. Cir. 2012) ........ 25, 26

*Envtl Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
36 F. 4th 850 (9th Cir. 2022) ........ 14

*FCC v. Fox TV Stations, Inc.*,
556 U.S. 502 (2009) ........ 23

*FEC v. Cruz*,
596 U.S. 289 (2022) ........ 8

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ........ 7, 8, 10

*Gov't of Manitoba v. Zinke*,
849 F.3d 1111 (D.C. Cir. 2017) ........ 13

*Karst Envtl. Educ. & Prot., Inc. v. EPA*,
475 F.3d 1291 (D.C. Cir. 2007) ........ 15

*Kettle Range Conservation Group v. United States BLM*,
150 F.3d 1083 (9th Cir. 1998) ........ 15

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ........ 16, 23

*Louisana v. Biden*,
622 F. Supp. 3d 267, (W.D. La. 2022) ........ 12

*Morton v. Mancari*,
417 U.S. 535 (1974) ........ 17, 18, 19

*Native Village of Hooper Bay v. Burgum*,
No. 3:25-cv-00316-SLG, 2026 WL 2409781 (D. Alaska Aug. 18, 2026) ........ 19

*Ohio Forestry Ass'n v. Sierra Club*,
523 U.S. 726 (1998) ........ 14

*Piedmont Heights Civic Club, Inc. v. Moreland*,
637 F.2d 430 (5th Cir. 1981) ........ 26

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) ........ 19, 20

*Riverfront Garden Dist. Ass'n, Inc. v. City of New Orleans*,
No. 00-544, 2000 WL 35801851 (E.D. La. Dec. 11, 2000) ........ 13

*Save Our Sonoran, Inc. v. Flowers*,
408 F.3d 1113 (9th Cir. 2005) ........ 8

*Shomberg v. United States*,
348 U.S. 540 (1955) ........ 18

*Sierra Club v. Jewell*,
764 F.3d 1 (D.C. Cir. 2014) ........ 7

*Sierra Club v. Morton*,
405 U.S. 727 (1972) ........ 7

*Sierra Club v. Morton*,
510 F.2d 813 (5th Cir. 1975) ........ 26

*Sierra Club v. Slater*,
120 F.3d 623 (6th Cir. 1997) ........ 13

*Sierra Club v. U.S. Army Corps of Engineers*,
645 F.3d 978 (8th Cir. 2011) ........ 7, 8

*Southern Utah Wilderness Alliance v. Burke*,
981 F. Supp. 2d 1099 (D. Utah 2013) ........ 14

*Te-Moak Tribe of Western Shoshone of Nev. v. United States Dept. of Interior*,
608 F.3d 592 (9th Cir. 2010) ........ 14

*Te-Moak Tribe of Western Shoshone of Nev*., 608 F.3d at 609; *Nat'l Indian Youth Council v. Watt*,
664 F.2d 220 (10th Cir. 1981) ........ 16

*Trudeau v. FTC,*
456 F.3d 178 (D.C. Cir. 2006) ........ 12

*Tucker v. Ridge*,
322 F. Supp. 2d 738 (E.D. Tex. 2004) ........ 18

*United States v. Palomares*,
52 F.4th 640 (5th Cir. 2022) ........ 18

*Vapor Tech. Ass'n v. Wooten*,
No. 25-1745, 2026 WL 2192803 (4th Cir. July 30, 2026) ........ 6

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
435 U.S. 519 (1978) ........ 26

*Wages & White Lion Invs., L.L.C. v. United States FDA,*
16 F.4th 1130 (5th Cir. 2021) ........ 24

Weyerhaeuser Co. v. United States Fish & Wildlife Serv.,
586 U.S. 9 (2018) ........ 21

*WildEarth Guardians v. Salazaar*,
No. 09-cv-1893, 2009 WL 6443120 (S.D. Texas Dec. 7, 2009) .......... 26

**Statutes**

16 U.S.C. § 3192 .......... 19

16 U.S.C. § 668dd .......... passim

42 U.S.C. § 4332 .......... 26

5 U.S.C. § 551 .......... 11

5 U.S.C. § 702 .......... 11

5 U.S.C. § 706 .......... 26

54 U.S.C. § 300320 .......... 19

54 U.S.C. § 306108 .......... 19

54 U.S.C. § 306121 .......... 1, 16, 17, 18

**Regulations**

50 C.F.R. § 25.21 .......... 4

50 C.F.R. § 25.51 .......... 4

**Other Authorities**

342 FW 5.7 .......... 21

Brandon Lingle and Leila Darwhiche, *SpaceX explosion shook South Texas, sparking oversight and safety concerns*, San Antonia Express-News, June 26, 2026 .......... 28

**Constitutional Provisions**

U.S. Const. art. IV, § 3, cl. 2 .......... 21

## INTRODUCTION

This case concerns an extraordinary land exchange ("Exchange") that would give 727 acres of the Lower Rio Grande Valley National Wildlife Refuge (the "Refuge" or "Rio Grande Refuge"), including over 700 acres of the federally-recognized and protected Palmito Ranch Battlefield National Historic Landmark, to SpaceX for development of these lands. Congress specifically protected historic properties like this one through the National Historic Preservation Act ("NHPA"), which only allows an agency to exchange federally-protected historic property "with comparable historic property." 54 U.S.C. § 306121(a)(2). There is no dispute that the Service will not receive comparable historic property from SpaceX through this Exchange. The Government is thus forced to argue that this mandatory statutory provision is optional.

This Exchange also violates the National Wildlife Refuge System Improvement Act ("Refuge Act"), which requires that exchanges both fulfill the conservation mission of the National Wildlife Refuge System and provide a net conservation benefit to the individual refuge. 16 U.S.C. § 668dd(a)(4)(D). Here, the Exchange will not provide a net conservation benefit to the Rio Grande Refuge, and thus is prohibited. Through the Exchange, the Refuge will lose hundreds of prime acres and habitat, including over 700 acres of a Historic Landmark, with SpaceX allowed to encroach further into the heart of the Refuge with its industrial activities.

In response to these fatal flaws (and other violations set forth in Plaintiffs' opening memorandum and addressed further below), the Government and SpaceX advance specious arguments for why Plaintiffs cannot obtain relief. As for standing, Plaintiffs' members live near the Refuge, and have long cherished and benefitted from this Refuge, including the Historic Landmark. But the Government now claims the public has always been prohibited from visiting these public lands, in a drastic and futile attempt to undermine standing. And even though the

Service has issued its final decision to implement the Exchange, and has stated in no uncertain terms that it will sign the land exchange agreement, the Government seeks to delay Plaintiffs' claims until the lands have changed hands and Plaintiffs' motion becomes moot.

Plaintiffs are likely to prevail on the merits. Additionally, the imminent privatization of these lands, followed closely thereafter by SpaceX's acknowledged concrete plans for significant expansion of a major test site and construction of a road, will cause irreparable harm to Plaintiffs and their members. While the Government and SpaceX claim a litany of harms, they are focused far into the future. But Plaintiffs have made clear they are willing to proceed on an expedited schedule on the merits, as soon as the Government can produce the administrative record. During the matter of months between now and when this case can be briefed and heard on the merits, the balance of harms weighs heavily in favor of Plaintiffs and maintaining the status quo of the Refuge and National Historic Landmark while this important case can be heard.

## ARGUMENT

### I. Plaintiffs have standing to challenge the Exchange.

#### A. Plaintiffs' members have visited and enjoyed the areas of the Refuge open to the public, intend to return, but cannot do so once the Exchange is executed.

As set forth in Plaintiffs' opening memorandum and supporting declarations, Plaintiffs' members have used and enjoyed the Refuge lands that will be transferred to SpaceX through the Exchange, they intend to do so again, but will not be able to if these lands are conveyed, privatized, and developed. Dkt. 24-1, pp. 19–20. This is sufficient to establish standing.

