United States District Court
Southern District of Texas
**ENTERED**
September 21, 2026
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 1:26-CV-831 |
| | § | |
| BRIAN NESVIK, *et al.*, | § | |
| | § | |
| Defendants. | § | |

# ORDER AND OPINION

In March 2026, Defendant United States Fish and Wildlife Service (the "Service") sought approval for an exchange of land with Intervenor/Defendant Space Exploration Technologies Corporation ("SpaceX"). The proposed transaction entails each party transferring to the other about 700 acres of land in south Texas.

The land that the Service intends to transfer to SpaceX holds environmental, historical, religious, and cultural value, leading several non-profit organizations that promote the preservation of such public lands to file this lawsuit. They allege that the Service violated federal statutes in its decision-making process leading to the proposed land exchange, and that the transaction itself does not comply with these laws. They request a preliminary injunction to enjoin the transaction during the pendency of this lawsuit, arguing that absent such relief, Plaintiffs' members will suffer irreparable harm. (Motion, Doc. 24, 2) Defendants oppose the Motion on numerous grounds.

On September 3, the Court held a hearing and heard argument from counsel regarding the requested injunctive relief. Based on the record and the applicable law, the Court concludes that Plaintiffs have not satisfied the requirements for the issuance of a preliminary injunction.

## I. Factual Background and Procedural History

### A. The Significance of the Land

In 1979, the Service established the Lower Rio Grande Valley National Wildlife Refuge for "the development, advancement, management, conservation, and protection of fish and wildlife resources." (Final Env. Assess., Doc. 26–4, 5) The Refuge currently comprises over 103,000 acres across several counties in south Texas. The holdings include the 11,500 acre Lower Rio Grande Valley National Wildlife Refuge (the "Boca Chica Tract"), which lies in Cameron County near Boca Chica Beach and is one of the Service's primary conservation holdings along the Rio Grande River. This property "provides habitat for federally listed species such as the ocelot, northern aplomado falcon, and piping plover." (Dec. Memo, Doc. 26–21, 2)

The Boca Chica Tract also possesses historical significance, as it encompasses a portion of the Palmito Ranch Battlefield National Historic Landmark, where in 1865 Union and Confederate soldiers fought the final land battle of the Civil War. The National Park Service recognized the 9,391-acre site as a National Historic Landmark in 1997, highlighting the preservation of "the integrity of the entire battlefield" and recognizing that the "landscape visible today is much the same as that the Union and Confederate soldiers experienced as they faced each other in battle." (Nat'l Reg. of Historic Places Form, Doc. 26–8, 31)

Portions of the Boca Chica Tract also hold religious significance for certain groups. In particular, the Carrizo/Comecrudo Tribe of Texas views some of the Boca Chica Tract as sacred land utilized for "ceremonial life ways." (Mancias Decl., Doc. 24–5, ¶ 6)

### B. SpaceX

Elon Musk founded SpaceX in 2002 with the ultimate goal of making life multiplanetary. In 2014, SpaceX obtained approval for the "construction and operation of Starbase, a launch site on private land in southern Texas near Boca Chica." (Styer Decl., Doc. 52–1, ¶ 13) Since then, SpaceX has continued acquiring and developing property in the area, and has constructed a

vertical launch area, a launch and landing control center, a manufacturing facility, offices, and "a testing facility located about 3 miles west at a site called Massey's." (*Id.* at ¶ 15) The Massey Test Site "includes six test pads including two integrated vehicle structural test stands, two development structural test stands, a component level test stand, and a fully integrated Starship Static Fire test stand." (*Id.* at ¶ 17) SpaceX owns the land on which the Massey Test Site sits, while the surrounding area lies within the Boca Chica Tract.

Neither the test site nor the surrounding lands and access road are open to the public. (*See* DeLaGarza Decl., Doc. 51–1, ¶ 8 ("The lands that are being exchanged out of the Refuge are currently closed to the public without any parking lots or access trails."); Styer Decl., Doc. 51–2, ¶¶ 16, 19 ("The area of the [Boca Chica Tract] near Massey's is not open to the public."); *see also* Reply, Doc. 53, 9 (recognizing that the Service "prohibits camping and limits visitors to designated roads, parking areas, and trails" within its holdings))

The Boca Chica Tract is not fully contiguous, possessing fragmentation occasioned by various individuals and entities, including SpaceX, owning parcels of land reaching into the Boca Chica Tract. This fragmentation poses challenges to the Service's maintenance of the Boca Chica Tract.

### C. The Land Exchange

In the past three decades, the Service has observed that the area surrounding the Boca Chica Tract "has experienced significant industrialization and development, particularly associated with the expansion of SpaceX facilities and related infrastructure." (Final Env. Ass., Doc. 26–4, 6) The "increased industrial activity combined with the fragmented pattern of private inholdings has led to increased disturbance from noise and lights, and elevated levels of habitat fragmentation, which have diminished the conservation value of these lands." (*Id.*) "The resulting changes in land use and landscape context have impacted the ability of these parcels to function as effective components of the regional conservation network." (*Id.*)

SpaceX's development and activities in Starbase have contributed to this degradation of conservation value within the Boca Chica Tract. In particular, "SpaceX's operations and development have resulted in road closures, water management impacts on the Refuge from development and wastewater discharge, stockpiling of materials near Refuge lands, and scattered debris and contaminants on Refuge." (Dec. Memo, Doc. 26–21, 3; *see also* Bradley Decl., Doc. 25 (attaching satellite imagery of SpaceX property near Starbase before and after SpaceX operations and development))

"In 2023, in light of the fragmentation of Refuge lands, the Service began to consider a potential land exchange with SpaceX, with the goal of consolidating SpaceX and Refuge operations, to reduce the fragmented ownership and effects thereof." (Dec. Memo, Doc. 26–21, 3) About three years later, in March 2026, the Service issued a Draft Environmental Statement (Doc. 26–19) proposing to divest 712 acres of the Boca Chica Tract, in exchange for 692 acres that SpaceX currently owns. The land that the Service identified for transfer to SpaceX lies between State Highway 4 ("SH 4") and the Rio Grande River.[1] The Property consists primarily of coastal prairie and thornscrub, with clay lomas (dunes), wind tidal flats, and native brushland, and is home to a host of animals, including several protected species. About 700 acres of the Property sit within the Palmito Ranch Battlefield National Historic Landmark.

