**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>BRIAN NESVIK, in his official capacity as Director of the United States Fish and Wildlife Service, et al.,<br><br>Federal Defendants,<br><br>SPACE EXPLORATION TECHNOLOGIES, CORP.,<br><br>Defendant-Intervenor. | No. 1:26-cv-0831 |

**FEDERAL DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS


FEDERAL DEFENDANTS' MOTION TO DISMISS ........ 1

BACKGROUND ........ 1

A. Agency Process ........ 1

B. Procedural Background ........ 2

C. The Court Denies Plaintiffs' Motion for Emergency Relief for Lack of Standing ........ 3

D. Plaintiffs' Second Amended Complaint ........ 3

STATEMENT OF THE ISSUES ........ 4

STANDARD OF REVIEW ........ 4

I. Lack of Standing/Subject Matter Jurisdiction ........ 4

ARGUMENT ........ 5

I. Plaintiffs do not have standing to challenge the land exchange. ........ 5

A. Plaintiffs Cannot Establish Standing Based on Direct Use of the Property ........ 7

B. Plaintiffs' Use of the Refuge Generally, General Interests inWildlife or Habitat Protection, and Speculation About Future Effects of SpaceX's Ownership of the Property Do Not Suffice To Show Injury-In-Fact ........ 8

1. Plaintiffs' interests in wildlife viewing and habitat protection do not establish concrete injury ........ 8

2. Use of the Refuge generally does not establish standing ........ 10

3. Speculative future effects from SpaceX's ownership of the Property do not support standing to challenge the Land Exchange ........ 13

C. Plaintiffs have not established standing for their NHPA claim ........ 16

II. Plaintiffs do not challenge final agency action reviewable under the APA. ........ 20

CONCLUSION ........ 24

# TABLE OF AUTHORITIES

**Other Authorities**

*Am. Airlines, Inc. v. Herman*,
176 F.3d 283 (5th Cir. 1999) .................... 20, 22

*Ass'n of Data Processing Serv. Organizations*, *v. Camp*,
397 U.S. 150 (1970) .................... 6

*Bender v. Williamsport Area School Dist.*,
475 U.S. 534 (1986) .................... 5

*Bennett v. Spear*,
520 U.S. 154 (1997) .................... 21, 22, 24

*Cent. & S.W. Servs., Inc. v. U.S. EPA*,
220 F.3d 683 (5th Cir. 2000) .................... 11

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .................... 13

*Comm. for Auto Resp. (C.A.R.) v. Solomon*,
603 F.2d 992 (D.C. Cir. 1979) .................... 17, 18, 19

*Common Sense Salmon Recovery v. Evans*,
217 F. Supp. 2d 17 (D.D.C. 2002) .................... 23

*Ctr. for Biological Diversity v. Nesvik*,
No. 26-CV-831, 2026 WL 2824297 (S.D. Tex. Sept. 21, 2026) .................... 7, 8

*Ctr. for Biological Diversity v. U.S. Dep't of Transportation*,
180 F.4th 796 (5th Cir. 2026) .................... 11

*Ctr. for Biological Diversity v. U.S. EPA*,
937 F.3d 533 (5th Cir. 2019) .................... 11, 12, 13

*Dalton v. Specter*,
511 U.S. 462 (1994) .................... 22

*Deep S. Ctr. for Env't Just. v. U.S. EPA*,
138 F.4th 310 (5th Cir. 2025) .................... 6

*Driftless Area Land Conservancy v. Rural Utilities Serv.*,
74 F.4th 489 (7th Cir. 2023) .................... 22

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .................... passim

*Fla. Audubon Soc'y v. Bentsen*,
94 F.3d 658 (D.C. Cir. 1996) .................... 11

*Friends of St. Frances Xavier Cabrini Church v. Fed. Emergency Mgmt. Agency*,
658 F.3d 460 (5th Cir. 2011) .................... 16, 17

*Hazardous Waste Treatment Council v. Thomas*,
885 F.2d 918 (D.C. Cir. 1989) ............ 18

*Hunt v. Washington Apple Advertising Comm'n*,
432 U.S. 333 (1977) ............ 19

*In re Katrina Canal Breaches Litig.*,
342 F. App'x 928 (5th Cir. 2009) ............ 23

*James v. City of Dallas*,
254 F.3d 551 (5th Cir. 2001) ............ 6

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ............ 17, 18

*Louisiana v. Biden*,
622 F. Supp. 3d 267 (W.D. La. 2022) ............ 23

*Louisiana v. U.S. Army Corps of Eng'rs*,
834 F.3d 574 (5th Cir. 2016) ............ 21

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ............ passim

*MediNatura, Inc. v. FDA*,
998 F.3d 931 (D.C. Cir. 2021) ............ 23

*Nat'l Park Serv. v. Nat'l Tr. for Historic Pres. in the U.S.*,
609 U.S. 1068 (2026) ............ 15, 18, 20

*Rochester Tel. Corp. v. United State*s,
307 U.S. 125 (1939) ............ 22

*Save the Bay, Inc. v. U.S. Army*,
639 F.2d 1100 (5th Cir. 1981) ............ 5

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ............ 6, 11, 13

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ............ 5, 6, 16

*United States v. Richardson*,
418 U.S. 166 (1974) ............ 10

*United States v. Students Challenging Regul. Agency Procs. (SCRAP)*,
412 U.S. 669 (1973) ............ 14

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*,
454 U.S. 464 (1982) ............ 10, 20

*Veldhoen v. U.S. Coast Guard*,
35 F.3d 222 (5th Cir. 1994) ............ 24

*Vieux Carre Prop. Owners, Residents & Assocs., Inc. v. Brown*,
875 F.2d 453 (5th Cir. 1989) .......... 17

*Williamson v. Tucker*,
645 F.2d 404 (5th Cir. 1981) .......... 5

**Statutes**

5 U.S.C. § 704 .......... 21

5 U.S.C. § 706(1) .......... 2

5 U.S.C. § 706(2) .......... 2, 4, 22

54 U.S.C. § 300101 .......... 17

**Rules**

Fed. R. Civ. P. 12(b)(1) .......... 1, 5

Fed. R. Civ. P. 12(h)(3) .......... 6

Fed. R. Civ. P. 15(d) .......... 3

**Regulations**

23 C.F.R. § 460.2(a) .......... 14

23 C.F.R. § 460.2(c) (2026) .......... 14

50 C.F.R. § 25.21 (2026) .......... 11

## FEDERAL DEFENDANTS' MOTION TO DISMISS

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, Brian Nesvik, in his official capacity as Director of the U.S. Fish and Wildlife Service, and the U.S. Fish and Wildlife Service ("Federal Defendants") respectfully request that the Court dismiss the second amended complaint filed by the Center for Biological Diversity, Save RGV, The Carrizo/Comecrudo Nation of Texas, Inc., and South Texas Environmental Justice Network ("Plaintiffs"), Second Amended Complaint ("SAC"), Dkt. No. 69, for lack of jurisdiction.