The Government and SpaceX do not (and cannot) dispute that Plaintiffs' members have in fact enjoyed the Refuge and would like to do so in the future. Rather, they assert that Plaintiffs and their members cannot be injured by the Exchange because the Refuge is not, at the moment, open to the public. Dkt. 51, pp. 1, 6. This disingenuous response—which is a surprise to

Plaintiffs' members who have enjoyed the Refuge for years, and appears to have been concocted just for this case and Exchange—conflicts with Congressional intent in enacting the Refuge Act, the Service's management plan for this Refuge, and the Service's own website for this Refuge.

In enacting the Refuge Act, Congress directed that "compatible wildlife-dependent recreational uses are the priority general public uses," and must receive "priority consideration." 16 U.S.C. § 668dd(a)(3)(C). The Service must provide "opportunities to families to experience wildlife-dependent recreation." *Id*. § 668dd(a)(4)(I), (K). When the Service developed its 1997 Management Plan for the Refuge, its vision was for the public to "enjoy this rare treasure." Dkt. 26-3, p. 8. The Service anticipated that "[w]ildlife abundance and high quality facilities will attract thousands of visitors annually," and that local communities "will enthusiastically identify and promote the area as a regional tourist destination that contributes to the economy and enhance the quality of life." *Id*. The goal was to provide "public access and recreational opportunities" to further the public's appreciation of the Lower Rio Grande Valley. *Id*. at p. 58.

The Refuge Act and the Service's 1997 Plan are consistent with the Service's current website for this Refuge, which includes the following under a heading titled "Visit Us":

> Seven days a week from sunrise to sunset, you can enjoy the many destinations and observation decks on the Lower Rio Grande Valley National Wildlife Refuge. The refuge has nearly 40,000 acres open for you to enjoy wildlife-related activities, including wildlife watching, hiking, and wildlife photography. An additional 6,000 acres are open to hunting.[1]

The Service's website titled "Facility Rules and Policies" further informs the public that "[t]he refuge is open from official sunrise to official sunset," though it prohibits camping and limits visitors to designated roads, parking areas, and trails.[2]

---

[1] https://www.fws.gov/refuge/lower-rio-grande-valley (last visited August 18, 2026).
[2] https://www.fws.gov/refuge/lower-rio-grande-valley/visit-us/rules-policies (last visited August 18, 2026).

In contrast to Congress' purpose in establishing national wildlife refuges, and the Service's Management Plan and website for this Refuge, the Government counters with a cite to 50 C.F.R. § 25.51, and a staff declaration. Dkt. 51, p. 7. The regulation merely provides that the Service may establish reasonable fees for public recreational use. 50 C.F.R. § 25.51. And the Service's declarant indicates he has been at the Refuge since 2024, and without any reference to the Management Plan or website for this Refuge, states generically that the National Wildlife Refuge System is considered closed until and unless the Service opens it. Dkt. 51-1, ¶¶ 1, 5.

SpaceX cites to 50 C.F.R. § 25.21(a), which provides that, with exceptions, areas of the National Wildlife Refuge System are "closed to public access until and unless we open the area for a use or uses." Dkt. 52, p. 12. This regulation makes clear, however, that the Service can open areas including by "individual permit," and "public notice." 50 C.F.R. § 25.21(a). At least one of Plaintiffs' members has received access to the Refuge, each time lasting for a year, and recalls the Service providing public notice of access to the Refuge. Supp. Chapman Dec., ¶ 4.[3] Another member has frequently enjoyed the Refuge through trips along the open road, which the Service's website confirms is open to the public. Supp. Branch Dec., ¶ 5.[4] If the Service is suggesting that these public access opportunities would now be denied to Plaintiffs' members, there is no basis in the Refuge Act, its implementing regulations, or the Service's Management Plan, supporting that decision.

[3] The Service's declarant avers that he is "unaware of requests made by or permits granted to" Plaintiffs' declarants. Dkt. 51-1, ¶¶ 1, 13. But the fact that he is personally "unaware" of any permits during his tenure does not supports the Government's sweeping and erroneous assertion that "none of the Plaintiffs have received [a special use permit]." Dkt. 51, p. 7 n.2.

[4] https://www.fws.gov/refuge/lower-rio-grande-valley/visit-us/rules-policies (last visited Aug. 27, 2026).

Even if some of Plaintiffs' members' past visits were somehow inconsistent with Service policies—which Plaintiffs do not believe is the case—they could hardly be faulted for thinking their enjoyment of the Refuge was not only permitted but welcomed. Plaintiffs' members have had no difficulties accessing the public roads, lands, and beaches of the Refuge until SpaceX began its construction and rocket testing activities in the immediate vicinity, at which time closures began in order to acquiesce to SpaceX. *See e.g.*, Dkt. 24-5, ¶ 8. Indeed, this is one of Plaintiffs' core concerns with the Exchange: that it will lead to the expansion of public closures that had previously never been invoked. *Id.*, ¶ 11. The closures are in fact accelerating, including Massey Road, where previously it was Plaintiffs' members' understanding that they could access the road, whereas now the signs have been moved to declare the road closed. Supp. Chapman Dec., ¶ 6; Supp. Branch Dec., ¶ 6.

The Government further claims that a decision enjoining the Exchange "would not change the statute quo of no entry." Dkt. 51, p. 8. But, according to the Service's website, if these lands remain part of the Refuge, Plaintiffs' members would be welcome, "[s]even days a week from sunrise to sunset," in order to "unplug from the stresses of daily life and reconnect with the natural surroundings."[5] At the very least, if need be, Plaintiffs members could (and would) apply for a permit to visit the Refuge and view the wildlife, and there would no reason for it to be denied. 50 C.F.R. § 25.21(a). Indeed, the Service's website confirms that birding and wildlife watching are allowed.[6] By contrast, the moment these lands are exchanged and privatized, Plaintiffs' members will be permanently barred from visiting these lands, or even requesting a permit to do so. That both confers standing and supports irreparable injury.

[5] https://www.fws.gov/refuge/lower-rio-grande-valley/visit-us (last visited Aug. 26, 2026).
[6] https://www.fws.gov/refuge/lower-rio-grande-valley/visit-us (last visited Aug. 26, 2026).

SpaceX further argues that this case concerns only a transfer of title, and nothing more. Dkt. 52, p. 11. But of course SpaceX does not seek these lands to keep them preserved for wildlife habitat, and to allow public access when requested. This is crystal clear from the Service's own Assessment: "the Service expects that the lands proposed for divestiture *will be developed and used by SpaceX for residential, commercial, institutional, infrastructure, and/or manufacturing activities*." Dkt. 26-4, p. 12 (emphasis added). Indeed, SpaceX already has a "current, concrete plan for the land it would receive" by developing the land near the Massey test site to "expand SpaceX's existing testing facility." Dkt. 52-1, ¶ 38.

SpaceX further asserts that Plaintiffs lack a "legally protected interest," pointing to the Service's recent steps to make accessing the Refuge more difficult. Dkt. 52, p. 13. But since those steps have evidently been taken to facilitate the Exchange, they support rather than undermine Plaintiffs' standing. Moreover, as the Fourth Circuit recently explained, "legally protected interest" is "just another way of saying a 'cognizable interest,'" and does not "graft onto Article III a novel requirement that the plaintiff have a *legal right* to engage in the regulated conduct." *Vapor Tech. Ass'n v. Wooten*, No. 25-1745, 2026 WL 2192803, *6–7 (4th Cir. July 30, 2026) (emphasis in original).

Put simply, Plaintiffs' members have routinely accessed portions of the Refuge—including the Exchange area—for purposes of wildlife viewing and recreation, and, but for the Exchange, there is no reasonable basis for concluding that they could not do the same going forward. But these opportunities will disappear completely if the land is conveyed to SpaceX. That is sufficient "injury in fact" to support standing.

### B. Plaintiffs' members will be further harmed through their use and enjoyment of nearby areas, due to the Exchange and SpaceX's plans for development.