In return, SpaceX identified numerous parcels of land for transfer to the Service. About 200 acres lie adjacent to and interspersed within the Boca Chica Tract, which means that the Land Exchange would reduce the overall fragmentation of the Boca Chica Tract. In addition, SpaceX would transfer to the Service 476.4 acres adjacent to the Laguna Atascosa National Wildlife Refuge, which is several miles north of the Boca Chica Tract. The Service has described the 692

[1] The Service also included about 6.8 acres north of SH 4 near Boca Chica Beach, as well as 1.3 acres immediately north of Starbase. And the Service and SpaceX have slightly adjusted the exact number of acres involved. (*See* Final Env. Assess., Doc. 26–4, 5 (identifying the divested lands as 715 acres, and the acquired lands as 683 acres)) The Court refers to the acres that the Service has identified for divestiture as the "Property," and to the contemplated transaction as the "Land Exchange."

acres that it seeks to obtain from SpaceX as largely undeveloped land containing "high-quality coastal marsh, tidal flats, saline prairie, and thornscrub habitats." (Dec. Memo, Doc. 26–21, 3)

The Draft Environmental Assessment relied on and attached a February 2026 Biological Assessment for the Proposed Boca Chica Land Exchange (Doc. 26–12). The Biological Assessment evaluated the impact of the Land Exchange on numerous species within the Property:

> The proposed action will have no effect on four species considered (i.e., Gulf Coast jaguarundi, cactus ferruginous pygmy-owl, South Texas ambrosia, and Texas ayenia) because those species' known distributions do not currently overlap with the action area. Two species proposed for listing (i.e., tricolored bat and monarch butterfly) and one critical habitat area proposed for designation (rufa red knot critical habitat) were also considered and dismissed from further analysis because conference is not required when the effects of the action are not likely to jeopardize the continued existence of a proposed species or destroy or adversely modify proposed critical habitat.
>
> The action area overlaps with the ranges and potential distribution of 11 listed species and one designated critical habitat area. The proposed action may affect but is not likely to adversely affect those 11 species and one designated critical habitat area. Table 2 summarizes the effect determinations for the species and critical habitat areas considered in this BA.

(*Id.* at 54)

In the Draft Environmental Assessment, the Service summarized the grounds it believed supported the Land Exchange: "The need for the Proposed Action is to reduce land use conflicts that impede the Service's mission to conserve species' habitats, improve habitat protection, consolidate ownership, and simplify management of refuge lands as established through the National Wildlife Refuge System Administration Act (as amended), consistent with the Final Lower Rio Grande Valley and Santa Ana National Wildlife Refuges Comprehensive Conservation Plan (Service 1997)." (Draft Env. Assess., Doc. 26–19, 8) As described in the document, the Service collaborated with SpaceX to develop a system for evaluating habitat quality within the lands to be exchanged. Service specialists assigned each parcel a Biological Importance Score based on habitat quality, Refuge connectivity, and critical-habitat presence, "where 0 is the lowest biological importance, and 1 is the highest." (*Id.* at 15) "Using this approach, the lands proposed

for divestiture were classified as poor (497 acres) and medium quality (215 acres), while the lands proposed for acquisition were classified as high quality (692 acres)." (*Id.*; *see also* Final Env. Assess., Doc. 26–4, 17 (reflecting that the lands within the Property scored between 0.33 and 0.60, while the parcels that the Service would acquire scored between 0.73 and 1.00)) In other words, the lands that the Service seeks to obtain from the Land Exchange received a higher Biological Importance Score than the lands that the Service would transfer to SpaceX.

During the month-long public comment period on the Draft Environmental Assessment, the Service received over 25,000 comments (including from Plaintiffs), the majority of which opposed the Land Exchange. On June 1, the Service issued its Final Environmental Assessment (Doc. 26–4), which remained substantively identical to the March 2026 draft.

On July 10, the Acting Southwest Regional Director for the Service delivered a USFWS Decision Memorandum (Doc. 26–21) to Brian R. Nesvik, Director of the Service, formally seeking approval for the Land Exchange. Three days later, Nesvik approved the Service "proceeding with the proposed land exchange at the Lower Rio Grande Valley National Wildlife Refuge." (*Id.* at 9)

Given the value of the Land Exchange, the U.S. Department of the Interior was required to submit the transaction to the House and Senate Committees on Appropriations for a 30-day examination period. The review period began on July 24 and expired on August 24, and the record does not reflect any comment from or action by the Committee.

On September 1, the Service and SpaceX executed the Land Exchange Agreement. They expect to transfer title on September 22.

Upon receiving ownership of the Property, SpaceX intends to promptly obtain local approvals and to expand the Massey Test Site toward the east and to construct a service road connecting the expanded facility to SH 4 at a point closer to Starbase. (*See* Styer Decl., Doc. 52–1, ¶¶ 5, 38; Exp. Map, Doc. 52–2, 2) In anticipation of the Land Exchange and the planned expansion, SpaceX refrained from developing on some of the land that it intends to transfer to the

Service. SpaceX characterizes the expansion as urgently needed. According to the company, without the additional testing capacity and access obtained through the expansion, SpaceX will continue to face constraints delaying its planned increased pace of Starship launches. The delay would impair the company's ability to meet contract milestones and fulfill customer needs that depend on an increased launch cadence.

Long term, SpaceX intends to develop the Property with a mix of residential, industrial, and infrastructure projects.

**D. Plaintiffs**

The four Plaintiffs are non-profit organizations that, in part, promote the protection and preservation of lands with historical, environmental, religious, and cultural value.

Plaintiff Center for Biological Diversity ("the Center") works through science, law, and policy to secure a future for species hovering on the brink of extinction. The Center has over 94,000 members and is headquartered in Tucson, Arizona.

Plaintiff Save RGV is a nonprofit organization that advocates for environmental justice and sustainability through addressing the causes and consequences of habitat loss and climate change that affect the health and well-being of the entire Rio Grande Valley community.

Plaintiff The Carrizo/Comecrudo Nation of Texas, Inc. ("Carrizo/Comecrudo Nation") serves the cultural, social, educational, spiritual, linguistic, economic, health, and traditional needs of its members and descendants of the Carrizo/Comecrudo Nation of Texas, as well as of other indigenous or Native American groups.

Plaintiff South Texas Environmental Justice Network ("Justice Network") works toward environmental justice in South Texas, largely on behalf of directly-impacted people of color.