## BACKGROUND

This case is about the Fish and Wildlife Service ("FWS" or "Service") improving its wildlife habitat holdings in Cameron County, Texas. The Service divested approximately 727 acres of lower quality habitat ("the Property") out of the 103,500-acre Lower Rio Grande Valley National Wildlife Refuge ("the Refuge") in exchange for approximately 683 acres of higher quality habitat formerly owned by Space Exploration Technologies, Inc. ("SpaceX") added to the Refuge (the "Land Exchange").[1]

### A. Agency Process

In considering whether to conduct the Land Exchange with SpaceX, the Service conducted an environmental review under the National Environmental Policy Act ("NEPA"). It ultimately issued a Final Environmental Assessment, in which it identified the Land Exchange as the agency's preferred alternative, and a Finding of No Significant Impact ("FONSI") for the proposed exchange. Jacks Decl. ¶¶ 20–21, Dkt. No. 14-1; FONSI, Dkt. No. 26-1. The FONSI also included the Region 2 Office's recommendation that the Service move forward with the

[1] Quitclaim Deed, Recorded October 5, 2026; https://cameron.tx.publicsearch.us/doc/331011810 (last visited Nov. 9, 2026).

Land Exchange, referred to as a "Decision Record," which the Region 2 Acting Director Leston Jacks signed. FONSI at 5. Pursuant to FWS policy, the next step was that the FWS Director needed to consider the Land Exchange and approve it in writing, if he agreed with moving forward. U.S. FWS, Non-Purchase Acquisition Manual, 342 FW 5.7(E)(2) (June 21, 1994).[2] The FWS Director provided his required approval for the Land Exchange on July 13, 2026, USFWS Decision Memo. ("Director's decision"), Dkt. No. 26-21, and the Land Exchange underwent a required period of congressional review. SAC ¶ 105. On September 1, 2026, the Service and SpaceX executed the land exchange agreement, authorizing the Land Exchange. Dkt. No. 56. On October 5, 2026, the Quitclaim Deed between the United States of America and SpaceX was recorded in the Cameron County clerk's office. *See* n.1.

### B. Procedural Background

Plaintiffs, seeking to stop the land exchange, filed suit on June 10, 2026, on the basis of the environmental review. SAC ¶ 109 (claiming that the FONSI was the agency's final decision); *see also* Compl. ¶ 95, Dkt. No. 1 (same) *and* First Am. Compl. ¶ 96, Dkt. No. 48 (same). The suit was filed prior to the Director's (required) approval and about two-and-a-half months before the agency executed the land exchange agreement. Plaintiffs brought claims pursuant to 5 U.S.C. § 706(2), challenging the Land Exchange on the basis of the Refuge Act, NEPA, and the National Historic Preservation Act ("NHPA"), and they brought an unreasonable delay claim under 5 U.S.C. § 706(1) regarding the Refuge's Conservation Plan. Compl. ¶¶ 111–42.

On July 20, 2026, Plaintiffs moved for emergency relief on the basis of the FONSI. Mem. in Supp. of Pl.'s Mot. for Prelim. Inj. 15, Dkt. No. 24-1 (asserting that the Final Environmental Assessment and the FONSI "announced a final agency action"). After the case

[2] Available at https://www.fws.gov/policy-library/342fw5 (last visited Nov. 9, 2026).

was transferred to this Court but before it ruled on the motion for emergency relief, Plaintiffs amended their complaint to challenge the Region 2 Acting Director's post-FONSI recommendation to the FWS Director to approve the exchange, First Am. Compl. ¶ 97, and the FWS Director's approval. *Id.* ¶ 98.[3]

**C. The Court Denies Plaintiffs' Motion for Emergency Relief for Lack of Standing**

On September 21, 2026, the Court denied Plaintiffs' motion for a preliminary injunction, finding that they had failed to establish standing. Dkt. No. 66 at 13–22. The Court first held that Plaintiffs cannot rely on loss of access to the Property to establish standing because, whether Plaintiffs accessed the Property in the past or did so legally, the Property has been legally closed to the public. *Id.* at 18. Thus, Plaintiffs could not establish injury on the basis of loss of future access to the Property. *Id.* at 18–19. The Court also found that declarants Branch and Chapman could not establish standing based on observing flora and fauna within the Property from adjacent lands because they had not supported their claims of effects on wildlife within the Property with evidence, *id.* at 20–21, and, in any event, the EA "controverts Branch's and Chapman's declarations on this issue" of effects on wildlife because the EA found that there would not be adverse effects on listed species from the Exchange. *Id.* at 21. "And more broadly, the Final Environmental Assessment identified no significant adverse affect from the Land Exchange in the area near the Massey Test Site[,]" including to historic interests. *Id.* at 22 (noting mitigation measures to ensure long-term preservation).

**D. Plaintiffs' Second Amended Complaint**

On October 16, 2026, Plaintiffs lodged their Second Amended Complaint, paring back

---

[3] Although it also would not cure the jurisdictional issue, *see infra*, Plaintiffs should have supplemented their complaint under Federal Rule of Civil Procedure 15(d).

their claims to just two, challenging the Land Exchange on the basis of the Refuge Act and the NHPA, under the Administrative Procedure Act, 5 U.S.C. § 706(2). SAC ¶¶ 110–22. They still contend that the FONSI was final agency action. *Id.* ¶ 89 (referencing the FONSI as the final decision). Plaintiffs also added a reference to the execution of the land exchange agreement. *Id.* ¶ 106.