"[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). Moreover, Plaintiffs can establish standing where their members use and enjoy areas nearby the lands where activities will take place, especially where their interests include wildlife that do not remain in one place. For example, in *Sierra Club v. Jewell*, 764 F.3d 1 (D.C. Cir. 2014), the plaintiffs challenged the removal of the Blair Mountain Battlefield from the National Register of Historic Places due to their concern that this could result in surface coal mining at the site. Even though plaintiffs' members had no legal right to enter the Battlefield area, the court found that they had an interest in "observing the landscape from surrounding areas." *Id*. at 6. As the court stated, "[t]heir cognizable interests thus do not depend on any legal right to make a physical entry onto the Battlefield." *Id*.

Likewise, in *Sierra Club v. United States Army Corps of Engineers*, 645 F.3d 978 (8th Cir. 2011), the plaintiffs challenged the Clean Water Act permit for a new power plant. The power company argued that plaintiffs alleging injury from environmental harm must use the affected area, and that the impacts would occur on private property. *Id*. at 986, 988–89. The Sierra Club argued, however, that the affected area included not just the plant site itself but also the area in its immediate proximity. *Id*. at 989. The Eighth Circuit agreed, holding that plaintiffs had standing based on their members' interests in the nearby area, including the threat of harm to

their aesthetic interests, and their concern that the project could "change the habits of the wildlife in the area substantially." *Id*. at 987–88 (internal citations omitted).[7]

Similarly, Plaintiffs' members are harmed by impacts to both the Exchange lands and the surrounding area caused by SpaceX's planned expansion of its heavy industrial operations. The use and enjoyment of nearby lands is especially supportive of standing where the members' interests are focused on wildlife species that move through the area.[8] For instance, harm to ocelots and jaguarundi at the location of the Exchange will injure Plaintiffs' members by impairing their use and enjoyment of nearby areas, where they may be less likely to see these species or signs of them. The same is true for bird species that rely on the Exchange as habitat, but may roam beyond the property lines to where they may be observed by Plaintiffs' members.

For example, Mr. Chapman avers that he has observed the Refuge and its wildlife from a boat on the Rio Grande, and that he intends to do so again. Supp. Chapman Dec., ¶ 7. His use and enjoyment will be diminished by expanded heavy industrial operations along the River—especially a massive rocket test site built just off the riverbank. *Id*., ¶¶ 7–8. Similarly, Ms. Branch stated that she has visited the Refuge since she was a child, and that she regularly enjoys stopping along Highway 4 to spot birds and other wildlife from that vantage. Supp. Branch Dec., ¶¶ 4-5. Her interests in doing so will be harmed by the Exchange. First, the massive (and visible) expansion of the test site will harm her interests, and the planned increase of rocket testing and

---

[7] *See also Cantrell v. City of Long Beach*, 241 F.3d 674, 681 (9th Cir. 2001) (concluding that if an area "can be observed and enjoyed from adjacent land, plaintiffs need not physically enter the affected area to establish an injury in fact."); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1120 (9th Cir. 2005) (finding plaintiff had standing to challenge a development project, in part due to the project's "alleged impact on wildlife in the area" and that the project being on private land "does not destroy standing"); *Friends of the Earth*, 528 U.S. at 180–183 (finding standing where a declarant sought to use a river "between 3 and 15 miles downstream from the facility.").

[8] SpaceX's suggestion that Plaintiffs' injuries are "self-inflicted," Dkt. 52, p. 15, is contradicted by the record and, regardless, is irrelevant under *FEC v. Cruz*, 596 U.S. 289, 297 (2022).

launches will further harm these interests by increasing noise and pollution and reducing the likelihood of seeing wildlife on formerly-public lands. *Id.*, ¶¶ 5, 7–8. And her aesthetic interests will be further harmed by the other "residential, commercial, industrial, and infrastructure" development that will inevitably follow. Dkt. 26-4, p. 42; *see Citizens for Clean Air v. United States DOT*, 98 F.4th 178, 188 (5th Cir. 2024) (finding standing to challenge pipeline that would cause, among other things, "unwanted noise [and] habitat destruction" and negative impacts to the plaintiff's "recreational activities on [the adjacent beach], and her observation of the beach's migratory birds and nesting sea turtles").

Recent history shows that SpaceX will develop these newly acquired lands rapidly, causing harm to wildlife and noise impacts that will extend beyond the four corners of the newly acquired lands. For example, Starbase underwent massive changes following SpaceX's decision to locate its operations there. Dkt. 25-2. And in just a few months, a forested loma along State Highway 4 was bulldozed, leveled, and used as a site for industrial infrastructure. Dkt. 25-3. The same occurred to a property along the Rio Grande River accessed via Quicksilver Avenue, which was quickly bulldozed and converted into a residential development. Dkt. 25-4. These and other activities directly harmed Refuge lands beyond the property line—a fact the Service now points to as justification for trading those lands away.

Moreover, SpaceX has concrete plans to expand the Massey test site, where explosions have already occurred that scorched acres of adjacent Refuge land. Dkt. 25-1. According to SpaceX, one of its first orders of business after the Exchange goes through will be expanding that test site to approximately double its footprint. Dkt. 52-1, ¶ 38-39. The new test site will be built along the Rio Grande, and it will be connected to Highway 4 via a new "service road" that will cross almost the whole Exchange area. *Id.*, ¶ 40; Dkt. 52-2 (map). According to SpaceX, this

new test site is urgently needed "to address a testing bottleneck and support increased launch cadence." Dkt. 52-1, ¶ 8. Thus, given the "critical" need for this additional infrastructure—which SpaceX acknowledges will be visible from Highway 4—the company expects to commence this expansion "promptly." *Id.,* ¶¶ 41-42.

Thus, the fact that Plaintiffs' members will be imminently harmed by the Exchange is not at all speculative. Beyond losing any ability to access formerly-public lands, their use and enjoyment of the surrounding area will be diminished by increased construction, increased heavy industrial infrastructure, increased explosions, and resulting impacts to the Refuge's natural conditions. In addition, all of these activities will likely harm, and certainly displace, wildlife that Plaintiffs' members previously observed on those lands. *See e.g*., Dkt. 24-6, ¶¶ 8-9. Plaintiffs' members will also suffer from the degradation of the historical and natural character of the National Historic Landmark, which will become unrecognizable as part of the site where the last battle of the Civil War occurred. *Id*., ¶¶ 10-12.

In sum, Plaintiffs' members have concrete interests in both the lands to be divested in the Exchange and nearby areas; those interests will be harmed if the Exchange goes through; those harms are fairly traceable to the Service's approval, which is a prerequisite to SpaceX's planned development on those lands; and, those harms would be redressed by a ruling blocking the Exchange. *Friends of the Earth*, 528 U.S. at 180–81. Plaintiffs therefore have standing.

## II. Plaintiffs properly challenge final agency action and the Service's failure to act.

The Government argues that four of Plaintiffs' five claims fail to challenge final agency action. Dkt. 51, p. 13. Agency action is final when it meets two requirements: (1) the action marks the consummation of the agency's decisionmaking process, and (2) the action is one by which rights or obligations have been determined, or from which legal consequences will flow.

*Clarke v. CFTC*, 74 F.4th 627, 637 (5th Cir. 2023). This is a "pragmatic inquiry," and "colored by the APA's embodiment of the 'basic presumption of judicial review.'" *Id*. at 637–38, *quoting Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967). The Service's decision to approve and implement the Exchange is final, and Plaintiffs properly challenge final agency action.[9]

The Service's Regional Director issued the agency's "Finding of No Significant Impact" ("FONSI") and "Decision" for the Boca Chica Land Exchange on May 21, 2026. Dkt. 26-1. The Decision left no doubt that the Service "has decided to implement the Proposed Action." *Id*. at 5. The Decision further states that the Service "will exchange" over 700 acres of the Refuge with SpaceX, and "will divest" these acres. *Id*. at 2. This Decision further confirmed that it was the culmination of the Service's NEPA process, and that an environmental impact statement was not required. *Id*. at 5. It likewise ended the Service's process under the NHPA, as it incorporated a finalized Programmatic Agreement signed by the Service and SpaceX. *Id*. at 4.