In support of their Motion, Plaintiffs submit declarations from several of their members, who each describe their use and enjoyment of the Property or adjacent lands.

Mary Angela Branch has been a member of the Center since 2011 and of Save RGV since 2017. She regularly visits the Boca Chica area to view wildlife and otherwise enjoy the public lands and beaches. Branch "regularly drive[s] out Highway 4 to view the scenery and wildlife within the Refuge, including within the proposed exchange area." (Branch Decl., Doc. 24–3, ¶ 13; *see also* Supp. Branch Decl., Doc. 53–2, ¶ 5) She describes the area near Massey Road as being "dense with wildlife, such as birds, and wildflowers" and visits the areas "near Massey Road . . . three to four times per year." (Branch Decl., Doc. 24–3, ¶ 13) She "plan[s] to return this summer and fall" to the area, during which time she "intend[s] to view wildlife in Refuge areas along Highway 4 (including areas proposed to be exchanged)." (*Id.* at ¶¶ 13, 31; *see also* Supp. Branch Decl., Doc. 53–2, ¶ 5 (representing that she visits the Refuge about six times a year))

Jim Chapman is a Save RGV member who lives in Weslaco, Texas. He describes the Property as "high habitat value riparian habitat" that he recently made a "river excursion to view." (Chapman Decl., Doc. 24–6, ¶ 9) During that excursion, Chapman "put in to the river off of Richardson Drive" by accessing the river from "a private landowner's property, with permission," and "travel[ed] upstream along the divestment area," where he was able to see "Brown Pelicans, Yellow-crowned Night Herons, Great Blue Herons and several unidentified raptors." (*Id.*; Supp. Chapman Decl., Doc. 53–1, ¶ 7) He possesses "definite plans to access the River again from [that] point and visit portions of the River that border the exchange area, including near the Massey Test Site," where "the birding along the forested edge of the river is excellent." (Supp. Chapman Decl., Doc. 53–1, ¶ 7) He has also "visited lomas often," including "the loma that Hwy 4 traverses at the Massey Way turnoff," and he characterizes the lomas as "biological treasures [that] provide important habitat for wildlife both within and just outside the Refuge." (Chapman Decl., Doc. 24-6, ¶ 7) Chapman has visited the area six times since June 2025, observing "dense, impenetrable thornscrub, the best kind of ocelot habit." (Supp. Chapman Decl., Doc. 53–1, ¶ 6) In addition, the Service "granted [Chapman] access to the Refuge on at least two prior occasions," including

"authorization to access the areas of the Refuge that will be exchanged to SpaceX under the proposed exchange, in addition to the lomas north of Highway 4." (*Id.* at ¶ 4)

Juan Benito Mancias is the Chairman (hereditary leader) of the Carrizo/Comecrudo Nation. He leads religious ceremonies at Boca Chica Beach and the surrounding area, which is "sacred to [him] and the Carrizo/Comecrudo People, and vital to [their] ancestral traditions." (Mancias Decl., Doc. 24–5, ¶ 6) Among these sacred lands is the area "along the Rio Grande River, including the lands that FWS is now giving to SpaceX for development and destruction (called the Divested lands by FWS)." (*Id.* at ¶ 12) In that area, Mancias and his Tribe "give offerings to honor" those "places where [his] ancestors walked . . . for thousands of years." (*Id.* at ¶ 13) In fact, because access to Boca Chica has become more difficult due to SpaceX's activities in the region, Mancias has been "relying on areas accessible from Route 4, Massey Way, and Quicksilver Avenue to visit and perform sacred ceremonies," which "includes the areas that are being given to SpaceX." (*Id.* at ¶ 14) He last visited the area in April 2026 to "walk the area, leave offerings for [his] ancestors, and perform sacred rituals." (*Id.*) And he "intend[s] to continue visiting at least 8 times per year on the Quarter days and Cross-Quarter days." (*Id.*)

Brett Hartl works as the Government Affairs Director for the Center and has been a member since 2013. He is a conservation biologist and lawyer who has dedicated his career to preserving wildlife. In the Boca Chica Tract and the Laguna Atascosa National Wildlife Refuge, he often "search[es] for shorebirds," including "Piping Plovers," which are "regularly observed near the lands sought to be transferred by SpaceX." (Hartl Decl., Doc. 24–7, ¶ 13) He described the Property as "very close to places [where he has] search[ed] for shorebirds," and notes that Piping Plovers have been sighted on a map along the area for exchange. (*Id.* at ¶¶ 13–14)

Rebekah Hinojosa is the founding member of the Justice Network. She gives tours to reporters, college students, and public officials of "the beach and surrounding wetlands."

(Hinojosa Decl., Doc. 24–4, ¶ 6) She particularly enjoys "visiting the tracts of the Refuge on the southside of Highway 4" before proceeding to Boca Chica Beach. (*Id.* at ¶ 8)

Plaintiffs' members also express their views regarding the impact of the Land Exchange on the Property and on their ability to enjoy those lands.

Branch shares her concerns that explosions at the Massey Test Site, "including ignition and liftoff at the launch pad," will "impact[] surrounding lands" and "harm habitat for protected wildlife and in fact all wildlife" that she "seek[s] out and enjoy[s]." (Branch Decl., Doc. 24–3, ¶ 20) She particularly seeks out "piping plovers, aplomado falcons, ocelots, coyotes, sea turtles and other migratory and year round birds and raptors," and believes that "noise and lights associated with construction of the Exchange parcel, and subsequently the explosions resulting from testing at this new site—and more frequent tests generally," will "disrupt and scare off wildlife that [she] enjoy[s] observing in the area," and that such development will "directly harm[] [her] interests in protecting and viewing those species." (*Id.* at ¶ 20; Supp. Branch Decl., Doc. 53–2, ¶ 7)