Plaintiffs' second amended complaint seeks to fix their standing problems. Plaintiffs now assert four potential bases for standing: (1) viewing wildlife, generally, within the Property, *id.* ¶¶ 14–15, 17; (2) a general interest in protection of wildlife and habitat in the region, *id.* ¶ 18; (3) visiting "other areas of [the Refuge]" that will allegedly be affected by the Land Exchange, including areas "surrounding [the] Refuge lands," *id.* ¶¶ 14–15; and, although drastically pared back, (4) claims of "use and enjoyment" of the Property itself. *Id.* ¶¶ 14, 25. Each count bases Plaintiffs' claimed harm on SpaceX's potential future activities in the area. Nothing in the complaint speaks to any Plaintiff's historic preservation interest or any alleged injury to that interest, nor is any Plaintiff organization a historic preservation organization. Further, Plaintiffs present allegations from only three organizations' members.

## STATEMENT OF THE ISSUES

1. Whether Plaintiffs' second amended complaint must be dismissed for lack of jurisdiction because they do not have standing.

2. Whether Plaintiffs' second amended complaint must be dismissed for lack of jurisdiction because they challenge an interlocutory agency action, not final agency action.

## STANDARD OF REVIEW

### I. <u>Lack of Standing/Subject Matter Jurisdiction</u>

When a plaintiff lacks standing, the suit must be dismissed for lack of subject matter

jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). The proper procedure to challenge standing is a motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure. *See, e.g.*, *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541–42 (1986); *Save the Bay, Inc. v. U.S. Army*, 639 F.2d 1100, 1102 (5th Cir. 1981) (per curiam). When standing is challenged on factual grounds, the allegations in the complaint are not controlling, and evidence outside the pleadings is properly presented and considered by the Court to determine standing. *See, e.g.*, *Williamson v. Tucker*, 645 F.2d 404, 412–13 (5th Cir. 1981). The plaintiff bears the burden of proving the existence of subject matter jurisdiction by a preponderance of the evidence. *See id.* "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3),

## ARGUMENT

### I. Plaintiffs do not have standing to challenge the land exchange.

The Court should dismiss the second amended complaint for lack of subject matter jurisdiction. "The 'law of Art[icle] III standing is built on a single basic idea—the idea of separation of powers.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 422 (2021) (citation omitted). "Under Article III, federal courts do not adjudicate hypothetical or abstract disputes" and "do not exercise general legal oversight of the Legislative and Executive Branches[.]" *Id.* at 423–24. Instead, to establish standing, a plaintiff must prove (1) that it has "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) that the injury is "fairly traceable to the challenged action of the defendant[,]"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–

61(cleaned up). Standing may not rest on 'speculation about the unfettered choices made by independent actors' whose actions are not being challenged in the present proceeding. *See id.*

Organizations can assert the standing of their members. *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). "That, in turn, requires [the Court] to consider the individual members' alleged injuries—which 'must be concrete, particularized, and actual or imminent.'" *Deep S. Ctr. for Env't Just. v. U.S. EPA*, 138 F.4th 310, 320 (5th Cir. 2025) (citation omitted). "Concrete," means "real and not abstract[,]" and "particularized[,]" means affecting in a personal way and "not be a generalized grievance." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). "By requiring the plaintiff to show an injury in fact, Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Id.*

Moreover, "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press." *TransUnion LLC*, 594 U.S. at 431. "[S]tanding . . . must be addressed on a claim-by-claim basis." *James v. City of Dallas*, 254 F.3d 551, 563 (5th Cir. 2001). Thus, for the Court to have jurisdiction over each claim brought by each Plaintiff, each Plaintiff must identify a real, non-abstract, and particularized (non-general) injury from the Land Exchange to its cognizable Refuge Act interests, and they must separately identify a concrete and particularized injury to any cognizable historic interests as relevant to their NHPA claim. *TransUnion LLC*, 594 U.S. at 417 ("No concrete harm, no standing."); *see also Ass'n of Data Processing Serv. Organizations*, *v. Camp*, 397 U.S. 150, 153 (1970) ("[Standing] concerns, apart from the 'case' or 'controversy' test, the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.").

Plaintiffs lack standing because they will suffer no concrete injury in fact from the Land Exchange.

### A. Plaintiffs Cannot Establish Standing Based on Direct Use of the Property

Perhaps because of the Court's observation that the Property is not publicly open, *see Ctr. for Biological Diversity v. Nesvik*, No. 26-CV-831, 2026 WL 2824297, at *10 (S.D. Tex. Sept. 21, 2026)—and because any allegations of direct use of the Property are admissions of a trespass if the use was unauthorized—Plaintiffs drastically cut back their claims of direct access to the Property. In fact, their claims of potential past direct use are paired with claims of general Refuge use, *see* SAC ¶ 14 (members have "derived recreational, spiritual, professional, scientific, educational, and aesthetic benefit"—generally—"from their regular use and enjoyment of the Exchange area, as well as other areas of the Lower Rio Grande Valley National Wildlife Refuge"); *id.* ¶ 15 (Ms. Branch claiming that "her ability to enjoy the Exchange area and the surrounding Refuge lands will be adversely affected"); *id.* ¶ 25 ("Most directly, the Land Exchange will privatize over 700 acres of the Refuge, thereby immediately and permanently affecting Plaintiffs' members' ability to use and enjoy this Refuge for recreational, spiritual, and other purposes."). Their claims of future use are non-concrete: "[b]ut for the Exchange, Plaintiffs' members would *seek to* continue to use and enjoy the Exchange areas lands frequently and on an ongoing basis." *Id.* ¶ 14 (emphasis added).