Because this Exchange exceeded a monetary threshold, the Service's Manual required ratification by the Service's Director, which was completed on July 13, 2026. Dkt. 26-21. The Director's "Decision" further confirmed that the Service's decision is complete and final, as the Director "approve[d] proceeding" with the Exchange. *Id*., at 9. This Decision also again made clear that the Service's process under all legal requirements regarding the Exchange was complete. *Id*. The Director's approval further confirmed that it is the end of the Service's discretionary decisionmaking process for the Exchange. *Id*. The Decision states that after a 30-

---

[9] Plaintiffs' third claim challenges the Service's failure to revise and update the 1997 Interim Management Plan for the Lower Rio Grande Valley National Wildlife Refuge, in violation of the Refuge Act, 16 U.S.C. §§ 668dd(e)(1)(A)(iv), 668dd(e)(1)(E). Dkt. 48 at 34-36. Pursuant to the APA, a person suffering a legal wrong because of "agency action" is entitled to judicial review, 5 U.S.C. § 702, and "agency action" includes an agency's "failure to act." 5 U.S.C. § 551(13). Neither the Government nor SpaceX argue the Court does not have jurisdiction over this claim.

day congressional review period, "the Service's Region 2 Office *will sign* the land exchange agreement . . .." *Id*. at 4 (emphasis added). Only "escrow" and "title curative actions" remain, *id*. which are ministerial and require no Service discretion or decisionmaking that may change the Exchange determination.[10]

For the "consummation" prong of the final agency action test, the key question is whether the agency action is "subject to further agency review." *Clarke*, 74 F.4th at 638. Now that the Regional Director has signed the Decision, and the Director has ratified it, the Exchange is not subject to further review by the Service. While the Government claims that the Exchange is still "merely proposed," Dkt. 51, p. 13, that is not what either the Regional Director's Decision or the Director's approval say. The Service "has decided to implement" the Exchange and "will sign the land exchange agreement." Dkt. 26-1, p. 4; Dkt. 26-21, p. 4. Like the letter at issue in *Clarke*, the Service's decision to implement the Exchange is final and unappealable. *Clarke*, 74 F.4th at 638. All that remains are the ministerial tasks of escrow and title, which will have no impact on either the decision to implement the Exchange, or the Service's compliance with NEPA, the NHPA, and the Refuge Act. Moreover, even if there was the possibility the Service may reverse course—which is belied by the Government's own brief—that would not change the fact that there is presently a final agency decision to implement the Exchange. *Id*. at 639.

---

[10] The Government suggests the Court may not have jurisdiction because the Director's approval occurred after the suit was filed. Dkt. 51, p. 15. Not only would it be a waste of time and resources for Plaintiffs to simply refile their case in lieu of their Amended Complaint (the apparent upshot of the Government's argument), but there is no precedent supporting that counterintuitive result. The post-complaint agency actions at issue in *Louisiana v. Biden*, 622 F. Supp. 3d 267, 286 (W.D. La. 2022) concerned entirely separate actions over which the court had no prior jurisdiction. That is not the case here. Rather, Plaintiffs amended their complaint to include the Director's approval that merely ratified the Service's Regional Director's Decision, which had already decided to implement the Exchange. *See also Trudeau v. FTC,* 456 F.3d 178, 184 (D.C. Cir. 2006) (holding that the final agency action requirement relates to whether a cause of action has been properly asserted under the APA rather than a Court's Article III jurisdiction).

As for the "legal consequences" prong, relevant factors include whether the Decision withdrew some of the Service's "previously held discretion," bound it "to some degree," and whether SpaceX or others "may rely" on it. *Clarke*, 74 F.4th at 638. The Service has relinquished its discretion regarding the Exchange, as it "has decided to implement" the Exchange, Dkt. 26-1, p. 5, made clear that it "will exchange 715 acres" with SpaceX, *id*. at 2, and confirmed that it "will sign the land exchange agreement." Dkt. 26-11, p. 4.

Moreover, SpaceX is relying on the Service's decision to implement the Exchange. First, SpaceX has a "concrete plan" to develop the land that it will receive in order "to expand SpaceX's existing testing facility." Dkt. 52-1, ¶ 38. Second, "[i]n reliance on this exchange, SpaceX has refrained from developing the land it intends to provide to the Service." *Id*. This is presumably why SpaceX has not joined the Government's final agency action argument.

The caselaw confirms that the Service's decision here is final. Plaintiffs' fifth claim challenges the "Final Environmental Assessment" for the Exchange, pursuant to NEPA. Dkt. 48, pp. 37–38. The Service issued its FONSI and Decision on May 21, 2026, ending the NEPA process. Dkt. 26-1. An agency's final decision document prepared under NEPA is a final agency action under the APA. *Sierra Club v. Slater*, 120 F.3d 623, 631 (6th Cir. 1997) ("[I]t appears well-established that a final EIS or the [Decision] issued thereon constitute the 'final agency action' for purposes of the APA."); *Gov't of Manitoba v. Zinke*, 849 F.3d 1111, 1115 (D.C. Cir. 2017) ("The issuance of a [Decision] constitutes final agency action" in a NEPA case); *Riverfront Garden Dist. Ass'n, Inc. v. City of New Orleans*, No. 00-544, 2000 WL 35801851, *5 (E.D. La. Dec. 11, 2000) ("When, as in this case, an agency concludes that the preparation of an EIS is not required, an aggrieved party may challenge the decision in federal court under the

APA."); *Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt*., 36 F. 4th 850, 868 (9th Cir. 2022) ("We have repeatedly held that final NEPA documents are final agency actions.").[11]

Rather than addressing the caselaw holding that final NEPA decision documents constitute final agency action, the Government relies on *Driftless Area Land Conservancy v. Rural Utilities Serv.*, 74 F.4th 489 (7th Cir. 2023). Dkt. 51, p. 14. But the Government ignores the unique background of that case, and the key difference that no final NEPA decision had been issued. While an environmental impact statement had been prepared for a transmission line, and a right-of-way permit had been issued, the permit was revoked. *Driftless Area Land Conservancy*, 74 F.4th at 492. Even though a new decision was not issued, the litigation continued. *Id*. The Seventh Circuit held that although an environmental impact statement had been prepared, "[i]t is the decision incorporating the statement into a recommendation or report that is a reviewable agency action." *Id*. at 495-96. Here, that is the very decision that Plaintiffs challenge. Based on the agency's Environmental Assessment, the Service issued a Decision, in which it "decided to implement the Proposed Action." Dkt. 26-1, p. 4. This was the culmination of the NEPA process and constitutes final agency action.

Because agencies typically address NEPA and NHPA compliance through the same process, courts frequently find the NEPA decision to constitute final agency action for NHPA claims as well. *Te-Moak Tribe of Western Shoshone of Nev. v. United States Dept. of Interior*, 608 F.3d 592, 598 (9th Cir. 2010) (in case including NHPA and NEPA claims, court reviewed the Decision Record and FONSI, "which is the final agency action."); *Southern Utah Wilderness Alliance v. Burke*, 981 F. Supp. 2d 1099, 1103 (D. Utah 2013) (identifying the Record of

---

[11] *See also Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 737 (1998) ("[A] person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper.").

Decision as the final agency action in case including NHPA and NEPA claims); *Karst Envtl. Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1295-96 (D.C. Cir. 2007) (noting the "operational similarity" between NEPA and NHPA claims in assessing final agency action). And again, here, the Regional Forester's FONSI and Decision incorporated the Programmatic Agreement, a binding agreement that sets forth the responsibilities of all parties under the NHPA. Dkt. 26-1, p. 4; *see* Dkt. 26-7 (final Programmatic Agreement under NHPA, signed by all parties).