Chapman fears that the Land Exchange will lead to the privatization of the Property, causing him to "immediately lose [his] right as a member of the public to visit and recreate on [those] lands." (Chapman Decl., Doc. 24–6, ¶ 16) He believes that SpaceX's development on the Property will "cause a great deal of traffic, noise, artificial light, and pollution" that is "harmful to the wildlife that [he] cares about at the Refuge," and that this impact would "harm[] [his] ability to peacefully visit and enjoy the Refuge." (*Id.* at ¶ 15) He expresses that SpaceX would "move very quickly to start construction on their acquired land" after the Land Exchange, and states that "there is no known restoration technique that would allow refuge managers to later restore these lands to anything close to their current diversity and wildlife value." (*Id.* at ¶ 18) He also claims that SpaceX's plans to "construct a whole new test area east of the Massey Test Site" and "increase the frequency of rocket testing" would "harm [his] aesthetic interest in observing and promoting the Refuge[,]" as the "noise and explosions resulting from testing at this new site" will "disrupt

and scare off wildlife that [he] enjoys observing in the area." (Supp. Chapman Decl., Doc. 53–1, ¶¶ 8–9)

Mancias believes that the Land Exchange will impact his "religious and spiritual interests" in the Property, as the Service would "giv[e] away some of the last remaining lands that [he has] access to and rely on for spiritual and religious purposes." (Mancias Decl., Doc. 24–5, ¶ 16)

Hartl expresses concern that "if [the Exchange] areas are industrialized, and as expected many more launches occur as a result, this whole area could become unusable for shorebirds." (Hartl Decl., Doc. 24–7, ¶ 14) He fears this development would lead to "declining populations of Piping Plovers and Red Knots" because of their sensitivity to human disturbance. (*Id.*) And this adverse impact would, in turn, "injur[e] [his] aesthetic and recreational interests in these species." (*Id.* at ¶ 15)

Hinojosa believes that the Land Exchange would result in "more industrial buildout on this wildlife habitat, destroying the area, including the habitat that [she] show[s] during tours[,]" and "severing a major wildlife corridor, disrupting species migration, and making it unlikely that we would continue to find these [protected] species." (Hinojosa Decl., Doc. 24–4, ¶ 7)

**E. Procedural History**

On June 10, 2026, Plaintiffs filed this lawsuit in the United States District Court for the District of Columbia, bringing suit against the Service and Brian Nesvik, in his official capacity as Director for the Service.[2] By the end of the month, Defendant SpaceX had successfully moved to intervene.

In late June, the Service and SpaceX moved to transfer the case to the Southern District of Texas. About three weeks later, Plaintiffs moved for a preliminary injunction. (Motion, Doc. 24)

[2] Given that Plaintiffs sue Nesvik in his official capacity, the Court refers to him and the agency in the singular as "the Service."

On July 28, the court granted the request to transfer the matter, but did not reach the request for a preliminary injunction. (*See* Order, 34)

On September 3, after the parties had fully briefed the issues, the Court held a hearing on the Motion. No party called witnesses at the hearing, relying on the evidence submitted with the briefing.

## II. Legal Standard

Federal Rule of Civil Procedure 65 governs the issuance of preliminary injunctions. To obtain such relief, a party must demonstrate (1) a likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) that the balance of equities favors the movant; and (4) that the injunction is in the public interest. *See Daniels Health Scis., LLC v. Vascular Health Scis.*, LLC, 710 F.3d 579, 582 (5th Cir. 2013); *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The third and fourth factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The party seeking a preliminary injunction bears the burden on each prerequisite. *Enter. Int'l, Inc. v.* Corporación *Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985). And "the court must remember that a preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion." *TitleMax of Texas, Inc. v. City of Dallas*, 142 F.4th 322, 328 (5th Cir. 2025).

## III. Analysis

Plaintiffs request that the Court enter a preliminary injunction enjoining the Land Exchange until the case is resolved on the merits.

Defendants challenge Plaintiffs' ability to satisfy any of the elements required to warrant a preliminary injunction, and they advance multiple arguments on each element. One central dispute concerns whether Plaintiffs have submitted sufficient evidence to demonstrate an injury that establishes standing and that constitutes irreparable harm. This contested issue also bears

relevance on the balancing required by the combined third and fourth elements. The Court resolves the request for a preliminary injunction based on its analysis of this contested issue and, as a result, does not reach the other challenges that Defendants advance.

**A. Substantial Likelihood of Success on the Merits**

"A plaintiff is not required to prove its entitlement to summary judgment in order to establish 'a substantial likelihood of success on the merits' for preliminary injunction purposes." *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009) (quoting *ICEE Distribs., Inc. v. J&J Snack Foods Corp.*, 325 F.3d 586, 596 n. 34 (5th Cir. 2003)). "Though there is no particular degree of likelihood of success that is required in every case, the party seeking a preliminary injunction must establish at least some likelihood of success on the merits[.]" *Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't*, 849 F.3d 615, 626 (5th Cir. 2017); *see also Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011) (quoting Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, 11A FEDERAL PRACTICE & PROCEDURE § 2948.3 (2d ed. 1995)) ("All courts agree that plaintiff must present a prima facie case but need not show that he is certain to win."). As to the degree of likelihood required, the Fifth Circuit has applied a "sliding-scale[.]" *TitleMax*, 142 F.4th at 328. The "importance and nature of the likely success on the merits requirement can vary significantly"; where "the other factors are strong, a showing of some likelihood of success on the merits will justify temporary injunctive relief." *Id.*

As a threshold jurisdictional argument, Defendants argue that Plaintiffs lack standing, precluding their ability to prevail on any of their causes of action. When a defendant challenges the factual basis that allegedly establishes standing, the plaintiff "has the burden of proving by a preponderance of the evidence that the trial court does have subject matter jurisdiction." *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). At the preliminary injunction stage, the movant must make a "clear showing" of this jurisdictional requirement. *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017).

The doctrine of standing helps ensure "the proper–and properly limited—role of the courts in a democratic society." *Summers v. Earth Island Inst.*, 129 S.Ct. 1142, 1148 (2009). Courts must "satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court-jurisdiction." *Id.* at 1149 (cleaned up). As the Fifth Circuit recently explained, "[f]ederal courts do not sit to resolve every important public controversy. We may act only when a plaintiff has suffered, or faces, a concrete and particularized injury." *Ctr. for Biological Diversity v. United States Dep't of Transportation,* 180 F.4th 796, 800 (5th Cir. 2026).