Nevertheless, to the extent that Plaintiffs claim injury based on interference with their direct use and enjoyment of the Property, that avenue for standing is foreclosed for the same reasons that the Court found that Plaintiffs did not have standing for a preliminary injunction. *Ctr. for Biological Diversity*, 2026 WL 2824297, at *9–12. Plaintiffs "cannot rely on a loss of access to the Property as a basis for standing[,]" because the Refuge lands at issue are not open

to the general public. *Id.* at *10; De La Garza Decl. ¶¶ 5–6, 8, 11, Dkt. No. 51-1. Accordingly, "no declarant will lose access to the Property as a result of the Land Exchange, given that they did not previously possess such a right[,]" thus failing to establish injury from the divestment of the Property. *Ctr. for Biological Diversity*, 2026 WL 2824297, at *10. As the Court noted, even if the Land Exchange had not gone forward, the Property would have remained closed to the public, precluding access by Plaintiffs' members. *Id.* Plaintiffs cannot establish that setting aside the Land Exchange will affect the status quo of no legal entry, and Plaintiffs are not harmed from the continued lack of legal access due to the privatization of the Property.[4] *See id.*

### B. Plaintiffs' Use of the Refuge Generally, General Interests in Wildlife or Habitat Protection, and Speculation About Future Effects of SpaceX's Ownership of the Property Do Not Suffice To Show Injury-In-Fact

With direct use of the actually exchanged lands foreclosed as a basis to claim standing, Plaintiffs pivot to much more general assertions that they generally have interests in wildlife viewing and habitat protection, use publicly accessible areas near the Exchange, and visit other areas of the Refuge. SAC ¶¶ 14–15, 17–18, 25. These allegations are too vague and general to support standing in the first instance, as general use of an area and general interests do not establish standing. Plaintiffs also speculate as to how SpaceX's operations on the Property will affect these interests. *Id.* ¶¶ 18–26. But speculative theories of injury, even were Plaintiffs' interests cognizable, do not suffice. Thus, Plaintiffs' additional theory of injury—that their general use of other areas of the Refuge and general interest in viewing wildlife might, in the future, be harmed by SpaceX's ownership of the Property—does not save them.

#### 1. Plaintiffs' "interests" in wildlife viewing and habitat protection do not establish concrete injury

[4] For this same reason, Plaintiffs fail the redressability prong too.

First, Plaintiffs' assertions that they generally view "wildlife" within the Property from publicly accessible areas such as State Highway 4 and the Rio Grande assert only a "special interest" in the subject of wildlife, which does not support standing. Although "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing[,]" *Lujan*, 504 U.S. at 562–63, key to that interest is naming a particular species—not a general interest in wildlife viewing. *Id.* And even if a particular species is named, a plaintiff must show more than a general injury—a plaintiff must *also* show that its claimed injury is "concrete" and "particularized." *Id.* at 560, 562–63 (a plaintiff must show "*more* than an injury to a cognizable interest" (emphases added)). To be concrete, the desire to use an animal species for aesthetic purposes must be supported by facts that "listed species [are] in fact threatened by the . . . activities" and that a member of one of Plaintiffs' organizations would be "'directly' affected apart from their 'special interest' in the subject.'" *Id.* at 563 (citation omitted).

Plaintiffs' allegations here fail this test: the Center and Save RGV's member Branch asserts that she uses State Highway 4 to view "wildlife that resides in the Refuge[,]" not any particular species. SAC ¶ 15 (Branch). The Center and Save RGV's member Chapman's allegations come closer: he contends that uses the Rio Grande to view "wildlife," including plovers, that reside "within the Exchange area[.]" SAC ¶ 17 (referencing viewing plovers and "other migratory species that rely on the area"). But the Exchange area does not contain critical habitat for plovers, EA 42, Dkt. No. 26-4, thus Mr. Chapman fails to identify a listed species that is "threatened by the . . . activities." *Lujan*, 504 U.S. at 563. Accordingly, Plaintiffs do not allege injury-in-fact based on desire to use any certain species: they fail to name species or fail to state how identified species will be affected by the Exchange, and thus they fail to lay a foundation for

how the Land Exchange could cause them any particularized injury relating to wildlife viewing. *Lujan*, 504 U.S. at 562–63.

Mr. Chapman's interest in habitat protection suffers from the same problem as his and Ms. Branch's general interest in wildlife. SAC ¶¶ 17–18 (alleging that Mr. Chapman advocates for wildlife that uses the land, has endeavored to preserve the Boca Chica areas, including the Property, and that SpaceX's planned activities on the Property will adversely affect "[h]is interests in observing and protecting the Boca Chica area, including the Lower Rio Grande Valley National Wildlife Refuge"). Interest, even intense interest, does not suffice, *Lujan*, 504 U.S. at 562–63, and interest may not be conflated with injury: "genuine interest" alone cannot satisfy the "particular concrete injury" requirement. *United States v. Richardson*, 418 U.S. 166, 176–77 (1974); *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 486 (1982) ("[Article III] standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy."). There must be concrete and particularized injury to a legally cognizable interest. What's more, there is no way for the Court to fashion proper redress to protect an interest in "habitat protection" generally, or "wildlife viewing," for that matter. Mr. Chapman's interest in habitat protection in the Boca Chica area is too abstract to confer standing. *Id.* at 485–86. Without specifics, Mr. Chapman presents only a "general legal, moral, ideological, or policy objection to a particular government action[,]" which does suffice. *All. for Hippocratic Med.*, 602 U.S. at 381.

**2. Use of the Refuge generally does not establish standing**

Ms. Branch's and Mr. Chapman's contentions that they use some Refuge lands, somewhere, like their assertions that they view "wildlife" within the Property from public access points near it, are too vague and general to support standing. First, neither Ms. Branch nor

Mr. Chapman identify any "specific site" that they use. *Ctr. for Biological Diversity v. U.S. EPA*, 937 F.3d 533, 538–39 (5th Cir. 2019) (faulting plaintiffs for not identifying specific sites that they use). Instead, they assert that they use areas "surrounding" the Property, "as well as other areas of [the Refuge]." SAC ¶ 14–15. But Refuge areas "surrounding the Exchange" are *all* areas around the Land Exchange except for south (which is Mexico), and that area extends for miles and is not open for general public use anyway. 50 C.F.R. § 25.21 (2026); *see* De La Garza Decl. ¶ 5 (citing 50 C.F.R. § 25.21). The Refuge lands immediately next to the Property are also not open to the public, and no Plaintiff has a legal right to use those lands.[5] Plaintiffs thus cannot establish harm based on use of the lands surrounding the Land Exchange or any attendant effects of SpaceX's activities on those lands. Plaintiffs' allegations that they use areas "surrounding the Refuge" fail to demonstrate standing.