Tellingly, the Government does not specify what it believes *will* be the final agency action. If it is the actual transfer of title (as appears to be the case), courts have allowed challenges to federal land exchanges to proceed based on the agency's final decision to implement the exchange, and prior to the actual execution of the exchange and transfer of title. *See e.g., Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1175 (9th Cir. 2000) (challenging Record of Decision); *Kettle Range Conservation Group v. United States BLM*, 150 F.3d 1083, 1085 (9th Cir. 1998) (challenging Environmental Assessment and Decision).

It appears that the Government and SpaceX hope to run out the clock until the lands have been exchanged and their destruction has occurred, at which point they will argue Plaintiffs' motion is moot (or at least that the equities have shifted), and perhaps even that the Exchange cannot then be reversed. *Kettle Range Conservation Group*, 150 F.3d at 1087 (noting that because the land had already been transferred, and the lands had "undergone significant modification," "it might be impractical to attempt to unscramble the eggs."); *see also Canal Authority of Florida v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974) (noting the importance of a preliminary injunction where "the court's ability to render a meaningful decision on the merits would otherwise be in jeopardy."). The Court should reject such gamesmanship. According to the Service itself, the Exchange decision has been made, and it is reviewable under the APA.

## III. Plaintiffs are likely to succeed on the merits.

### A. Plaintiffs are likely to succeed under NHPA because the Exchange does not yield "comparable historic property" or adequately protect the landmark.

The fundamental purpose of the NHPA is to ensure the preservation of historical resources. *Te-Moak Tribe of Western Shoshone of Nev*., 608 F.3d at 609; *Nat'l Indian Youth Council v. Watt*, 664 F.2d 220, 226 (10th Cir. 1981). To that end, Section 111 of the NHPA only permits the Service to exchange a federally-designated historic property when certain conditions are met. 54 U.S.C. § 306121(a)(2). Here, the Service has authorized an exchange without meeting those statutory preconditions. The Service seeks to exchange a historic property that it owns for other property that is not "comparable historic property," and without "adequately ensur[ing] the preservation of the historic property." *Id.*

The operative text of Section 111 says:

> "Notwithstanding any other provision of law, each Federal agency, after consultation with the Council . . . may . . . exchange any property owned by the agency with comparable historic property, if the agency head determines that the lease or exchange will adequately ensure the preservation of the historic property."

*Id.* The Service would indisputably not receive any "comparable historic property" through this Exchange. Instead, the Government and SpaceX ask the Court to treat these unambiguous statutory protections as "optional" and "permissive." Dkt. 51, pp. 27–28, 31; Dkt. 52, p. 18. That is hardly the "best reading" of the plain statutory language. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). Rather, it contradicts the plain language and core tenets of statutory interpretation and, if adopted, would allow the Service to nullify the effect of Section 111 and defeat the NHPA statutory scheme. This Exchange violates Section 111 and should be enjoined.

The process of statutory interpretation is "focus[ed] . . . on the statutory text, its linguistic context, and various canons of construction." *Loper Bright Enters.*, 603 U.S. at 434 (Gorsuch, J.,

concurring). One basic principle is that "when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974). When there are two statutes concerning the same subject, the rule is to give effect to both if possible. *Id*. The Government and SpaceX ask the Court to "give effect to one statute at the expense of the other" which courts "are instructed not to do." *Abdallah v. Mesa Air Grp., Inc.*, 83 F.4th 1006, 1017 (5th Cir. 2023).

This Exchange can and therefore must comply with the mandatory requirements of both the Refuge Act and the NHPA. 16 U.S.C. § 668dd(b)(3); 54 U.S.C. § 306121(a)(2). Both statutes place limits on the Service's discretion to exchange lands unless specific substantive requirements have been met. *Id.* While the Refuge Act requires the values of the properties to be approximately equal, the NHPA requires that if the Service decides to exchange *historic* property, it must be exchanged for comparable historic property, and then only if the Service determines the exchange will adequately ensure the preservation of the historic property. *Id*.

Plaintiffs do not disagree that the use of "may" in Section 111 makes the decision *whether* to engage in an exchange a discretionary one. According to Defendants, however, Congress' use of "may" removes any qualifications on the exercise of that discretion. Dkt. 51, p. 31; Dkt. 52, p. 16. But if Congress had wanted to give agencies unbridled discretion to exchange historic property, it would have stopped there. Instead, Congress explicitly cabined that authority by requiring the exchange to involve "comparable historic property" and ensure that the historic property will be preserved. 54 U.S.C. § 306121(a)(2); *see Bouarfa v. Mayorkas*, 604 U.S. 6, 14–15 (2024) (distinguishing between Congressional grants of authority that "in no way prescribe how that discretion must be exercised" and those authorizing agency action "only if [it] first confirms that certain preconditions have been satisfied"). The Court must reject an interpretation

that is so disconnected from the plain language and would treat language as surplusage. *See United States v. Palomares*, 52 F.4th 640, 644–45 (5th Cir. 2022).[12]

The Defendants' interpretations also misunderstand Section 111's "notwithstanding" clause. Dkt. 51, p. 32; Dkt. 52, pp. 18–19. "When used by Congress, the word "notwithstanding' "overrides any specified, contrary provisions of law." *Tucker v. Ridge*, 322 F. Supp. 2d 738, 743 (E.D. Tex. 2004) (citing *Shomberg v. United States*, 348 U.S. 540, 547–48 (1955)). Thus, in this context, Congress' use of the word "notwithstanding" clearly connotes that NHPA Section 111's exchange provision must control in the face of conflicting statutes. But the Defendants' interpretation does exactly the opposite: it applies Refuge Act requirements for exchanges while nullifying Section 111 altogether.

Beyond NHPA Section 111's plain language, Defendants also fail to explain why the Court could not give effect to both statutory requirements. *Morton*, 417 U.S. at 551. While the Refuge Act only allows exchanges that comply with the overarching refuge-management requirements under 16 U.S.C. § 668dd(a)(4), and then only if the exchanged lands are "suitable for disposition" and exchanged for "approximately equal" value, *id.* § 668dd(b)(3), the NHPA has its own separate but compatible requirements geared towards the historic preservation purposes of that law, 54 U.S.C. § 306121(a)(2).[13] Because the Service here seeks to exchange

[12] In sharp (and dispositive) contrast to Section 111 of the NHPA, the statute at issue in *Biden v. Texas*, 597 U.S. 785 (2022), on which SpaceX relies (Dkt. 52, pp. 16-17), merely provided that the government "may" take certain immigration-related actions and attached no conditions whatsoever. That was critical to the Court's analysis. *See id*. at 801-03 ("The statutory grant of discretion here contains no such caveat, and we will not rewrite it to include one.").

[13] SpaceX argues that the Advisory Council on Historic Preservation ("ACHP") has advanced a "repeated, reasoned interpretation of Section 111 as permissive." Dkt. 52, p. 20. SpaceX's citations, however, simply provide evidence of scattered references to Section 111 as a tool "to promote the preservation, enhancement, and sustainable use of the nation's diverse historic resources." Dkt. 52-7, p. 4. Regardless, as Plaintiffs have noted, "an agency guidance document cannot rewrite the plain language of the NHPA." Dkt. 24-1, p. 24.

land that is protected both as a National Wildlife Refuge and as a National Historic Landmark, the agency is faced with "two acts upon the same subject" that impose separate limitations on its authority to exchange this doubly protected federal land. *Morton*, 417 U.S. at 551. Neither the Government nor SpaceX offer any explanation for why the requirements of both statutes are not "capable of co-existence." *Id*.