"'The irreducible constitutional minimum of standing contains three elements': injury in fact, causation, and redressability." *Diamond Alt. Energy, LLC v. Env't Prot. Agency*, 145 S.Ct. 2121, 2133 (2025) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Injury in fact "requires the plaintiff to demonstrate an injury that is 'concrete,' 'particularized,' and 'actual or imminent, not speculative.'" *Diamond Alt. Energy*, 145 S.Ct. at 2133 (quoting *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 381 (2024)); *see also Friends of St. Frances Cabrini Church v. FEMA*, 658 F.3d 460, 466 (5th Cir. 2011) ("The plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical.") (quoting *City of L.A. v. Lyons,* 461 U.S. 95, 101-02 (1983)). "Causation requires the plaintiff to show 'that the injury was likely caused by the defendant,' and redressability requires the plaintiff to demonstrate 'that the injury would likely be redressed by judicial relief.'" *Diamond Alt. Energy,* 145 S.Ct. at 2133 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)).

"An association has standing if at least one member can establish injury, causation, and redressability." *Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 111 (D.C. Cir. 2021); *see also Deep S. Ctr. for Env't Just. Ctr. v. United States Env't Prot. Agency*, 138 F.4th 310, 320 (5th Cir.

2025) (explaining that courts "consider the individual members' alleged injuries—which 'must be concrete, particularized, and actual or imminent.'")[3]

When the alleged injury involves environmental or similar concerns, "the relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff." *Friends of the Earth*, 528 U.S. at 181. "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Id.* at 183 (citations omitted). "[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing." *Lujan*, 504 U.S. at 562–63; *see also Sierra Club v. Jewel*, 764 F.3d 1, 5 (D.C. Cir. 2014) ("[I]njury in fact can be found when a defendant adversely affects a plaintiff's enjoyment of flora or fauna." (quoting *Am. Soc'y for Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus*, 317 F.3d 334, 337 (D.C. Cir. 2003)). Similarly, a plaintiff has standing to challenge a federal land exchange where its members use and enjoy the federal lands, and the land exchange would prevent them from continuing to use and enjoy these lands. *See Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1176-80 (9th Cir. 2000).

The evidence concerning a loss of aesthetic and recreational value must establish a sufficient nexus between the affected individual and the property at issue. For example, "averments which state only that one of the [organization's] members uses unspecified portions of an immense tract of territory, on some portions of which mining activity has occurred or probably will occur by virtue of the governmental action" proved insufficient. *Lujan*, 497 U.S. at 889; see also *Ctr. for Biological Diversity*, 180 F.4th at 803 ("[A] petitioner 'must show that [he]

---

[3] In addition, "the interests at stake [must be] germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 97 S.Ct. 2434, 2441 (1977). In the present matter, neither Defendant challenges these requirements.

use[s] the area affected by the challenged activity and not an area roughly in the vicinity of a project site.'" (quoting *Summers*, 555 U.S. at 499)). In addition, "mere offense, disagreement, or distaste does not qualify as a concrete and particularized injury under Article III." *Nat'l Park Serv. v. Nat'l Tr. For Historic Pres. In the United States,* 609 U.S. No. 26A203, slip. op. at 3 (August 31, 2026) (rejecting, as insufficient, an individual's affidavit that the construction of the White House ballroom "would cause her to suffer 'injuries' to her 'aesthetic, cultural, and historical interests' because she finds the 'scale,' 'height,' and 'massing' of the government's design distasteful."); *see also Ctr. for Biological Diversity*, 180 F.4th at 801 ("[Plaintiffs'] concern for the Gulf may be heartful. But concern, without injury, is not standing.").

Still, the affected individual need not always have direct access to the area at issue. Individuals can possess a cognizable interest "in observing the landscape from surrounding areas[.]" *Sierra Club*, 764 F.3d at 6. "If an area can be observed and enjoyed from adjacent land, plaintiffs need not physically enter the affected area to establish an injury in fact." *Cantrell v. City of Long Beach*, 241 F.3d 674, 681 (9th Cir. 2001). In such instances, "cognizable interests . . . do not depend on any legal right to make a physical entry onto" the property at issue. *Sierra Club*, 764 F.3d at 6.

In the present case, the Service challenges Plaintiffs' standing on two related fronts. First, it argues that Plaintiffs have suffered no cognizable injury premised on access to the Property because "no Refuge lands are currently open for general public use." (Service Resp., Doc. 51, 16 (relying on 50 C.F.R. § 25.51); *see also* SpaceX Resp., Doc. 52, 18 ("Plaintiffs cannot show harm from the land exchange between the Service and SpaceX because they are not allowed to access the parcels that SpaceX is acquiring.")) In other words, according to the Service, Plaintiffs cannot establish an injury based on their use and enjoyment of the Property, as they have not had legal access to that Property. The Service adds that Plaintiffs cannot show that "enjoining the proposed

exchange would . . . change the status quo of no entry[,]" (Service Resp., Doc. 51, 17), precluding their ability to demonstrate that a favorable decision would redress the alleged injury.

SpaceX advances additional challenges to standing. The company contends that Plaintiffs' "theory of harm is too speculative and too removed from the challenged action[,]" as they seek "to stop the Service's action based on decisions SpaceX might later make." (SpaceX Resp., Doc. 52, 20) The company also challenges the accuracy of Plaintiffs' evidence concerning the impact on flora and fauna from SpaceX's activities, citing to the environmental assessment regarding the Land Exchange. (*See* SpaceX Sur-Reply, Doc. 61, 7) And SpaceX argues that at best, Plaintiffs' members visited the affected lands only after hearing of the proposed Land Exchange, running afoul of the doctrine that "standing cannot be conferred by a self-inflicted injury." (SpaceX Resp., Doc. 52, 22 (quoting *Ctr. for Biological Diversity v. U.S. Env'tl Protection Agency*, 937 F.3d 533, 541 (5th Cir. 2019)))

**1. Loss of Access to the Property**

The evidentiary record reveals that Branch, Chapman, and Mancias accessed the Property at various points during the past year, or at least observed flora and fauna within the Property, while parked on SH4 or from a vessel on the Rio Grande River. Branch declared that she visits the Refuge about six times per year and views the scenery and wildlife "within the proposed exchange area." (Branch Decl., Doc. 24–3, ¶ 13) She also "periodically stop[s] along the side of the road to view wildlife in the Refuge[,] includ[ing] land proposed to be given to SpaceX in the exchange." (Supp. Branch Decl., Doc. 53–2, ¶ 5) Chapman represented that he toured the Rio Grande River adjoining the Property, viewing the wildlife within the Property on those occasions. He also recalled that the Service "granted [him] access to the Refuge on at least two prior occasions," including "authorization to access the areas of the Refuge that will be exchanged to SpaceX under the proposed exchange, in addition to the lomas north of Highway 4." (Supp. Chapman Decl., Doc. 53–1, ¶ 4) And Mancias declared that he leads religious ceremonies at

different locations in the area, including a location "sacred to [his] people [ ] along the Rio Grande River, including the lands that FWS is now giving to SpaceX for development and destruction (called the Divested lands by FWS)."[4] (Mancias Decl., Doc. 24–5, ¶ 12)