Plaintiffs' assertions that they use "other areas of [the Refuge]", SAC ¶ 14, that may be affected by the Land Exchange are also not enough. *Ctr. for Biological Diversity v. U.S. Dep't of Transportation*, 180 F.4th 796, 803–04 & n.19 (5th Cir. 2026) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)). Like with pollution, courts cannot simply presume that development or change in habitat in one place will affect all would-be plaintiffs everywhere. *See Cent. & S.W. Servs., Inc. v. U.S. EPA*, 220 F.3d 683, 700–01 (5th Cir. 2000) (holding that a member of the Sierra Club could not establish an injury in fact because he could not show waste left in a landfill would reach "the aquifer that supplies his drinking water"); *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 667 (D.C. Cir. 1996) ("In the case of broad rulemaking, a court may not assume that the areas used and enjoyed by a prospective plaintiff will suffer all or any

[5] The only other areas near the Property are State Highway 4 and the Rio Grande, both publicly accessible, but standing cannot be established on general interest in viewing non-specific wildlife, as demonstrated above.

environmental consequences that the rule itself may cause."); *see Lujan*, 504 U.S. at 566–67 & n.3 (requiring a factual connection between harmful activity alleged and land used). "[G]eographic remoteness" forecloses a finding of injury "when no further facts have been brought forward . . . showing that the impact . . . in those distant places will in some fashion be reflected" where the plaintiffs are. *Lujan*, 504 U.S. at 567 n.3. After all, to analyze whether a plaintiff has a "real, not abstract" injury, the Court needs to know what land he or she uses and what the effects are *on that land*, *that the plaintiff experiences*, from the challenged activity. Thus, Plaintiffs must present evidence showing a "geographic nexus" between land they use and alleged impacts from the challenged activity. *Ctr. for Biological Diversity*, 937 F.3d at 538. "Without a geographic nexus, Petitioners' members cannot suffer an injury in fact." *Id.*

Plaintiffs fail to establish a geographic nexus. The Refuge is huge—over 103,000 acres—and mostly closed to the public; even Boca Chica Beach is more than four miles from the divested Property.[6] Plaintiffs have not claimed they use any specific Refuge lands at all, let alone provided evidence to support their claims that the Land Exchange will have concrete, harmful effects on any Refuge lands that they actually (legally) visit. SAC ¶ 14 (claims that they visit "other areas of [the Refuge]" and "intend to continue to use and enjoy, frequently and on an ongoing basis, other Refuge lands"); *id.* ¶ 17 (they visit "the Boca Chica area, including the Refuge"); *id.* ¶ 25 (the Land Exchange "threatens Plaintiffs' members' regular use and enjoyment of the Boca Chica area, including the Refuge"). Their statements "simply assert some

---

[6] One member of one Plaintiff organization, Mr. Mancias, references past use of the Beach but names no effects from the Land Exchange on the Beach itself, instead speculating that future Beach *access* may be impaired by the Land Exchange. SAC ¶ 24. Plaintiffs' other allegations about the Beach are also about access, not effects on the Beach itself. *See* SAC ¶¶ 19, 22, 24, 26, 84 (referencing ancestral lands, which were elsewhere referenced as the Beach (¶ 24)). Speculative beach closures or lack of access via road closures due to SpaceX's possible future activities, however, do not establish injury from the Land Exchange. *Infra* pp. 14–17.

interest somewhere within a large geographic area," which is insufficient. *Ctr. for Biological Diversity*, 937 F.3d at 538 (the Court "must 'assure itself that' members of the plaintiff associations 'plan to make use of *the specific sites*' where environmental effects would allegedly be felt." (quoting *Summers*, 555 U.S. at 499)). Plaintiffs fail to even provide a predicate—specific lands that they use—and thus cannot establish a geographic nexus with the Land Exchange.[7]

### 3. Speculative future effects from SpaceX's ownership of the Property do not support standing to challenge the Land Exchange

Not only do Plaintiffs fail to specifically name any lands, they also fail to allege a plausible chain of causation from the Service's divestment of the Property to alleged effects on the land Plaintiffs use. *All. for Hippocratic Med.*, 602 U.S. at 385 (plaintiffs must "show a predictable chain of events leading from the government action to the asserted injury"). To the extent that Plaintiffs contend that their use of the entire Boca Chica tract, or their general "interests," will be interfered with because of road closures or other potential future activities attributable to SpaceX, SAC ¶¶ 18, 20–26, this attempt to establish concrete harm contravenes standing jurisprudence. Standing may not rest on "speculation about the unfettered choices made by independent actors not before the courts." *All. for Hippocratic Med.*, 602 U.S. at 383 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)).

---

[7] Further, Plaintiffs bring an action against the entire Land Exchange, claiming a loss to their wildlife viewing and habitat protection interests based on the divestment portion of the action, but the Land Exchange includes *gain* of habitat. Thus, to demonstrate how the Land Exchange will harm interests in wildlife and habitat protection, Plaintiffs must demonstrate how the entire Land Exchange, which is the action they challenge, will concretely and personally injure them. Plaintiffs make no effort to demonstrate that any putative habitat losses, in terms of effect on their interests in wildlife viewing and habitat protection, are greater than any gains. Without that, their theory of injury from the Land Exchange is incomplete and fails to show injury in fact from the challenged action.

As an initial matter, however, Plaintiffs do not have a cognizable interest in having a public state highway be always open, *see* 23 C.F.R. § 460.2(c) (2026) (noting exceptions to a road being "[o]pen to public travel")[8], but even if they did, it is certainly not a right conferred on them by the fact that the Service rather than a private company owns any particular lands adjacent to that state highway. Moreover, any future road closures would be an action taken by a third party, like the State of Texas, in response to safety and traffic concerns on the state highway, not a direct result of the mere October 5 transfer of adjacent property from the Service to SpaceX. Future state highway closures of uncertain timing and duration at the behest of the State fail to establish a concrete, imminent harm from a title transfer of the surrounding property.

Second, whether there will be any closures of the road or the beach in the future at all is speculative in the first instance, and certainly as to timing and duration, and thus the effects of any such closures are speculative as to any specific Plaintiff. Certainly, Plaintiffs have presented no evidence as to how often or how long any future road closure would be, and whether it would interfere with any specific future plans. Adding to that, SpaceX's materials show they are constructing a service road to connect the Massey Site to a point closer to Starbase, which may alleviate any traffic or closure problems on State Highway 4. Declaration of Justin Styer ¶ 38, Dkt. No. 52-1. In any event, such speculative effects—that Plaintiffs may be affected by a future road or beach closure, assuming one happens on a day and at an hour that they may want to visit the area, or they may not—do not establish a "real and not abstract" injury. *All. for Hippocratic Med.*, 602 U.S. at 381; *United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669, 688–89 (1973) ("A plaintiff must allege that he has been or will in fact be

---

[8] These regulations have to do with public road mileage for apportionment of Federal highway funds. They define public road as "any road under the jurisdiction of and maintained by a public authority and open to public travel." 23 C.F.R. § 460.2(a).

perceptibly harmed by the challenged agency action, not that he can imagine circumstances in which he could be affected by the agency's action.").