The Alaska District Court recently applied this same analysis in *Native Village of Hooper Bay v. Burgum*, No. 3:25-cv-00316-SLG, 2026 WL 2409781 (D. Alaska Aug. 18, 2026). There, the court was confronted with a land exchange governed by both the Refuge Act and the Alaska National Interest Lands Conservation Act ("ANILCA"). *Id.* at 76-77; 16 U.S.C. §§ 668dd(b)(3), 3192(h). The Secretary of Interior relied only on the ANILCA provision, arguing that it "supersedes any conflicting Refuge Act requirement." *Native Village*, slip op. at 77. The court disagreed, holding that "[t]he Secretary can give effect to both provisions." *Id.* So too here.

Defendants also err in their characterization of Section 111 within the statutory scheme of the NHPA. It is a well-established canon of statutory interpretation that the specific governs the general. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). This canon applies to statutes "in which a general authorization and a more limited, specific authorization exist side by side" in order to "avoid[] . . . the superfluity of a specific provision that is swallowed by the general one." *Id* at 639. Section 106 of the NHPA generally requires federal agencies to take into account the effect of an undertaking on any historic property, 54 U.S.C. § 306108, and "undertaking" is broadly defined to include "a project, activity, or program in whole or in part under direct or indirect jurisdiction of a Federal agency," *id.* § 300320. By contrast, Section 111 only applies to a narrow subset of undertakings, leases or exchanges of historic properties, and it imposes substantive protections for historic properties in that specific

context. *Id.* § 306121(a). Thus, the Government's interpretation—that an agency can satisfy the NHPA by complying with Section 106, alone, Dkt. 51, p. 30—is plainly wrong, because it ignores the "specific" prescription within the NHPA and renders those specific provisions of Section 111 superfluous. *RadLAX Gateway Hotel*, 566 U.S. at 645.[14]

In sum, the Exchange must comply with NHPA Section 111, and Plaintiffs are likely to prevail on their claim that the Service failed to comply with this statutory requirement.

**B. The Service violated the Refuge Act because the Exchange will not provide a net benefit to the Refuge, and is not consistent with the 1997 Plan.**

The Exchange violates the Refuge Act because (1) it will not further the purposes of or provide a net conservation benefit to the Lower Rio Grande Valley National Wildlife Refuge, and (2) it is inconsistent with the Refuge's 1997 Interim Management Plan. Dkt. 24-1, pp. 25–30. In response, the Government mostly responds to arguments that Plaintiffs did not make. Dkt. 51, pp. 17–25. When they turn to Plaintiffs' arguments, they are unpersuasive.

**1. The Exchange will not provide a net conservation benefit to the Refuge.**

The Refuge Act first provides the policy that each refuge must be managed to fulfill both the mission of the National Wildlife Refuge System as a whole, and the specific purposes of the individual refuge. 16 U.S.C. § 668dd(a)(3)(A). The Refuge Act then imposes a mandatory requirement that the Service must ensure that the mission of both the entire system and the individual refuge is carried out. *Id.* § 668dd(a)(4)(D). Importantly, if there is a conflict between

[14] Defendants' discussion of "legislative context"—a tacit admission that their argument fails under the plain text of the statute—reveals the opposite of what they seem to have intended. Dkt. 51, pp. 32-33; Dkt. 52, p. 18. Defendants show that Congress drafted Section 111 to "ensure the preservation of an historic property." *Id.* Here the Service is pursuing an exchange that fails to "enhanc[e] the nation's stock of historic property." *Id.* The fact that an agency action subject to a particular provision achieves the opposite of what Congress intended is in fact an indication that the agency is acting in violation of that statutory provision.

the purposes of an individual refuge and the mission of the overall system, the conflict must be resolved in a manner that first protects the purposes of the individual refuge. *Id*.

The Service's has interpreted this statutory provision to require that any land exchange "*must provide a net conservation benefit to the refuge*." Dkt. 26-15, p. 4 (342 FW 5.7(B)(2)(c)) (emphasis added). If the record does not demonstrate that the exchange would meet this criterion, the land exchange is inconsistent with the Refuge Act, and the Service "should not pursue it." *Id*. (342 FW 5.7(B)(2)(c)). This interpretation is fully supported by a Solicitor's Memo from 2023, which upon a review of the "text, structure, and legislative history" of the Refuge Act, concluded that the Service should "apply heightened standards to land exchanges," (Dkt. 26-9, p. 12), and further concluded that "a refuge land exchange must provide a conservation benefit to the refuge, and further the individual refuge's purposes." *Id*. at 7.[15]

The 727 acres that will be traded away under this Exchange are all from within the Lower Rio Grande Valley National Wildlife Refuge ("the Refuge" or the "Rio Grande Refuge"). Dkt. 26-4, p. 5. The lands to be acquired by the Service include 216 acres in an area known as "Las Palomas," which are surrounded by the Refuge. *Id*. at 6. The remaining 476 acres to be acquired are along SH 100 (Laguna Heights Parcels). *Id*. These 476 acres are contiguous with a different refuge, the Laguna Atascosa National Wildlife Refuge (the "Laguna Refuge"). The Service admits that the Laguna Heights Parcels are "contiguous with" the Laguna Refuge, and "adjacent

---

[15] The Service advances a different interpretation in this litigation, as does SpaceX: that the Refuge Act gives the Service unfettered discretion to deem lands "suitable for disposition." Dkt. 51, p. 17–18; Dkt. 52, p. 26–27. But this interpretation not only contravenes the "strong presumption favoring judicial review of administrative action," Weyerhaeuser Co. v. United States Fish & Wildlife Serv., 586 U.S. 9, 23 (2018), but would remove any "intelligible principle" from the Refuge Act's grant of exchange authority and, thus, would run afoul of both the nondelegation doctrine and the Constitution's Property Clause, U.S. Const. art. IV, § 3, cl. 2. *See Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 441–42 (5th Cir. 2020).

to" a portion of the Laguna Refuge. *Id*. The fact that all lands to be given to SpaceX are within the Rio Grande Refuge, and that the majority of lands to by acquired are adjacent to and contiguous with a different refuge, is plainly apparent by the Service's map at page 4 in the Final Environmental Assessment. *Id*. at 8. Moreover, the fact that two different national wildlife refuges are involved in the Exchange is evident by the title of the action itself, which is the "Lower Rio Grande Valley and Laguna Atascosa National Wildlife Refuges Boca Chica Land Exchange." *Id*. at 1. Indeed, the Service states in the Assessment that the acquired lands would be administered by the Rio Grande Refuge and the Laguna Refuge, Dkt. 26-4, p. 7, with the Rio Grande Refuge logically managing the 216 acres within that refuge, and the Laguna Refuge managing the 476 acres that are "contiguous with" and "adjacent to" that refuge. *Id*. at 6.

The Rio Grande Refuge and the Laguna Refuge are two separate national wildlife refuges, with the Rio Grande Refuge established in 1979, and the Laguna Refuge established in 1946. Dkt. 26-4, p. 5. They are each "managed under their respective Comprehensive Management Plans." Dkt. 26-4, p. 5. The Rio Grande Refuge, along with the Santa Ana Refuge, is managed pursuant to the 1997 Interim Management Plan (Dkt. 26-3), while the Laguna Refuge is managed pursuant to a separate 2010 Comprehensive Conservation Plan. Dkt. 26-10.

This type of an exchange is not allowed under the Refuge Act. The Service cannot shrink the Rio Grande Refuge by 476 acres, while losing over 700 acres of a National Historic Landmark in the Refuge, to increase the size of a different refuge. There is no way to characterize this as a "net conservation benefit" for the Rio Grande Refuge. And this is before even considering that the Exchange will allow SpaceX to encroach further into the heart of the Refuge, which will undoubtedly cause more conflicts and degradation in the Refuge. Thus, the Exchange will not provide a net conservation benefit to the Refuge, as both the Service's Manual

(Dkt. 26-15, p. 4) and the Solicitor (Dkt. 26-9, p. 7) plainly state is required in order for a land exchange to be compliant with the Refuge Act, 16 U.S.C. § 668dd(a)(4)(D).