These declarations undermine Defendants' contention that Plaintiffs rely solely on accessing land "in the vicinity" of the Property. (SpaceX Resp., Doc. 52, 19) True, some declarants generally discuss accessing and enjoying the Boca Chica Tract and the surrounding area. But Branch, Chapman, and Mancias also specifically aver that the land they accessed or observed was within the property that the Service will transfer to SpaceX. Both the Service and SpaceX contest that any declarant had legal access to the Property, but they do not negate the evidence reflecting that these individuals nevertheless obtained access. And as Branch's access appears to extend back by at least one year, her declaration negates SpaceX's argument that Plaintiffs' members began visiting and enjoying the Property only after learning of the proposed Land Exchange.

The Court finds, however, that Plaintiffs cannot rely on a loss of access to the Property as a basis for standing. Whether the declarants accessed the Property in the past, or did so legally, Plaintiffs do not controvert the Service's evidence that the Property remained legally closed to the public during that time. This fact defeats an injury in fact, as no declarant will lose access to the Property as a result of the Land Exchange, given that they did not previously possess such a right.

In addition, even if the declarants held such a right in the past, they fail to controvert the Service's statements that whether or not the Court preliminarily enjoins the Land Exchange, the Service will keep the Property closed to the public, precluding access by Plaintiffs' members. In response, Plaintiffs cite to general regulations concerning the Wildlife Refuge as a whole, (*see* Reply, Doc. 53, 9–10), but those regulations do not require the Service to keep every acre of the

[4] The remaining declarants do not claim to have accessed the Property or observed flora and fauna within the Property. For example, Hartl declared only that he searches for shorebirds "regularly observed *near the lands* sought to be transferred by SpaceX." (Hartl Decl., Doc. 24–7, ¶ 13 (emphasis added); *see also id.* at ¶ 14 (describing the Property as "*very close* to places [where he has] search[ed] for shorebirds") (emphasis added))

land that the Service oversees open to the public. In fact, the evidence that Plaintiffs submit recognizes that the Service "prohibits camping and limits visitors to designated roads, parking areas, and trails" within its holdings, (*id.* at 9), affirming the Service's authorization to exclude the public from portions of its holdings. And no statute or regulation speaks to the specific acres slated for transfer to SpaceX. Thus, the Court finds that despite Plaintiffs having accessed the Property in the past, they fail to demonstrate that they will have legal access to the Property in the future, even if the Land Exchange does not move forward during the pendency of this lawsuit. This finding precludes Plaintiffs' ability to demonstrate redressability from any injury linked to the alleged loss of access to the Property.

**2. Loss of Observational Value**

Of course, loss of access is not the only injury that Plaintiffs allege. Branch and Chapman state that they have observed flora and fauna within the Property from adjacent lands, which represents a cognizable interest "in observing the landscape from surrounding areas[.]" *Sierra Club*, 764 F.3d at 6. And they specifically reference viewing the land near the Massey Test Site, an area that SpaceX intends to develop upon receiving title to the Property.[5] They also aver that they would continue to enjoy the flora and fauna from those vantage points. For instance, Branch "plan[s] to return this summer and fall" to the area, during which time she "intend[s] to view wildlife in Refuge areas along Highway 4 (including areas proposed to be exchanged)." (Branch Decl., Doc. 24–3, ¶¶ 13, 31) And Chapman has "definite plans to . . . visit portions of the River that border the exchange area, including near the Massey Test Site," where "the birding along the forested edge of the river is excellent." (Supp. Chapman Decl., Doc. 53–1, ¶ 7)

The specificity of Branch and Chapman's statements distinguish this case from others in which courts have concluded that standing did not exist because the declarants referenced only

[5] At the preliminary injunction hearing, SpaceX's counsel represented that the company expects to gain the required approvals for the development within weeks of the transfer of title.

"'some day' intentions" to return to the land at issue. *Lujan*, 504 U.S. at 564. Instead, their statements more closely resemble the deposition testimony that the Supreme Court found adequate to establish standing in *Friends of the Earth*. In that case, witnesses testified that they would visit the impacted river site or enjoy its beauty from surrounding areas, including observing wildlife, but avoided doing so due to concerns of the impact of illegal discharges in the river. *Friends of the Earth*, 528 U.S. at 182–83. The Supreme Court concluded that such statements sufficed to support standing. Similarly, Branch and Chapman's declarations establish that these two individuals have enjoyed the aesthetic and recreational value of the Property, in a manner that they intend to continue, and in an area subject to immediate activity by SpaceX upon the transfer of title.

Still, Plaintiffs must demonstrate that SpaceX's plans near the Massey Test Site will occasion an injury. In other words, it is not enough for Plaintiffs to offer that one or more of its members enjoys the aesthetic and recreational value of the Property. They must demonstrate that absent injunctive relief, the aesthetic and recreational value "will be lessened," *id.* at 183, or "adversely affect[ed]," *Sierra Club*, 764 F.3d at 5, and that this impact will occur in the immediate future.

Branch and Chapman offer some evidence on this point. Branch states that explosions at the Massey Test Site will "impact[] surrounding lands" and "harm habitat for protected wildlife and in fact all wildlife" that she "seek[s] out and enjoy[s]." (Branch Decl., Doc. 24–3, ¶ 20) She continues that the "noise and lights associated with construction of the Exchange parcel, and subsequently the explosions resulting from testing at this new site—and more frequent tests more generally," will "disrupt and scare off wildlife that [she] enjoy[s] observing in the area[.]" (*Id.* at ¶ 20; Supp. Branch Decl., Doc. 53–2, ¶ 7) Chapman claims that SpaceX's plans to "construct a whole new test area east of the Massey Test Site" will "increase the frequency of rocket testing," "disrupt[ing] and scar[ing] off wildlife that [he] enjoys observing in the area." (Supp. Chapman

Decl., Doc. 53–1, ¶ 8) These statements, if accepted as true, would demonstrate standing. But in support of these personal beliefs, neither Branch nor Chapman offer any evidence. And Plaintiffs submit no assessment of the environmental impact from SpaceX's immediate plans near the Massey Test Site.[6] It is true that the Service recognizes that "SpaceX's planned development of the divested parcels will result in foreseeable and unavoidable consequences," (Dec. Memo, Doc. 26–21, 5), and this concession may bear relevance were this case to reach trial. But at the preliminary injunction stage, the Service's estimation of the long-term impact of the Land Exchange bears little weight as to the immediate impact of SpaceX's development at the Massey Test Site.