Following from the above, Plaintiffs do not have a cognizable right in preventing SpaceX from conducting future legal activities on its own land—at least, not without a showing as to how those activities harm them, specifically, through their use of specific lands or species under the analysis set forth above, which they have not done. *All. for Hippocratic Med.*, 602 U.S. at 383 (standing may not be based on a chain of causation that is "too speculative or too attenuated"). Plaintiffs' theory of standing based on the effects of SpaceX's future activities, which is, at base, the gravamen of Plaintiffs' argument against the title transfer, SAC ¶ 23, fails because it does not connect any effects of SpaceX's activities to specific lands or wildlife that they use and enjoy. Thus, even if potential future harms from SpaceX's activities were cognizable as reasons to stop the Exchange (and they are not), Plaintiffs have failed to establish that they will suffer a real, personal injury from this speculative, attenuated chain of causation. *All. for Hippocratic Med.*, 602 U.S. 383–85.

Nor can Plaintiffs argue with development on the Property generally, SAC ¶¶ 21–22, without showing how such development concretely injures a cognizable interest. While they have named wildlife viewing and habitat on the Property, *see id.*, they must name specific recreational or aesthetic interests that will be concretely affected, and the general interests they have named do not suffice for the reasons given above. Further, to the extent they indicate that they simply do not want to see a built environment instead of a natural one, *id.* mere distaste or disagreement with a view is not a legally cognizable injury. *Nat'l Park Serv. v. Nat'l Tr. for Historic Pres. in the U.S.*, 609 U.S. 1068, 1072–73 (2026). Moreover, if they are harmed by SpaceX's future activities, that might be the basis for a future claim against SpaceX but is not

grounds for unwinding the title transfer here, which did not proximately cause any of those future, speculative effects. In any event, Plaintiffs have not shown a personalized and real harm—they speculate about future (unknown) effects on unnamed animals and unspecified parcels of land, that they may not even be legally able to use. Plaintiffs' litany of general complaints about SpaceX's future activity thus does not provide the specific harms from the government action that is necessary to maintain this suit.

### C. Plaintiffs have not established standing for their NHPA claim

Plaintiffs press a historic preservation claim as well as an environmental one, SAC ¶¶ 116–122 (NHPA claim), but their complaint is devoid of any allegations that they even have particular, personal *historic preservation* interests, much less that those interests are affected by the Land Exchange. *See id.* ¶¶ 14–18, 24–25 (plaintiffs' interests, confined to alleged "recreational, spiritual, professional, scientific, educational, and aesthetic benefit"). "[S]tanding[,]" though, "is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press." *TransUnion LLC*, 594 U.S. at 431; *Friends of St. Frances Xavier Cabrini Church v. Fed. Emergency Mgmt. Agency*, 658 F.3d 460, 466 (5th Cir. 2011) ("In considering standing, this court proceeds on a claim-by-claim basis."). Here, Plaintiffs' stated concerns are environmental, as set forth above, not historical. Plaintiffs allege no personal harm based on the Service's alleged failure to preserve the historic character of the site, the NHPA's concern. 54 U.S.C. § 300101 ("Policy"). A general reference to "adverse effects" to the battlefield, SAC ¶ 84, does not suffice. Plaintiffs have failed to allege a concrete injury in fact to *their* particular, cognizable historic interests for purposes of any claim under the NHPA. They have not established standing for that claim in the first instance. *TransUnion LLC*, 594 U.S. at

417 ("No concrete harm, no standing."); *Friends of St. Frances Xavier Cabrini Church*, 658 F.3d at 466.

In addition, "a statutory cause of action extends only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (citation omitted). Thus, in *Vieux Carre Property Owners*, the Fifth Circuit found that the appellant organization could not proceed with its APA claim under the Rivers and Harbors Act ("RHA") because its concern was historic preservation rather than the navigability of the Mississippi River. *Vieux Carre Prop. Owners, Residents & Assocs., Inc. v. Brown*, 875 F.2d 453, 458 (5th Cir. 1989) (finding standing under the NHPA not the RHA). Likewise, in *Committee for Auto Responsibility*, the D.C. Circuit held that "appellants [had] satisfied standing requirements to charge violations of NEPA but not of the Public Buildings Amendments ["PBA"] of 1972." *Comm. for Auto Resp. (C.A.R.) v. Solomon*, 603 F.2d 992, 998 (D.C. Cir. 1979). There, plaintiffs had alleged environmental injuries sufficient to support a NEPA claim against the government action but had not established what losses they experienced from GSA's alleged violations of the PBA, the purpose of which was to provide the government with an economical and efficient system for the procurement, utilization and disposal of property. *Id.* at 998–99. Thus, they did not have standing to maintain a suit for alleged violations of the PBA. *Id.* at 999 ("While appellants have urged that their health and conservational values are similarly diminished by GSA's failure to exact commercial parking rates from federal employees, it seems clear that these asserted losses fall well outside the zone safeguarded by the Amendments.").

Plaintiffs whose alleged injury is based on environmental harms and species protection—like here—thus do not have interests that "systematically, not fortuitously" align with those that

Congress had "in mind" when enacting the NHPA. *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 924, 927 (D.C. Cir. 1989). Plaintiffs' failure to present any historic preservation interests, let alone any injury in fact, means they cannot press a cause of action under the NHPA—they advance no allegations of harm falling within the zone of interests of a historic preservation statute, for which any alleged environmental injuries are not enough. *Lexmark*, 572 U.S. at 129; *Nat'l Tr. for Historic Pres.*, 609 U.S. at 1072–73 (discussing need for injury beyond distaste or disagreement as well as a cognizable interest).