In response, the Government argues that the Service's Manual does not have the force of law or regulation. Dkt. 51, p. 27 n. 8. Regardless, an agency cannot "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *FCC v. Fox TV Stations, Inc*., 556 U.S. 502, 515 (2009). Notably, the Service relied on this same Manual elsewhere for this same Exchange when it determined that it needed Director-level approval. Dkt. 26-21, p. 2. And the Service's Manual sets forth the agency's longstanding interpretation of the Refuge Act, which "may be especially informative" for the Court. *Loper Bright Enters.*, 603 U.S. at 402.

The Government also argues that the Solicitor Memo has been "suspended." Dkt. 51, p. 27 n. 10. But as the Government notes, this was a general suspension of all "M-Opinions" issued between January 2021 and January 2025. *Id*. The temporary "suspension" of this Memo, however, provides no indication that the Service has any reason to doubt or question the directly relevant legal opinions and conclusions reached by the Solicitor in 2024, especially because it is fully consistent with and supported by the Service's Manual which remains in effect.

In an attempt to avoid this statutory requirement, the Service now claims that the 476 acres of newly acquired lands that are "contiguous with" and "adjacent to" the Laguna Refuge will become part of the Rio Grande Refuge. Dkt. 51, p. 26. The arbitrariness of this new characterization of these acquired lands is apparent by the Service's position that these lands may be "added" to the Rio Grande Refuge but "assigned" to the Laguna Refuge. *Id*. The Service's sole reliance for this position is a litigation declaration that post-dates its May 21, 2026 Decision to implement the Exchange, and is an arbitrary attempt to avoid this violation of the Refuge Act.

*See Wages & White Lion Invs., L.L.C. v. United States FDA,* 16 F.4th 1130, 1136 (5th Cir. 2021) (in reviewing an agency's decision, the Court "cannot consider *post hoc* rationalizations").

Moreover, it does not appear that the Service could "assign" the Laguna Heights Parcels to the Rio Grande Refuge, even if it wanted to. The Service premises this notion on its assertion that this parcel lies within the "approved acquisition boundary" of the Refuge. Dkt. 26-21, p. 3. But this is incorrect. The Refuge's 1997 Management Plan includes a map of its acquisition zone, and the Laguna Heights Parcels are outside that zone. Dkt. 26-3, p. 146. Thus, the Service cannot reasonably deny that the impact of this Exchange will be to remove 476 acres from the Refuge and add acreage to a separate refuge. This violates 16 U.S.C. § 668dd(a)(4)(D).

**2. The Exchange is inconsistent with the Refuge's 1997 Interim Plan.**

As Plaintiffs explained, the Service has failed to demonstrate how the Exchange will be consistent with the Service's 1997 Interim Management Plan for the Refuge, in violation of the Refuge Act. Dkt. 24-1, p. 29 (citing 16 U.S.C. § 668dd(e)(1)(E)). In response, the Government claims that the Management Plan for this Refuge is not relevant, does not apply, and "is not a legal requirement." Dkt. 51, pp. 25, 39.

The Refuge Act, however, requires the Service to manage each refuge in a manner consistent with the applicable conservation plan. 16 U.S.C. § 668dd(e)(1)(E). The Exchange is inconsistent with the 1997 Plan, which is not surprising since the Plan is 30 years old and pre-dates the existence of SpaceX, which now dominates the region. The 1997 Plan speaks of ambitious land acquisition, attracting thousands of visitors, and becoming a tourist destination. Dkt. 26-3, p. 8. The Service now claims, however, that it has closed these lands to the public, and the Exchange would further decrease public access, and reduce the acreage and habitat of this Refuge, in contravention of the Plan, and in violation of the Act. 16 U.S.C. § 668dd(e)(1)(E).

**C. The Service is in violation of the Refuge Act by failing to have in place an up-to-date Comprehensive Conservation Plan ("CCP") for the Refuge.**

Plaintiffs' complaint includes a "failure to act" claim, brought pursuant to Section 706(1) of the APA, challenging the failure of the Service to have in place an up-to-date Comprehensive Conservation Plan ("CCP") for the Refuge. Dkt. 48, pp. 34-36. As set forth in Plaintiffs' opening brief, the Service is in ongoing violation of Refuge Act because it continues to rely on and implement its 1997 "Interim Comprehensive Management Plan" ("Interim Plan") for the Refuge, which the Service admits was only intended to be in place for 5 to 10 years. Dkt. 26-3, p. 4.

The Government and SpaceX argue that Plaintiffs failed to identify any discrete agency action that the Service is required to take. Dkt. 51, p. 40; Dkt. 52, p. 33. But Plaintiffs identified the mandatory statutory provision requiring that each refuge must be managed pursuant to an up-to-date CCP. Dkt. 24-1, p. 30. Specifically, the Service "shall not less frequently than 15 years after the date of issuance of a conservation plan . . . and every 15 years thereafter, revise the conservation plan as may be necessary." 16 U.S.C. § 668dd(e)(1)(A)(iv).

Based on this mandatory requirement, the Service's Manual requires it to review each CCP "every 15 years, or more frequently if necessary," to determine if a revision is needed. Dkt. 26-20, § 3.15. The Service, however, has ignored this requirement for the Refuge for decades. Again, the Service has never prepared the legally required CCP for this Refuge, but instead prepared an Interim Plan that it only intended to be in place for 5 to 10 years. Dkt. 26-3, p. 4.

The Government and SpaceX argue this claim is time-barred. Dkt. 51, p. 40; Dkt. 52, p. 33. But the Service's violation of its legal obligation to update the Plan is a continuing one. The continuing violation doctrine is an exception to the general rule that a "claim normally accrues when the factual and legal prerequisites for filing suit are in place." *Earle v. District of Columbia*, 707 F.3d 299, 306 (D.C. Cir. 2012) (citations omitted). The doctrine can apply if "the

text of the pertinent law imposes a continuing obligation to act or refrain from acting." *Id.* at 307.[16] That is the case here. The Service has an ongoing obligation to update the Plan, and that obligation does not disappear over time; rather, the delay becomes ever more “unreasonable” and “unlawful.” 5 U.S.C. § 706(1). The Service is in ongoing violation of the Refuge Act by relying on the same CCP for this Refuge for the past 30 years, apparently without ever considering whether the Plan needs to be updated or revised. 16 U.S.C. § 668dd(e)(1)(A)(iv).

### D. Plaintiffs are likely to succeed on their NEPA claim because the Service failed to consider reasonable alternatives to exchanging the Refuge lands.

NEPA required the Service to “study, develop, and describe appropriate alternatives to recommended courses of action.” 42 U.S.C. § 4332(2)(H). “The purpose of the alternatives requirement is to assure that the government agency as a decision-making body has considered methods of achieving the desired goal other than the proposed action.” *Piedmont Heights Civic Club, Inc. v. Moreland*, 637 F.2d 430, 436 (5th Cir. 1981) (citing *Sierra Club v. Morton*, 510 F.2d 813, 815 (5th Cir. 1975)). Thus, while the agency need not consider every alternative, it must consider alternatives provided in comments that are not “remote and speculative possibilities” and whose effects can be readily ascertained. *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978).

Here, the Service considered only two options: do nothing or implement the Exchange. In doing so, it ignored other feasible alternatives, like increasing efforts to prevent degradation to Refuge lands and minimize land-use conflicts by simply enforcing the law.

---

[16] *See also WildEarth Guardians v. Salazaar*, No. 09-cv-1893, 2009 WL 6443120 (S.D. Texas Dec. 7, 2009) (holding that plaintiffs’ claim was not time barred where plaintiffs suffered a continuing violation from the Secretary’s continuing failure to act toward the recovery of the jaguarundi, as required by the Endangered Species Act).