In addition, Defendants highlight the Final Environmental Assessment conducted as part of the Service's evaluation of the Land Exchange. This assessment controverts Branch's and Chapman's declarations on this issue. For example, Branch and Chapman each reference the ocelot as a species they enjoy viewing on the Property, and implicitly claim that SpaceX's development near the Massey Test Site will decrease their enjoyment of viewing this species. In contrast, the Final Environmental Assessment concluded that "[b]ased on observations and habitat characteristics, it is unlikely that ocelots occur in lands proposed for divestiture[.]" (Final Env. Assess., Doc. 26–4, 40) That is, the assessment rebuts not only that Branch and Chapman regularly see ocelots in the Property, but also that any activity by SpaceX would adversely affect the ocelot population in the area. The evaluation reached similar conclusions as to numerous species, including others that some of the declarants reference. (*See, e.g.*, *id.* at 42 ("None of the lands proposed for divestiture south of SH 4 contain piping plover habitat, as they are either too densely vegetated or not sufficiently connected to the intertidal or supratidal hydrology of the

[6] Other declarants generally reference possible harm from SpaceX's development plans. (*See, e.g.*, Hartl Decl., Doc. 24–7, ¶ 14 (declaring that the "many more launches" by SpaceX would render "this whole area . . . unusable for shorebirds); Hinojosa Decl., Doc. 24–4, ¶ 7 (stating that "more industrial buildout on this wildlife habitat" would "destroy[ ] the area")) But they do not link the alleged harm to SpaceX's immediate plans at the Massey Test Site. Similarly, Plaintiffs' concern for damage to the lomas, especially within the historical battlefield, (*see* Mem. in Support, Doc. 24–1, 45–46), is not specifically connected to the Massey Test Site and the new access road.

region.")) And more broadly, the Final Environmental Assessment identified no significant adverse affect from the Land Exchange in the area near the Massey Test Site. Even when the Final Environmental Assessment identified an adverse impact from the overall Land Exchange, the Service incorporated mitigating steps. (*See, e.g., id.* at 30 ("The transfer of federally owned property within the Palmito Ranch Battlefield NHL to SpaceX would constitute an adverse effect under Section 106 unless 'adequate and legally enforceable restrictions or conditions to ensure long-term preservation are put in place through the development of this Programmatic Agreement.'"); Dec. Memo, Doc. 26–21, 6 ("Although SpaceX will likely develop much of this land, SpaceX has signed a Programmatic Agreement under Section 106 of the NHPA and has committed to restrictions on its activity on the site[.]"))

The competing evidence weighs heavily in Defendants' favor. While Branch and Chapman provide their personal views regarding the impact of SpaceX's activity near the Massey Test Site, they submit no supporting evidence. The substantive and comprehensive Final Environmental Evaluation undermines their subjective beliefs. It is true that Plaintiffs challenge the adequacy of the Final Environmental Assessment, alleging that the Service "failed to take the required 'hard look,' and failed to ensure the scientific integrity of its analysis[.]" (Am. Compl., Doc. 48, ¶ 110) But for purposes of its request for a preliminary injunction, it offers no evidence in support of those allegations, aside from the personal views of declarants such as Branch and Chapman. Considering the evidentiary record as a whole, the Court concludes that Plaintiffs have not established a substantial likelihood that they have standing in this matter.

**B. Irreparable Injury**

"[P]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948.1 (2d ed. 2013); *see also Winter*, 555

U.S. at 21. An injury is "irreparable" when it cannot be undone through monetary remedies. *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 2000); *Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 312 (5th Cir. 2008) ("[T]he absence of an available remedy by which the movant can later recover monetary damages may be sufficient to show irreparable injury."). Money damages rarely represent an adequate remedy with respect to environmental injury, which is often permanent or at least of long duration. *Amoco Prod. Co. v. Vill. Of Gambrell,* 480 U.S. 531, 545 (1987). And when "the threatened harm is more than de minimis, it is not so much the magnitude but the irreparability that counts for purposes of a preliminary injunction." *Enter. Int'l*, 762 F.2d at 472–73.

A plaintiff need only show it is "likely to suffer irreparable harm in the absence of preliminary relief." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (quoting *Winter*, 555 U.S. at 20). Still, courts do not issue preliminary injunctions "simply to prevent the possibility of some remote future injury." *Winter*, 555 U.S. at 22. "[A] showing of speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Janvey*, 647 F.3d at 600. And the irreparable injury requirement imposes "a higher burden than that of standing due to the drastic remedy that is a preliminary injunction." *Louisiana v. Horseracing Integrity & Safety Auth., Inc.*, 617 F.Supp.3d 478, 498–99 (W.D. La. 2022) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

Here, Plaintiffs contend that the Land Exchange will cause "irreversible impacts[,]" (Mem. in Support, Doc. 24–1, 41), but they rely on the same arguments and evidence as for their position on standing. For example, they contend that upon completion of the Land Exchange, SpaceX will privately own the Property and will deny access to Plaintiffs' members. They emphasize the loss of public access for members of the Carrizo/Comecrudo Nation, who recognize the sacred ancestral nature of the land and utilize it for cultural and ceremonial purposes. And they submit satellite imagery of SpaceX property near Starbase as evidence of the company's ability to quickly

remove longstanding natural habitat features from its land. (*See* Mem. in Support, Doc. 24–1, 44; Bradley Decl., Doc. 25 and accompanying exhibits))

The Service responds that as Plaintiffs currently lack legal access to the Property, they cannot claim any injury from the privatization of the land. With respect to any alleged environmental harm, the Service contends that Plaintiffs offer only speculation insufficient to demonstrate a "concrete and corroborated harm." (Service Resp., Doc. 51, 19) The agency notes that Plaintiffs identify neither any specific plans by SpaceX nor any adverse impact from such plans.