In sum, Plaintiffs have failed to allege a historic preservation injury in the first instance—Plaintiffs have not established the requisite personal stake in historic preservation to show that any member would have standing. *All. for Hippocratic Med.*, 602 U.S. at 379 (plaintiffs without a personal stake are mere bystanders). Moreover, the alleged environmental injuries of Plaintiffs are outside the zone of interests that the NHPA was intended to protect. Plaintiffs' NHPA claim cannot ride the coattails of unrelated injuries. *See C.A.R.*, 603 F.2d at 998–99.

Finally, even if some member might have sufficient historic preservation interests and could possibly identify a concrete injury, Plaintiff organizations the Center and SaveRGV could not advance it. They are focused on environmental issues, not historic preservation: the Center states that it "works through science, law, and policy to secure a future for all species[] . . . hovering on the brink of extinction.'" SAC ¶ 10. Its mission is "saving life on earth," and it focuses on biodiversity[9]; in a press release, it described itself as "a national, nonprofit conservation organization with more than 1.8 million members and online activists dedicated to the protection of endangered species and wild places."[10] SaveRGV "advocates for environmental

---

[9] Center for Biological Diversity, "About the Center," https://www.biologicaldiversity.org/about/ (last accessed Nov. 9, 2026).

[10] Center for Biological Diversity, "Emergency Injunction Sought to Protect Texas Wildlife

justice and sustainability through addressing the causes and consequences of habitat loss and climate change that affect the health and well-being of the entire Rio Grande Valley Community." SAC ¶ 11.[11] Historic preservation interests are not "germane to [their] purposes" as required for them to have standing to press their members' claims. *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 343–44 (1977). And the "asserted [environmental] losses fall well outside the zone safeguarded by" the NHPA, meaning the Court must deny standing. *C.A.R.*, 603 F.2d at 999. Accordingly, even if the Court finds that Plaintiffs have standing based on environmental harms sufficient to support a Refuge Act claim, which they do not as explained above, the Court lacks jurisdiction over their NHPA-based challenge to the Land Exchange.[12]

* * *

The allegations in the second amended complaint fail to establish injury-in-fact. As before, Plaintiffs cannot establish injury based on direct use of the land. And their claims that they use other portions of the Refuge are too vague and general to support standing—they fail to establish geographic nexus between any lands that they specifically use (because they have not identified any) and effects flowing from the divested Property. Likewise, their claims that they generally view "wildlife" in the area, or even in the Property, or want to protect habitat in the

---

Refuge From SpaceX", https://biologicaldiversity.org/w/news/press-releases/emergency-injunction-sought-to-protect-texas-wildlife-refuge-from-spacex-2026-07-20/?_gl=1*1lunetf*_gcl_au*MTUzMTk1MDg5NS4xNzkzMzIyNDgz (last visited Nov. 9, 2026)

[11] Save RGV, "About Us", https://www.savergv.org/about-us (last visited Nov. 9, 2026).

[12] The other two Plaintiff organizations have failed to establish standing at all. Mr. Mancias, the representative from the Corrizo/Comecrudo Nation, provides allegations that he has used Boca Chica Beach and has been prevented from accessing the Beach in the past. These allegations fail to establish a concrete injury from the Land Exchange, for all the reasons given above. And there are no claims at all from any member of the South Texas Environmental Justice Network (STEJN) in the second amended complaint, precluding standing for that organization. Without standing established for a member, an organization does not have associational standing. *Hunt*, 432 U.S. at 343. Plaintiffs Carrizo/Comecrudo Nation of Texas and STEJN must be dismissed from the suit. *See id.*

area, are not specific enough to demonstrate a concrete injury flowing from the divestment of the property—at most, they demonstrate an interest, which is not enough, and they fail to take account of the entire effect of the Land Exchange on their desire to view wildlife or protect habitat. And any specifics as to listed species that they could allege would be controverted by (conceded) facts showing that no listed species will suffer adverse effects from the divestment of the Property; some species may even benefit from the Exchange overall. At base, Plaintiffs have alleged an abstract environmental harm, but it is harm to the plaintiff, not harm to the environment that counts. And Plaintiffs have utterly failed to allege any historic preservation injury to support their NHPA claim, rendering it a non-starter.

Thus, Plaintiffs have failed to show a personal stake. Plaintiffs have, at most, demonstrated a "general legal, moral, ideological, or policy objection to a particular government action[,]" *All. for Hippocratic Med.*, 602 U.S. at 381, and "distaste" and "disagreement with" the Land Exchange, but neither of these are enough. *Nat'l Tr. for Historic Pres.*, 609 U.S. at 1072–73 (citation omitted). Accordingly, they are mere bystanders—and a Federal lawsuit is not "a vehicle for the vindication of the value interests of concerned bystanders." *Valley Forge Christian Coll.*, 454 U.S. at 473 (citation omitted).

The Court should dismiss the complaint.

## II. Plaintiffs do not challenge final agency action reviewable under the APA.

Even if Plaintiffs could establish standing, their claims must be dismissed for lack of jurisdiction because they are not based on final agency action. Judicial review under Section 706(2) of the Administrative Procedure Act ("APA") is limited to "final agency action." 5 U.S.C. § 704; *see also* SAC ¶¶ 8, 61, 115, 122 (citing the APA as the basis for the Court's review). Not everything an agency does constitutes final agency action reviewable by the courts. *Am. Airlines,*

*Inc. v. Herman*, 176 F.3d 283, 286–93 (5th Cir. 1999) (reviewing actions). For an agency action to be "final," it must (1) "mark the consummation of the agency's decision making process" and (2) "be one by which rights or obligations have been determined, or from which legal consequences flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation modified). "Interlocutory" actions are not reviewable under the APA. *Id.* at 178. In this Circuit, lack of final agency action at the time of complaint is a fatal jurisdictional flaw that cannot be corrected through amending the complaint. *Louisiana v. U.S. Army Corps of Eng'rs*, 834 F.3d 574, 584 (5th Cir. 2016) ("Final agency action[] . . . is a jurisdictional prerequisite of judicial review."). Because Plaintiffs sued before the Service approved the Land Exchange and before the Service signed the land exchange agreement, the Court lacks subject matter jurisdiction.