Defendants attempt to dismiss Plaintiffs' alternative by inaccurately recasting it as just another version of its no-action alternative. Dkt. 51, p. 38; Dkt. 52, pp. 35–36. It is true that since SpaceX began purchasing Refuge inholdings in 2014, the Service has essentially done nothing to protect the Refuge from the company's expansion. It has granted rights-of-way when it did not need to, and chosen not to hold SpaceX accountable when its activities cross property lines in destructive ways. *See, e.g.*, Dkt. 25-1; Dkt. 26-11. Plaintiffs do not propose a continuation of that pattern; but rather quite the opposite. And while SpaceX reiterates that an agency need not consider every proposed alternative, Dkt. 52, p. 35, the reality is the Service considered none.

Finally, the Defendants suggest that this proposed alternative would not reduce land use conflicts or simplify management. Dkt. 51, p. 38. The conflicts and management challenges the Service complains of, however, are the result of cross-border impacts from SpaceX's activities. Requiring SpaceX to keep its activities and the resulting impacts on its own property would undeniably solve these problems—no doubt more effectively than trading SpaceX's small inholdings for a massive one that will only facilitate even more conflicts down the road.

**IV. Plaintiffs will be irreparably harmed without a preliminary injunction.**

Plaintiffs exhaustively described how they will be irreparably harmed if the Court does not enjoin the Exchange, caused by the privatization of these lands and imminent construction activities by SpaceX. Dkt. 24-1, pp. 35–41. SpaceX's response to these assertions of harm categorically confirms them. According to SpaceX, as soon as the Exchange is executed, it will promptly construct a second test site, which will sit adjacent to the Rio Grande River and double the current testing footprint, and will also construct a new road across the Exchange area to move equipment to that test site. *See* Dkt. 52-1, ¶¶ 38–41; Dkt. 52-2 (map).

As Plaintiffs' members have explained, impacts from the Massey test site have been among the most consequential aspects of SpaceX's operations. *See* Dkt. 24-3, ¶¶ 20–22; Dkt. 24-4, ¶ 14; Supp. Chapman Dec., ¶¶ 7–8. As the name indicates, the site is used to "test" rockets, and those tests frequently go wrong, resulting in catastrophic explosions that send fiery debris and other wreckage out for miles. In a recent example, a failed test scorched acres of land within the existing Refuge. Dkt. 25-1; *see also* Supp. Branch Dec., ¶¶ 7–8. During that test, residents 10 miles away on South Padre Island called 911 to report that their homes were shaking.[17]

Plaintiffs' members will suffer recreational and aesthetic harm from Space's immediate clearing of land along the Rio Grande River. *See, e.g.*, Supp. Chapman Dec., ¶ 8. Moreover, the imminent, planned construction of conspicuous testing equipment will harm their interests in recreating and observing wildlife nearby due to the noise, pollution, and explosions that will impact the Exchange lands and adjacent, publicly-accessible areas. *Id.*, ¶ 9; Supp. Branch Dec., ¶ 7. Their interest in viewing and enjoying the National Landmark in its historic, natural state will also be harmed by the development on these lands. Dkt. 24-6, ¶¶ 10–12.

## V. The balance of harms and public interest weigh in favor of an injunction.

The Government concedes that "[t]he public interest undoubtedly favors conservation of the Refuge and the battlefield." Dkt. 51, p. 44. But it argues that the balance of harms weigh against a preliminary injunction, due to the purported diversion of "staff attention and effort from conservation goals to managing conflicting land uses," and loss of other supposed "conservation benefits" from the Exchange. *Id.* SpaceX similarly emphasizes consequences it may face from "a lengthy or permanent injunction," or a "delay of two years or longer." Dkt. 52, pp. 39–40.

---

[17] B. Lingle and L. Darwhiche, *SpaceX explosion shook South Texas, sparking oversight and safety concerns*, San Antonio Express-News, June 26, 2026 (last accessed Aug. 19, 2026).

These arguments are untethered from the motion before the Court, which merely seeks maintenance of the status quo pending resolution of the merits. On multiple occasions, Plaintiffs have proposed an expedited summary judgment briefing schedule to Defendants, to no avail. Regardless, the merits will be determined on cross motions for summary judgment, based on the administrative record, which can likely be completed in a matter of months. Especially since (according to Defendants) the Exchange has been in the works for years, an additional months-long delay to allow for a final merits ruling before the Exchange becomes a fait accompli will not cause irreparable harm for either the Government or SpaceX.

Given this context, the Service's concerns about delayed conservation benefits are also unfounded. If SpaceX could readily use the lands it already has, it would have done so. There is no practical risk that SpaceX will develop these lands if the Exchange is paused for a matter of months. Further, the Government's complaints about the "staff attention and effort" needed to manage "conflicting land uses" for a few more months pale in comparison to the risk to Plaintiffs from this land being transferred, bulldozed, and paved over. *See* Dkt. 51, p. 43.

Similarly, SpaceX fails to demonstrate any harm over the next few months that would outweigh the irreparable harm that Plaintiffs' will suffer without a preliminary injunction.
In the absence of an injunction, SpaceX intends to promptly expand the current test site and construct a road across the acquired lands to facilitate an increase in rocket testing. The company cannot do so without permanently damaging Refuge land; it will cut down vegetation, bulldoze land, and destroy wildlife habitat to complete this project. It also cannot drastically increase testing—and the explosions that come with it—without damaging the Refuge.

The balance of equities clearly favors temporarily maintaining the status quo.

**VI. The Court should exercise its discretion to order no bond for the minor administrative burden caused by a temporary pause of the Exchange.**

As explained, the Court has broad discretion to determine the appropriate amount of an injunction bond, including the discretion to require no bond. Dkt. 24-1, p. 44; *see A.T.N. Indus., Inc. v. Gross*, 632 Fed. Appx. 185, 192 (5th Cir. 2015) ("[U]nder Rule 65(c), a court may elect to require no security at all." (citations and quotations omitted)). The Government suggests that the Court should "fashion an appropriate bond," but makes no attempt to explain how it will suffer financial harm if this Court temporarily enjoins the exchange. Dkt. 51, p. 45.

SpaceX requests a bond to compensate it for purported "site-development costs," delays to "testing and contractual milestones," revenue that may be "jeopardize[d]," and "risk market opportunities that cannot readily be recaptured." Dkt. 52, p. 42. Rather than providing any detail, however, SpaceX requests a hearing to present evidence. *Id.* But SpaceX informed the Court that it would not need an evidentiary hearing as part of its presentation of arguments on Plaintiffs' motion, so its request now is untimely and would only needlessly delay the proceedings.

Again, Plaintiffs have made repeated proposals to expedite summary judgment briefing, which would minimize any asserted harm resulting from a preliminary injunction. Plaintiffs stand ready to proceed with merits briefing as rapidly as the Court prefers. Given that the exchange has already been subject to a multi-step agency process, a congressional examination period, and a title and escrow process, SpaceX cannot reasonably claim substantial harm from a few more months of delay in taking title of lands to which it has no legal right.

**CONCLUSION**

For all of these reasons, and the reasons set forth in Plaintiffs' opening memorandum, the Court should grant Plaintiffs' motion for a preliminary injunction and enjoin the Exchange.

Respectfully submitted on August 28, 2026.

*/s/ Brandon Jones-Cobb*
Brandon Jones-Cobb (WA Bar No. 64828)*
Center for Biological Diversity
P.O. Box 30604
Seattle, WA 98113-0604
Phone: 564-397-0830, ext. 478
Email: bjonescobb@biologicaldiversity.org

Ivan R. Ditmars (D.C. Bar No. CA00243)*
Center for Biological Diversity
2100 Franklin St., Suite 305
Oakland, CA 94612
Phone: 510-844-7158
Email: iditmars@biologicaldiversity.org

Marc D. Fink (MN Bar No. 343407)*
Center for Biological Diversity
209 East 7th St
Duluth, MN 55805
Phone: 218-464-0539
Email: mfink@biologicaldiversity.org

*Attorneys for Plaintiffs*
**Admitted Pro Hac Vice*