SpaceX urges the same arguments as the Service, and also represents that its only current plans for the Property include expanding the Massey Test Site and building a service road eastward. The company also contests Plaintiffs' arguments regarding imminent ecological or historical harm, pointing to the conclusions within the Final Environment Assessment. And SpaceX characterizes any other alleged harm as based on mere conjecture of the company's future plans for the Property, or on SpaceX's past and current operations, which cannot form the basis of a challenge to the Land Exchange.

The Court's assessment for purposes of standing also leads it to conclude that Plaintiffs fail to demonstrate irreparable injury. As to Plaintiffs' claim that the Land Exchange will preclude their access to the Property, Plaintiffs offer no evidence that they possessed legal access in the past. Thus, as with the issue of standing, they can rely solely on the alleged harm that their members will suffer from a decrease in the aesthetic and recreational value of the Property, as viewed from adjoining lands. On this issue, the Court weighs the same competing evidence—e.g., Branch's and Chapman's declarations against the Final Environmental Assessment. And the Court conducts this analysis taking into account that the standard for irreparable injury is greater

than the standard for injury in fact for purposes of standing.[7] *See Louisiana*, 617 F.Supp.3d at 498–99.

Ultimately, Plaintiffs fail to offer any persuasive evidence that absent a preliminary injunction, their members will immediately suffer from a lessening of the aesthetic and recreational value of observing any portion of the Property from adjacent lands. Other courts considering similarly-lopsided evidence as to irreparable injury have also declined to issue a preliminary injunction. *See, e.g., Sierra Club v. U.S. Army Corps of Engineers*, 990 F.Supp.2d 9, 39 (D.D.C. 2013) (Jackson, J.) (concluding that "Plaintiffs' bald allegations of concrete injury to flora and fauna [did not] clearly establish that the FS Pipeline construction will have a significant or substantial impact on the wildlife in the pipeline's paths."). The same result holds true here. Plaintiffs' failure to demonstrate that any of its members–or, for that matter, the Property itself–will suffer irreparable injury in the absence of a preliminary injunction defeats their request for such relief.

**C. Balance of Equities and the Public Interest**

A plaintiff seeking a preliminary injunction must establish that the balance of equities tips in its favor and that an injunction is in the public interest. *Winter,* 555 U.S. at 20. When the government is the opposing party, these factors merge. *Nken*, 556 U.S. at 435. For this assessment, a court balances "the competing claims of injury and consider[s] the effect on each party of the granting or withholding of the requested relief," while also considering the "public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.

Plaintiffs contend that the requested preliminary injunction would occasion little more than an "administrative burden on the [Service]," which does not outweigh the threat of irreparable environmental harm to the Property. (Mem. in Support, Doc. 24–1, 47) As for SpaceX, Plaintiffs argue that a modest delay in its plans for the Property would occasion little, if any harm

[7] The Court would reach the same conclusion applying the same evidentiary burden applicable to the standing analysis.

and would simply maintain the longstanding status quo of the Property. In contrast, Plaintiffs continue, the public interest strongly favors preservation, as the National Wildlife Refuge System serves the public by "protecting these 'environmentally rich lands,'" which "huge numbers" from the public visit each year. (*Id.* at 48) The public also possesses an interest in maintaining the status quo on the Palmito Ranch Battlefield, an interest furthered by preserving the "exceptional integrity of setting, feeling, association and location" of the historic site. (*Id.*)

The Service responds that the public interest supports the Land Exchange because the transaction provides a "net benefit to the Refuge" by consolidating land holdings, achieving enhanced management efficiencies, and heightening the staff's focus on Refuge priorities. (Service Resp., Doc. 51, 52) In addition, the Service characterizes the land that it will acquire as "desirable for conservation[.]" (*Id.* at 52)

SpaceX responds that a lengthy preliminary injunction would lead the company to "redirect engineering, permitting, and construction to less suitable land it already owns"–i.e., land that the Service seeks to acquire through the transaction–"steer[ing] development toward the higher-value land the Service seeks to protect while increasing cost, delay, and fragmentation." (SpaceX Resp., Doc. 51, 46) In addition, SpaceX devotes considerable attention to other harms that it contends weigh against a preliminary injunction. For example, according to the company, a delay in the expansion of the Massey Test Site would adversely affect Starship's launch cadence, impairing SpaceX's ability to deploy artificial-intelligence data centers to sustainably address accelerating demand for computing power, its meeting of demanding milestones required to support NASA's planned crewed lunar landing in 2028, and its compliance with a $102 million contract with the Air Force Research Laboratory to investigate "rapid point-to-point military cargo transportation using Starship." (*Id.* at 47) The postponement would also impose economic loss to the community by negating the need for SpaceX to hire employees, contractors, and suppliers. (*Id.* at 48)

The Court concludes that the balancing of the competing equities and of the public interest weighs against the issuance of a preliminary injunction. In large measure, this conclusion rests on the Court's assessment that Plaintiffs offer relatively weak evidence of environmental harm in the immediate future from the expansion of the Massey Test Site. While they rightfully argue that the preservation of wildlife and historical lands furthers the public interest, they present no evidence demonstrating that the Property will suffer aesthetic, environmental, cultural, or historical degradation during the pendency of this lawsuit. In contrast, the Service offers compelling evidence that the Land Exchange will further the overall preservation of the Refuge in Cameron County, such as by decreasing fragmentation in the Boca Chica Tract and increasing the size of the Laguna Atascosa National Wildlife Refuge. As for SpaceX's interests, the Court shares some of Plaintiffs' skepticism that the modest expansion of the Massey Test Site and the planned additional access road represents a lynchpin to the company's enterprise-wide efforts. Still, the Court recognizes that a preliminary injunction would impose uncertainty into and would result in modifications to SpaceX's development plans, placing additional hardship on the company's ability to meet milestones and contractual obligations.

Plaintiffs fail to demonstrate that a balance of the equities and public interest favor the issuance of a preliminary injunction.

## IV. Conclusion

For these reasons, the Court concludes that Plaintiffs have not satisfied the requirements of Federal Rule of Civil Procedure 65 to warrant the requested injunctive relief.

As a result, it is:

**ORDERED** that Plaintiffs' Motion for a Preliminary Injunction (Doc. 24) is **DENIED**.

Signed on September 21, 2026.

Fernando Rodriguez, Jr.

Fernando Rodriguez, Jr.
United States District Judge