Plaintiffs' claims challenge the Land Exchange under 5 U.S.C. § 706(2). SAC ¶¶ 115 (Refuge Act), 122 (NHPA); *see also* First Am. Compl. ¶¶ 120, 128, 142, 147. Plaintiffs base these claims on the environmental review the agency prepared in considering the Land Exchange—the FONSI. Compl. ¶ 95; First Am. Compl. ¶ 96; SAC ¶ 89 (describing the FONSI as the "final decision"); Dkt. No. 24-1 at 15–16. The FONSI in this case, however, fails both prongs of *Bennett*—it is not final agency action. First, the proposed land exchange needed additional approval within the Service after the FONSI. 342 FW 5.7(E)(2); *see* SAC ¶ 90. In the context of the agency process here, the FONSI was a decision to recommend approval, *see* Dkt. No. 24-1 at 15–16, which the Service followed with an actual recommendation to the Director, who held the authority to approve or disapprove the proposed land exchange. Dkt. No. 26-21. But even then, the process was not complete: only after the Director's decision, and only after the thirty-day congressional review, did FWS sign the Land Exchange Agreement, committing the agency to the land transfer. *See* Jacks Decl. ¶¶ 19–30, Dkt. No. 14-1 (outlining the steps

required after the Decision Record and prior to signing the Land Exchange Agreement); Dkt. No. 56 (notice of signing of the Land Exchange Agreement on September 1, 2026). The signing of the Land Exchange Agreement opened a period of escrow and title work before the final title transfer.

The FONSI documents the Service's decision to continue with the land exchange process, but that action was not the consummation of the agency's decision making. Indeed, the Seventh Circuit recently denied as premature a request to stop a proposed land exchange by FWS based on the environmental review under NEPA. *Driftless Area Land Conservancy v. Rural Utilities Serv.*, 74 F.4th 489, 495–96 (7th Cir. 2023) (discussing that an environmental review under NEPA "differs from a decision to approve any given action"). Like in *Driftless*, the FONSI identified by Plaintiffs is "a prerequisite" to the land exchange "rather than the end of the agency's process." *Id.* at 494. Plaintiffs' ineffective attempt to amend their complaint to add additional facts about the approval process makes this point—if they could defend the finality of the FONSI, they would not need to add additional facts about any later decisions. SAC ¶¶ 91, 106, 109.

What's more, the FONSI did not determine "rights or obligations" or have "legal consequences," and thus does not satisfy the second requirement for final agency action. *Bennett*, 520 U.S. at 178 (citation omitted). Any alteration of legal rights or obligations here happened when the Service signed the Land Exchange Agreement. *See* Jacks Decl. ¶¶ 18–30. The FONSI thus, at best, "only affects . . . rights . . . on the contingency of future administrative action" and is, therefore, "nonfinal" agency action. *Am. Airlines*, 176 F.3d at 288 (quoting *Rochester Tel. Corp. v. United State*s, 307 U.S. 125, 130 (1939)); *Dalton v. Specter*, 511 U.S. 462, 469–70 (1994) (holding that agency reports recommending military base closures were not final agency

actions because they had "no direct consequences" absent "certification of approval" from the President (citation omitted)).

Nor can the FWS Director's decision to approve the exchange or the Service's signing of the Land Exchange Agreement during the pendency of this suit save Plaintiffs' claims. "The fact that [an agency's] final decision . . . is the same as its interlocutory decision does not retroactively transform the interlocutory decision into a final decision." *MediNatura, Inc. v. FDA*, 998 F.3d 931, 940 (D.C. Cir. 2021). And Plaintiffs may not amend to cure a threshold, jurisdictional issue, as jurisdiction did not exist at the time of filing and "amendment may not create subject matter jurisdiction when none exists." *In re Katrina Canal Breaches Litig.*, 342 F. App'x 928, 931 (5th Cir. 2009) (per curiam). Instead, the complaint defines Plaintiffs' claims and it does not challenge the executed land exchange, because it had not happened at the time they filed. *See generally*, Compl.; *Louisiana v. Biden*, 622 F. Supp. 3d 267, 286 (W.D. La. 2022) ("Subject matter jurisdiction is determined at the onset of the suit. The action cannot be a final agency action under the APA before it occurs."). In fact, Plaintiffs still do not challenge the final decisions, even though they reference them: their substantive claims against the Land Exchange are based on the EA and the FONSI. SAC ¶¶ 98–104.

Plaintiffs' challenge to only interlocutory steps in the Land Exchange's execution is not an empty formality. An administrative record is tied to the challenged agency action, and does not contain information post-dating the challenged action (and that would inherently not have been before the agency when it made its decision). *Common Sense Salmon Recovery v. Evans*, 217 F. Supp. 2d 17, 20–21 (D.D.C. 2002). Here, for example, the additional agency actions after the FONSI, like the Director's Approval and the signed land exchange agreement, would not be in the administrative record for this lawsuit based on the FONSI, and thus key documents that

could affect the merits of the suit would not be before the Court.

The FONSI thus fails to meet both prongs of *Bennett v. Spear*. It was not the consummation of the agency's decision-making, and no legal consequences flowed from it. Plaintiffs must base their complaint on final agency action to establish jurisdiction. *Veldhoen v. U.S. Coast Guard*, 35 F.3d 222, 225 (5th Cir. 1994) ("The APA permits 'non-statutory' judicial review only of 'final agency action.' If there is no 'final agency action,' as required by the controlling statute, a court lacks subject matter jurisdiction." (citations omitted)). Plaintiffs did not base their claims on final agency action, so there is no waiver of sovereign immunity and no subject matter jurisdiction in this Court. *Id.* Accordingly, Plaintiffs' second amended complaint must be dismissed for lack of subject matter jurisdiction.

## CONCLUSION

For these reasons, the Federal Defendants respectfully request that the Court dismiss Plaintiffs' second amended complaint.

Dated: November 10, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
United States Department of Justice
Energy & Natural Resources Division

*/s/ Alison S. Vicks*
ALISON S. VICKS
(*Pro Hac Vice*)
Trial Attorney
KRYSTAL-ROSE PEREZ, TX Bar No. 24105931
Senior Trial Attorney
U.S. Department of Justice
Natural Resources Section
150 M Street NE
Washington, DC 20002
(202) 297-2862 (Vicks)
(202) 532-3266 (Perez)
alison.vicks@usdoj.gov
krystal-rose.perez@usdoj.gov

*Attorneys for Defendants*